# EXHIBIT

# 1

CRAIG R. FRYE

vs.                                                    TRANSCRIPT

THE TOWN ON VINTON

       Transcript of Grievance Hearing in the case of Craig R. Frye v. The Town of Vinton,

held before the Honorable Jonathan Apgar on March 7, 2018.

           APPEARANCES:  Mr. Jeremy Carroll
                   37 Campbell Avenue SW
                   Roanoke, VA   24001
                   Counsel for Town of Vinton

                   Mr. Dale Webb
                   P. O. Box 4126
                   Roanoke, VA   24015
                   Counsel for Grievant

# I N D E X

GRIEVANCE HEARING                    MARCH 7, 2018                                        1

WITNESSES FOR THE GRIEVANT:

THOMAS FOSTER

    DIRECT EXAMINATION QUESTIONS BY MR. WEBB                                16
    CROSS EXAMINATION QUESTIONS BY MR. CARROLL                             129
    REDIRECT EXAMINATION QUESTIONS BY MR. WEBB                             171
    RECROSS EXAMINATION QUESTIONS BY MR. WEBB                              174
    FURTHER REDIRECT EXAMINATION QUESTION S BY MR. WEBB                    174

WILLIAM CUNNINGHAM

    DIRECT EXAMINATION QUESTIONS BY MR WEBB                                175
    CROSS EXAMINATION QUESTIONS BY MR. CARROLL                             197
    REDIRECT EXAMINATION QUESTIONS BY MR. WEBB                             200

CRAIG R. FRYE

    DIRECT EXAMINATION QUESTIONS BY MR. WEBB                               202
    CROSS EXAMINATION QUESTIONS BY MR. CARROLL                             215
    REDIRECT EXAMINATION QUESTIONS BY MR. WEBB                             222

WITNESSES FOR THE TOWN OF VINTON:

VALERIE CUMMINGS

    DIRECT EXAMINATION QUESTIONS BY MR. CARROLL                            223
    CROSS EXAMINATION QUESTIONS BY MR. WEBB                                224

GRIEVANCE HEARING FOR CRAIG FRYE          3/7/2018

JUDGE APGAR:  We're here in the Administrative Hearing in the appeal of Craig R.

Frye.  There's been a request by the Town of Vinton to close the Hearing.  We are closing the Hearing,

which is their right.  So everyone will have to step outside unless you are a party or an attorney.  With

that, Mr. Webb, are you ready on behalf of Mr. Frye?

MR. WEBB:  Yes, Judge, I am.

JUDGE APGAR: Mr. Carroll, are you ready on behalf of the Town of Vinton?

MR. CARROLL:  Yes sir.

JUDGE APGAR:  We'll be happy to hear whatever opening statement either side would

like to make.

MR. WEBB:  Thank you.  Good morning to the panel.  As you know, my name is Dale

Webb and I represent Craig Frye in this Grievance Matter.  I want to thank basically each of you guys for

being here today as a panel member.  I know that pay is not a motivating factor for your service today so I

appreciate the fact you would take your valuable time of your day to be here to hear this case.  At the

outset, I think it's important to point out that Mr. Frye has not had any Hearing or input at the Federal

level and this is the only Hearing opportunity he's ever had in order to get his side to respond to these

charges.  The U.S. Attorney who made their decision in this case did so without any Hearing, without any

input from Craig Frye.  So three days after the Town of Vinton sent records up to the U.S. Attorney, the

U.S. Attorney made the decision that Craig Frye could never testify in Federal Court again.  That was

without any input from Mr. Frye.  That was without an opportunity for him to come in and explain his

answer.  The decision was made three days later, no input, no Hearing.

The Town of Vinton terminated Mr. Frye in September of 2017.  It is based on alleged

misconduct, that he was untruthful when he provided his responses to a number of Giglio questions.

Those are questions posed to him by AUSA Attorney Shelvey on April 27, 2017.  The Town of Vinton,

and there's an issue here, Jeremy and I were talking about it, as to who has the burden of proof.  The

policy says we go forward.  There's an issue of whether, I think Jeremy's position, we're going to both

look at it and try to get for the panel what we believe the law is, but Jeremy's position is that we have the burden of proving that this was an arranged decision or was an improper decision.  There's another question whether they have the burden of proving willful misconduct.  That normally is the standard, is that Mr. Frye, when he answered these questions, must at first answered the questions falsely.  Then the second part of the inquiry, he must have knew at the time he answered those questions that he was answering falsely.  So there is an intentional, willful aspect of this.  The actual charge is willfully failed to give this information at the proper time.  So there's two-parts required.

First, did he answer the question truthfully and second, was he willful and he knew he was not answering the question truthfully.  I think relevant to both of these, and I think for this panel's inquiry today, are a couple of issues.  One is what type of material is in fact Giglio material, and you're going to hear opposite positions on that, and that's what the panel has to decide as to whether the response was false.  The town's position is that any complaint, whether it's founded or unfounded, must be turned over if it addresses truthfulness or bias.  So from the town's perspective, if a complaint is made, even if it's unfounded, that has to be turned over as part of Giglio, and that's in Chief Foster's letter as the analysis implied.  From their position any findings that that complaint was unfounded are irrelevant to the Giglio requirement.

You're going to hear the opposite position that the local ATF where Mr. Frye was supervised and worked and Mr. Frye believe that findings are critical in determining whether that information has to be disclosed.  So for example, if there's a complaint and then there's an investigation and it's found unfounded, their belief, the way they've always operated is that's not disclosed under Giglio, a very important distinction as to whether it's false, but more importantly even if the town convinces this panel they're right, I don't think they are, but if they convince this panel that all complaints have to be disclosed, the second part of this inquiry is they have established that Mr. Frye knew that they had to be disclosed had he answered it untruthfully.  Willful intent, willful intent, that's the second part of this inquiry.

The second big difference in how this Giglio policy was supposed to work dealt with prior disclosures. You're going to hear the town's position that every time an agent answers a Giglio question that they have to answer the question reviewing the record from beginning of time, which often can be high school, college, if they did something on a test. Every time they answer that question, they have to review that Giglio person, or the questioning person, from the beginning of time to the present and if they fail to do that, even though they previously disclosed that to the Giglio officer and to the U.S. Attorney, even if they previously disclosed that, if at this set of questions they don't disclose it again, it's misconduct and they can be fired for it. That's the town's position. That's how they've analyzed this case.

The opposite position of that you're going to hear from the ATF, the local renegade ATF and from Mr. Frye is that once you give a private disclosure you don't have to in a subsequent Giglio questionnaire answer that same question again. You don't to provide that same question because they have it. He used distinction in how to speak to the policy works. There are several reasons why the local ATF and Mr. Frye believe it and have done it that way since the beginning of time. One is these candid conversations you're going to hear about. That's the question where they ask the Giglio questions. They call it a candid conversation. That conversation always lasts less than five minutes. It's not some lengthy conversation so to say that in less than five minutes you're going to review your career from beginning of time to the present is simply impractical and never happened. The second reason that they know that it's just an update is that there's a Giglio officer. There's a Giglio file. The Federal people retain that information because they ultimately have to review that in their disclosures. This is a situation where they're maintaining the file. The officer, as things happen, is sending that information up and they have the file so they're not going back and re-plowing old ground. They're just updating what they've already given. A huge distinction between the town's position and the local AFT and Craig Frye as to how that question would be asked. So when you're looking at these questions, this analysis has to be one, was it a founded or unfounded complaint. If it's unfounded from their belief, they don't have to reveal it. Secondly, the issue is do they have to provide an answer from the beginning of time or if they've already

disclosed it, do they have to re-disclose it again.  Those are the two concepts here that are very important in the evidence of this case.  Again, even if the town proves that prior disclosures had to be re-sent again, it has to be willful intention.  So did Mr. Frye know that?  Was he trained that way?  Is that how the whole ATF office, if the whole ATF office is doing it the way Mr. Frye was doing it and understanding it that way, is he the one who is intentionally violating the policy?  It's a willful intent.  You have to prove willfully he knew that.  I think the training and practice will show that he did it the way he's always done it and understood it to be.

Now you're going to hear evidence today that recently Rick Mountcastle took over as U.S. Attorney and during that period of time after he came in, he started changing a wide variety of policies or procedures.  That caused a lot of problems between the ATF and the U.S. Attorney's office because these procedures were in place, the way they had been doing all these things all this time were suddenly being eliminated or changed.  For example, the informant procedures and things like that caused a lot of disagreement between them.  You'll hear about that atmosphere.  I think that atmosphere plays a lot in this decision, but in any event the ATF had asked Rick Mountcastle, "Give us training in these changes and procedures, of what you're thinking we're supposed to do.  Tell us about how we're supposed to be answering these Giglio questions."  He never gave them to them.  At the time Mr. Frye provided his answers, the U.S. Attorney's office had never came to them and said, "Here's how we want this policy procedure implemented."  Never trained them, never told them that.  So if they had a policy in place, they sure didn't let the ATF know about it.

You're going to hear evidence today that from the standpoint of how the actual Giglio policy was implemented by the U.S. Attorney's office was haphazard.  You're going to hear that some U.S. Attorneys never asked the question.  You're going to hear that other U.S. Attorneys asked a variety of the type of question.  It was kind of hit or miss, but in any event when the ATF and Mr. Frye were answering those questions when they were asked, it was in the form of an update.  You've got my Giglio file.  There's nothing changed since the last time I gave it to you.  If it is, this is what it is.  If it hasn't changed from when I previously gave it to you, the answer is "No, there's no update."  That's how they

answered it. They've been doing that for a long time that way. So in this case you're going to hear that Mr. Frye, when he answered the Giglio questions that day, understood and believed that unfounded complaints do not have to be revealed, and secondly, he was providing an update from what he had given to them before. He had already disclosed it to them. He didn't think he had to go re-disclose to them again. That was his belief. That was the common practice. That's how he and the ATF people were doing it at the time.

There's not going to be any dispute really in the facts of this part of the case. That is that on the day Mr. Frye answered these questions to U.S.A. Attorney Shelvey that he told her, "Go see my Giglio file. Bassford has my Giglio file. He's got it" and when he answered the questions, he said "No" because he knew he had no change or no discipline, no reprimands, no complaints since the last time he'd updated that file. So it's undisputed he told her, "Go see the Giglio file", that's the reason because they maintain all the prior responses. They maintain all the prior information. You'll hear it's a phone call. It's less than five minutes because they were quick and he's telling them there's no update. He's not going back there re-plowing. That's not how it was done. In their book today, I've tried, I spent a lot of time. I hope it's turned out to be helpful, but in the Exhibit book, which is this white book, the very first exhibit are the Giglio questions. Keep in mind that the officer never sees these questions. It is something that the U.S. Attorney has. Sometimes they read these questions. Sometimes they don't, but this is the format of the questions that they had to read from. Mr. Frye would not see them. He'd be on the phone. He would be hearing the questions read to him. I want to tell you about just a couple of things in this book that are important. Number three, you probably have seen that before, but that's our responsive letter to the allegation of misconduct, but more importantly so I can explain to you, Number four, that is the charging letter in this case. That is Chief Foster, September 15th, 2017 charging that. I have placed so this makes sense. In his charging letter, he has 17 different attachments, and that's what the yellow stickers are so that when we get to this charging letter and he says "Attachment 1 for 17", that's what that is.

The other thing is what we know is that three days after the town released these records, U.S. Attorney Mountcastle made a finding that Frye was a Giglio officer. He could never testify in Federal Court again. Three days after he got these documents. This panel is going to spend more time reviewing this case than the U.S. Attorney's office did. They basically had only the limited documents that were sent by the town and based on those documents, they made that decision.

Regarding the town's actions, what you're going to hear, that the time that the town sent these limited documents, they knew that they had destroyed all of their Internal Affairs Investigation files. The files where they investigated the complaint, and they had a finding, whether it's unfounded or not, all that's destroyed. The records they sent were on a, they call it a Disciplinary Scanner File so people refer to it as a Seeker file, but they have a smattering of documents that are not the complete file. For a prime example, there is an example in this case. They sent to the U.S. Attorney a complaint by Brian Holohan, the Assistant Commonwealth Attorney, had a concern, a complaint that Mr. Frye was not truthful during some testimony. Well, the complete file, the Investigation file, the Town of Vinton did an investigation. They made a finding, that's not true. There's no inconsistency here. It comes back unfounded. Mr. Frye has no Brady issue. He has been testifying consistently in this Trial. There's a finding of that. The town doesn't know that and the town sends the complaint to the U.S. Attorney's office that he has lied to a Commonwealth Attorney. Well, because they didn't have a complete file, they re-investigate the case. Mr. Foster goes and talks to Brian Holohan and gets more information from him. The U.S. Attorney, Laura Rottenborn, goes and talks to Holohan and gets the investigation response from him. Based on that, they come up with a different conclusion than the Town of Vinton did at the time they did the investigation when they said it was unfounded. They find that there is something there and that that's the basis for misconduct. So this issue, the town's failure to keep these complete files and send only complaints when they did send the investigation, it had disastrous consequences in this case. It's painting a picture that Mr. Frye had complaints he didn't turn over when there had been an investigation. It was unfounded and they didn't have to turn it over. So the actions of the town here are at issue.

I point out when we look at the law today the town had no obligation to send the records to the U.S. Attorney. There's no law that required it. In fact, the law and policy that was in place is quite obvious of that. First, the town's policy was that before these records were sent to an outside person, two things have to happen. One, Mr. Frye would have to give consent, and two, the Town Manager would have to sign off on the documents. The policy was never followed. Mr. Frye had no input. If they had followed that policy and if Mr. Frye had came in and said, "Hey, that document is not complete. There's an investigation finding. If you're going to send it, let's send the whole record." He never had an opportunity to do that. They just sent the complaint. The second thing, there's laws dealing with the Data Dissemination Act that says the Town of Vinton has to keep complete files. They have to due diligence to make sure the records they have and are sending out to people are complete. Sending a complaint when you don't send the investigation saying it's unfounded, that's not a complete file.

More importantly, there are criminal laws. There's a law of expungement and I know a number of you are going to know all about the laws of expungement. It says when you get an expungement order from a Circuit Court Judge, the records regarding that arrest, that event, are removed because it's so prejudicial. That had been done in this case. Mr. Frye, a long time ago, had a business partner who basically filed some complaint and he was arrested, the case completely dismissed, no merit. A Court Order expunged that entire record. The Town of Vinton said they saw a mug shot of Mr. Frye, which shouldn't exist. A mug shot is a part of the Court record. They used that and said that he had been arrested and they gave that to the U.S. Attorney. The U.S. Attorney, up till today, thinks that Mr. Frye was actually convicted of a felony. He's said that number of times when that's completely untrue. There was an arrest. It had been expunged and removed from the case. So they find he committed misconduct in saying, "Well, you failed to tell us that you had had a previous arrest." Well, when he answered the question, he said "That's expunged. That's gone. That doesn't exist. That arrest has been removed from my record, removed from existence" and they're saying "You should have told us anyway." No training. He has to reveal an expunged arrest? Again, it goes to the willful intent. Would he have known that? No, and the question didn't ask "Tell me about expunged arrests." It said, "Arrests". So that aspect of

this case and how the town has acted and the documents they sent is an issue in this case because the record they sent to the U.S. Attorney was not complete. It paints a picture of him that they so like instantly ruled on three days later. "You're a Giglio cop. You can never testify in Federal Court again." That's how egregious the record is of what they sent up.

You're going to find as we go through the charges that in each case one, that he had already had a prior disclosure. He disclosed every one of these things at the time that they had to be disclosed. They knew it. He gave it to them. His position and the ATF's position is you don't keep re-sending it up. That would just create some big huge file. I mean you send up new stuff. You don't send up the old stuff. Secondly, anything he did send up, he believed based on the Giglio policy it was unfounded or didn't meet a complaint or a finding of a complaint, he didn't have to send it up.

I'm going to tell you about another key document in this case that answers a lot of the questions this panel is going. If the panel will turn to Document 17, Exhibit 17, that is a letter from Chief Herbert Cooley dated October 22nd, 2009. You'll see there Chief Cooley has reviewed all the records of the Vinton Police Department, all the files, all the personnel files and he says, "This Department has looked into any and all complaints with no exception. Nothing in these matters rose to the level of disciplinary action against Detective Frye, nor do they put his honesty into question. I further state that if I felt that Detective Frye was not completely honest and trustworthy, he would not be working for this Department." That's for sure. If he felt he wasn't honest, he wouldn't have been here, but he was. This date was also critical. You can circle October 22nd, 2009, and the reason is the Town of Vinton in this case is going back and charging him with records that existed before October 2009 when his Chief had reviewed everything and made a finding there is no impeachable evidence. There's nothing here.

More importantly, on Exhibit 18, the Court at the time, Judge Conrad, there was a Motion for an in camera review where they reviewed all the records of Craig Frye, and you'll see on the second page references that they were used as a prior personnel file, which is Exhibit 19, at the time and also they had Chief Cooley's letter. The U.S. Attorney at the time was arguing prior to 2009 there is no impeachable Brady material response to this issue. Yet the town now is going back on a number of cases

and pulling documents before 2009 and said, "You should have revealed that. That's misconduct." Well, we think Mr. Frye should reasonably be able to rely upon his Chief, Judge Conrad's ruling on that issue and he did.

Lastly, I want to tell you some information you're going to hear today is about that in camera review. One of the charges is, and this shows you the difference in their understanding of the application of the policy. Craig Frye believed that this information, this in camera, the document, this traffic stop document which is attached to Exhibit 1, all is in the possession of the U.S. Attorney's office. They know about it. They've had a big Hearing about it and that that was a prior disclosure. One of the charges in this case is that Mr. Frye failed to disclose this when he spoke to Attorney Shelvey in 2017. I mean they think that he knows this stuff is already, the U.S. Attorney's office has already given it to them. They're thinking he has to bring it up again and tell U.S. Attorney Shelvey that. That is not how it's done. If he had already prior disclosed it, those prior disclosures do not have to once again be discussed.

Lastly, this panel is going to hear evidence regarding the atmosphere that existed between the U.S. Attorney's office and the ATF, and I hope the panel will listen to that tentatively because is that the type of atmosphere, and you're going to hear how toxic it was, is that the type of atmosphere that a decision should be made by a U.S. Attorney in three days that Mr. Frye should is now a Giglio officer. That atmosphere I think does play a lot in what happened here and the decision here so I hope the panel will listen to that information. I appreciate you guys hearing what I have to say. Thank you.

MR. CARROLL: I apologize that you gentlemen have more notebooks than I'm sure you care to have here. There are going to be multiple copies of documents and we'll be referring to different Exhibits and different notebooks, and I apologize for that. I echo Dale's comments about thanking you for your time and your efforts and your willingness to come here and help us today. This is an important matter for the town. It's an important matter for Mr. Frye. I appreciate your efforts. I'll try as I go through my opening to respond to some of Dale's comments. Some of the things he touches on I

agree with and others we do take a different approach to and a different position on and I'll address those as I go through.

Mr. Frye, as you know, was a detective with the Town of Vinton. He was assigned to the ATF Task Force so he was working with the ATF Task Force as Dale has mentioned. After a Giglio analysis, the Department of Justice determined that Frye could not serve as a government witness in Federal prosecution cases. The U.S. Attorney's office of the Western District of Virginia determined they would not use him as a witness in their cases because of concerns about his credibility. A Giglio analysis is anything that the prosecutor has to turn over to the Defense Attorneys, anything that could be used to impeach the credibility of a witness, and that's what we're dealing with here. It's information that the Department of Justice determined would have to be turned over to opposing Counsel because it impacted his credibility as a witness. As a result of the Department of Justice and the U.S. Attorneys, and I use those phrases interchangeably and perhaps I shouldn't, I apologize. As a result of the U.S. Attorney's decision, the ATF removed him from the Task Force because he would no longer be able to testify. As a result of the Giglio letter which was shown to the Roanoke County Commonwealth's Attorney, they expressed their concern that they, the Commonwealth's Attorney, would have to turn that letter over to Defense Counsel. They could not use Mr. Frye except where there were corroborating witnesses to his testimony. Otherwise it would impair the ability to prosecute cases in which he were. So this determination by the Department of Justice prohibits him from testifying in Federal Court, removes him from the ATF and extremely limits his ability to work in the state court system as well.

Now all these decisions are made by Federal parties. These are not decisions that are made by the town. The U.S. Attorney's office initiates the Giglio process. They go to Mr. Frye. They ask him questions because of their constitutional obligations to turn this information over to Defense Counsel. They ask him a number of questions. They then reach out to the agency for whom he works and asks them to disclose certain information. There is a letter dated May 3rd which is in your packet and it is where the U.S. Attorney's office has reached out to Chief Foster and asked him for certain information. Chief Foster does his job, he goes to his Ordinance and asks for, do we have any

information that we need or we should consider disclosing to the U.S. Attorney in response to this May 3, 2017 letter, and they have a disciplinary file. They have disciplinary files on everybody who has disciplinary facts, and it is scanned into the computer and it is maintained. It was produced for Chief Foster. Chief Foster reviews it. Chief Foster studies the Giglio Policy, which I'll refer to in just a second, and he makes a determination that some of these materials may be subject to Giglio disclosure. Importantly, he doesn't make this decision on his own. He speaks to SAUSA Munro who tells him specifically the timeframe is unlimited. Anything that could impact his credibility is subject to disclosure. She also tells him founded or unfounded is to be disclosed. She also tells him evidence of bias, gender/racial bias goes to credibility so it must be disclosed. So the timeline, the founded or unfounded, the bias issues all have to be disclosed according to what Chief Foster is told by the U.S. Attorney's office. That's in a phone conversation early in the process. Subsequently Chief Foster met with AUSA Rottenborn and she confirmed the same disclosure obligations. I understand that Mr. Frye may think that the disclosure obligations aren't as broad as the U.S. Attorney's office thinks, but what the U.S. Attorney's office told Chief Foster is what Chief Foster acted on, and indeed, the disclosure obligations are addressed in the Giglio policy. I'm referring to, and it's Bate stamped 00027, it's at Document 3. It's behind the July 28th letter where the Department of Justice has reached its determination that it will no longer use Mr. Frye as a witness, and it talked about unfounded allegations. It says, a carryover from 27 to 28, "Unfounded allegations are to be disclosed when the requesting official, the U.S. Attorney's office, and the agency official, Chief Foster, agree that such disclosure is appropriate." Next "when disclosure is otherwise deemed appropriate by the agency", that's the Police Department in this case. So when Chief Foster sits down with AUSA Rottenborn and they discuss what should and shouldn't be disclosed, they're reaching an agreement under this policy that these things are appropriate to disclose.

If you look at the questionnaire itself, you will see that the materials that we're talking about should have been disclosed by Mr. Frye. Question Number 2, which in the July 28th, 2017 letter from the U.S. Attorney's office, they refer to three specific questions in the Giglio questionnaire that caused them concerns. I'm now looking at Bate stamp 117, and it is elsewhere obviously. I think it's at

Tab 1 in Dale's materials. Question Number 2, "Are you aware of any allegation or finding" so allegation or finding, "by a Judge, Magistrate Judge, Administrative Hearing Officer, or Prosecutor?" That is Brian Holohan's concern right there. There is an allegation by the Prosecutor, they don't mention it, allegation by a Prosecutor that Mr. Frye was dishonest during a prosecution. It's not whether it's a finding. It's not whether it's founded or unfounded. Is there an allegation? There was an obligation to disclose that. It was not disclosed. When that information was turned over to the U.S. Attorney's office, they reached their own determination as to whether or not that was a Giglio violation.

Now Dale mentioned that the Holohan concern was deemed unfounded by the Chief at the time, and that's correct. The Chief reviewed it. Chief Cooley, I believe it was, and determined that it was not an issue to be concerned with. The interesting thing is that letter that Dale references in Exhibit 17 of his binder, it's also in our binder, but I'm trying to bounce around, that letter from Chief Cooley which said it was unfounded is attached to Judge Conrad's Order where he ruled that it was Giglio material. So the unfounded finding by the Chief, Mr. Frye's belief that it was unfounded was not sufficient to convince the Judge that it wasn't Giglio material, but now we're expecting Chief Foster to make decision. He is to report to the Department of Justice what he's asked to report. They make the determination. They reported what they need to, but this document which Dale says is so important demonstrates that founded or unfounded is not the key issue here. It's whether there's an allegation and then the Judge, in this case Judge Conrad, will determine if it is Giglio material.

I apologize. I'm bouncing around a little bit because I'm trying to respond to some of his issues, but that was Question 2. While Mr. Frye did refer to a 2008 traffic stop incident, it's worth noting that nobody reports that he referenced Judge Conrad's Order in response to his Giglio questionnaire. So in response to Question 2, he did not disclose the Conrad Order or the Holohan, Brian Holohan concern about his credibility.

Question Number 3 was another issue that the Commonwealth's Attorney had and that does refer to sustained findings about performance of your official duties or any off duty conduct, one thing, and then 3-B is anything negative in your personnel file. Again, Chief Foster reviews the

disciplinary file, then speaks with the AUSA and turns over information about his disciplinary file where there were founded.  There were two incidences where he had improper communications with, improper conduct towards two female employees.  One time hitting someone on the rear end, one time pretending to kiss somebody, one time making a comment.  There was disciplinary action for it.  It was turned over.  Again, what the AUSA does with it in their Giglio analysis is up to them, but Chief Foster was certainly proper in turning it and it is something that is negative in the personnel file that should have been disclosed by Mr. Frye.  There were instances of racially insensitive comments turned over.  They were negative.  They were in his personnel file.  They were founded and they related to his performance of his duties.  So they should have been disclosed by Mr. Frye.

There was an incident where he, as he would describe it a practical joke, I believe, changed somebody's website to an inappropriate home page.  He was disciplined for it.  In fact, he wrote an apology for it, but it was negative information in his personnel file which Chief Foster, after talking to the AUSA, was requested to turn it over, and that's Question 3.  So there are founded.  You'll hear about founded or unfounded.  Obviously, you've already heard a fair amount about that, but those are incidents that occurred, they were founded, and they were turned over by Chief Foster to the U.S. Attorney's office, appropriately so.

Question 6, "Have you ever been arrested, charged with, or convicted of a criminal offense?"  Mr. Frye does have an arrest for grand larceny.  Mr. Frye's arrest for grand larceny has been expunged.  Chief Foster, you will hear him testify, mentioned that to AUSA Rottenborn.  He didn't turn over any records.  Mr. Webb made it sound like he had turned over some records.  He simply said, "I'm aware that he has been arrested in the past and that has been expunged."  He clarified with Ms. Rottenborn whether that was something that should have been disclosed in the Giglio questionnaire and she confirmed that it was.  So again, the question to which he said "No" to which he should have said "Yes", these are the types of misrepresentation that the Department of Justice found to be sufficient to warrant the determination that he would not be permitted to testify in Federal Court.

So those are the three questions that he did not respond to truthfully, and those do have implications for the town policy. The town has two policies, and Dale was talking about PER3-9, which is in our book at Tab 9. You don't necessarily need to refer to it, but you certainly may. There is some language in there which speaks in terms of willfully misrepresenting, and I assume that's where Dale is getting his requirement for willful misconduct. Generally, even if we do have the burden of proof, the burden would be to show that our actions were reasonable based on the record. It wouldn't be to show willful misconduct. Willful misconduct would be under employment standard which is not an ultimate standard in deciding whether to terminate an employee, but 3-9 on Page 172 does talk about willfully giving false statements to officials or the public. That is one of the policies that he didn't violate, that he willfully didn't give information that was negative in his personnel file. He willfully didn't give any information that was about his arrest and didn't give information about his difficulties with the Assistant Commonwealth's Attorney, but in Tab 8, Page 165, it's the other policy he violated. "Employees shall not engage in any conduct which is detrimental to the Police Department or its reputation." That doesn't require willful misconduct. That doesn't lower standard, and based on the information it is reasonable for the Chief to determine that that policy was violated. So I think the laser focus on willful misconduct is misplaced in this case.

You'll see in the termination letter and in Chief Foster's Investigative Report, there really are two separate, independent bases for why Mr. Frye was terminated and they both stand alone. One is these policy violations to which I was just referring, the damage to the reputation of the Police Department and the willful misrepresentations during the Giglio questionnaire. But in order to be a Police Department, a police officer and particularly a detective with this Police Department, you will hear Chief Foster say you have to be able to testify in Court. That is one of the fundamental job duties of a police officer, much less a detective with the Vinton Police Department. Mr. Frye, whatever the source of the cause is, cannot testify in Federal Court and is severely restricted in his ability to testify in State Court, and under those circumstances he is not capable of fulfilling the job duties. He seeks full reinstatement, if you look at his Grievance documents. He has requested his full reinstatement to his

position. Respectfully, that's not available here because he cannot perform the duties of his position. He can't perform the duties of a police officer in the Town of Vinton, and respectfully, we submit that that is something that can't be granted by this panel.

I'll finish up here. I appreciate your indulgence. There was some discussion from Mr. Webb about the applicable rules on document retention. The Library of Virginia says that Internal Investigation files can be retained as long as administratively useful to permit flexible exchanges between law enforcement agencies. There's no hard and fast timeframe. The town policy also allows retention of reprimands for archival purposes. So that's why there is a disciplinary file here. These are things that are administratively useful that they want to archive and save for circumstances such as when the U.S. Attorney comes and asks for Giglio information or anything else that a founded disciplinary procedure incident might be useful for. There's nothing wrong with retaining those documents in a separate disciplinary file. There's certainly nothing wrong with scanning them into a computer rather retaining physical files. We're all moving in that direction. As far as the disclosure goes, you'll hear a lot, particularly the Dissemination of Privacy Act doesn't prevent the disclosure. There's a case actually in the annotations of what Dale provided that says it doesn't prevent the disclosure of information, it doesn't create confidential information. It just sets up some procedures. One other point, we're talking about accused constitutional rights here and those accused persons being prosecuted by the Department of Justice have a right under Giglio, under Brady to certain information, and Chief Foster did what he had to do. You'll even see the town policy talks about disclosures as allowed or required by law, and that's exactly what Chief Foster did. He was allowed to make these disclosures if not required to make these disclosures. He met with the U.S. Attorney. He gained an understanding from them as to what they were looking for. He studied the policy that I referenced to you before. He found that unfounded came be disclosed. He conferred with Rick Mountcastle. Rick Mountcastle confirmed unfounded matters can be disclosed and that it is not an update. Rick Mountcastle specifically said, "This is not an update." AUSA Rottenborn said, "This is not an update." It goes back to the beginning of time and they are required to disclose everything.

One last point, on Exhibit 17 of Dale's, and then I will conclude. The U.S. Attorney was again, Dale made a point about did she foster and only turn over part of the information about Brian Holohan's concerns and not turn over all the information. It's abundantly clear that the U.S. Attorney had that information. It was turned over. It was in their possession. So the notion that we're only giving partial files is incorrect and the evidence will bear that out as we go through the day. I appreciate again your indulgence and I will make way for Mr. Webb.

JUDGE APGAR:  Who did you want to call first?

MR. WEBB:  The grievant is going to call Mr. Foster first.

(WITNESS SWORN)

The first witness, TOM FOSTER, having first been duly sworn, testified and stated as follows:

DIRECT EXAMINATION -- QUESTIONS BY MR. WEBB

Q.    Mr. Foster, would you state your full name for the record please?

A.    Thomas L. Foster.

Q.    Mr. Foster, you are the Chief for the Town of Vinton, is that correct?

A.    That's correct, yes sir.

Q.    And you've been so since, is it roughly March 2016?

A.    March 16th I believe is the exact date.

Q.    Now you issued a Notice to Craig Frye that he was being placed on administrative leave, and that was on June 20th, 2017?

A.    Yes sir, I believe that date is correct.

Q.    And that was regarding an alleged misconduct responding to Giglio questions, correct?

A.    Yes sir.  Well, a violation of town policy and failure to disclose Giglio.

Q.    All of it though is surrounding whether he was truthful in answering Giglio, for this panel's inquiry, correct?

A.     Yes sir, that would be correct.

Q.     I've put a book in front of you today and I'm going to ask that you kind of refer to that so we can kind of all be looking at the same thing.  Exhibit 1 there, you agree that is representative of the Giglio questions that would have been asked Mr. Frye that we're referring to?

A.     Yes sir.  It appears to be the standard Giglio questionnaire.

Q.     And Exhibit 2 is your letter of June 20th placing him on administrative leave, is that correct?

A.     Yes sir, that's correct.

Q.     Looking at Exhibit 3, I provided you our responsive letter dated August 29th, 2017.  Does Exhibit 3 reflect the letter that you received from me?

A.     Yes sir.  It does appear to be a copy of the document I received, yes sir.

Q.     I put the Town Notice regarding the Data Dissemination Act, correct?

A      Yes, Chapter 38, Title 2.2.

Q.     And I also asked and requested that there be an independent investigation into the charges of misconduct.  Do you recall that?

A.     Yes sir.  You did make that request.

Q.     You did not send the case out nor have it investigated independently.  You did that yourself, correct?

A.     That's correct.

Q.     And on September 15th, 2017 you issued your charging letter.  That's Exhibit 4 which contains your 17 attachments and findings of misconduct, correct?

A.     That's correct.  There's a letter of allegation that I was given that I gave to Mr. Frye on that meeting of course along with some other documents, Garrity Warnings and the procedural documents that they're standard issue when giving the grievance under the police officer's Bill of Rights. The 17 attached documents were actually given to him at the conclusion of the investigation when the investigation was complete.  So he would not have received the 17 attachments until a later meeting

because at that point in time I had not completed my investigation. I had given him his letter of

allegation, provided him with five days to file a written response. He asked for an extension and so I

couldn't complete my investigative file until I received his response. So those additional attachments

would have been provided to him later.

      Q.      Attachments 4 through 11 are the documents that you forwarded to the U.S.

Attorney's office, correct?

      A.      I'm sorry. Did you say 4 through 11?

      Q.      Yes sir.

      A.      Yes sir, that happens to be, I mean very quickly scanning over them, yes sir, that

appears to be correct.

      Q.      And obviously, this isn't a trick question, in your charging letter you list

Attachments 4 through 11 as the documents you sent to the U.S. Attorney's office?

      A.      Yes sir. I think I spell out in there which ones I forwarded.

      Q.      Did you consider this a serious complaint that's being brought against Mr. Frye?

      A.      Yes sir.

      Q.      Aren't serious complaints supposed to be investigated by the Internal Affairs

personnel in your office?

      A.      There is in our policy that serious complaints will be referred to the Internal

Affairs section. In this particular case I was not able to do so. The Policy states that the Chief of Police

has the authority to modify these procedures in certain instances. In this particular case our Internal

Affairs' Investigator is Sergeant Valerie Cummings and she was involved in one of the sustained

complaints for sexual misconduct or sexual harassment. The next step would be our Operations

Lieutenant who is Lieutenant Glen Austin. He is a close personal friend of Mr. Frye and therefore, that

was not a viable option. Then my Deputy Chief Police, Rich Drumond, whom I just promoted to Deputy

Chief in January and he has not attended an Internal Affairs School nor has he conducted a serious

investigative inquiry, and so therefore I decided to elect to use the option in the policy that allows me to

deviate from Internal Affairs.  I personally am a former Internal Affairs Investigator myself with the Virginia Department of the State Police and have had extensive training as such so I elected to conduct this investigation myself.

Q.      Turn to Exhibit 10, if you would please.  Do you see there it says General Order 1-26

A.      Exhibit 10?

Q.      Yes.  Not the red, but the white.

A.      I'm sorry.

Q.      So Chief Foster you know, the other tabs are the attachments to your report, okay?

A.      Okay.  Thank you.

Q.      Exhibit 10 is General Order of 1-26, correct?

A.      Yes.  It appears to be, yes sir.

Q.      If you go to Roman Numeral Number 3, Investigative Responsibility.  Do you see that?

A.      Yes sir, I do.

Q.      And One, "Serious complaints are supposed to be investigated by Internal Affairs personnel."  You see that, correct?

A.      Yes.

Q.      Do you see Number 4, "Chief of Police may request the State Police to undertake an investigation prior to or at any time during an investigation"?

A.      Yes, I do.

Q.      Look at "C".  "The Chief of Police shall have the authority to assign and investigate outside the previously stated guidelines should he determine a need to do so."  Do you see that?

A.      Yes.

Q.      I don't see anywhere in that policy it says you can modify it and do it yourself.

A.      Well, this policy is one that, of course since I've been appointed Chief, I've been updating all our policies. The Virginia Department of State Police does not investigate internal affairs complaints outside of the agency as a matter of policy. So the request to investigate this matter would deviate from their policy. Second of all, there is a, if you'll give me a moment to find it. It states that I do have the authority. "The Chief of Police shall have the authority to assign an investigation outside the previously stated guidelines should he determine a need to do so." Paragraph C.

Q.      Look at Paragraph H. "In the case of any serious complaint, the Chief of Police shall appoint appropriate personnel to conduct an internal affairs investigation," and Number 3, your role is to supervise and control the investigation of alleged misconduct. That's how the policy is set up, correct?

A.      Can you please tell me which paragraph that is?

Q.      "H", 1 and 3. It says "In the case of serious complaint, the Chief shall. Are you with me there? It's on Page 6 of that document.

A.      Yes. It does say in Paragraph H, "In the case of a serious complaint, the Chief shall —

Q.      It is "shall", right? That's an order, correct?

A.      It does say "shall", yes sir.

Q.      But you chose to modify it and do the investigation yourself, correct?

A.      Yes sir, I did.

Q.      Now one of the issues and allegations in this case, there's an allegation from the U.S. Attorney's office that Craig Frye had threatened you, right? He had threatened you as part of this process. He made a big deal about it in his letter. Do you recall that?

A.      Yes. I didn't take it as a physical threat. I took it as a threat of —

Q.      Legal action?

A.      Potential legal action, yes sir.

Q.      But that was one, the U.S. Attorney made a big deal out of that saying somehow he was obstructing justice in his statements to you, correct?

A.      That was one of the points they brought up.  I believe Point 4 possibly in the letter.

Q.      You didn't charge him with that, but the U.S. Attorney mentioned that and made it a point in his letter, correct?

A.      That's correct.  I did not.  I didn't, although it was important to me that he said that, it was not something that, I chose not to make it an allegation in my investigation.  I just didn't feel that it was necessary.

Q.      I guess my concern is, and you see where I'm going here, is that you are a witness to that aspect of it, yet you are investigating this case which includes you as a witness.  Do you see this conflict I'm talking about?

A.      Yes sir.  That would be a reason that I would have chosen not to elect to make it a point in my investigation and I did not give him a letter of allegation with that.  It was an obvious violation of conduct.

Q.      And it was known, it was known, Chief Foster, was it not that at the time you were doing this investigation, you also had an application in with the Federal people to try to get a job there, correct?

A.      I'm not sure – well, here is where that stands.

Q.      At the time, I'm asking, at the time of the investigation.  Not where it stands now, but at the time of the investigation were you applying for a position with the Federal Marshal's office?

A.      I can't give you the exact timeline.  I can tell you that my name was submitted to the President by Republican members of the House of Representatives, primarily Congressman Morgan Griffith and Congressman Goodlatte, and that in June my name was submitted to the President by Senator Mark Warner and Senator Kaine for appointment to the position of the United States Marshal for the Western District of Virginia.  I have not received any further information regarding that.  I just know that

my name has been submitted by both the Republican delegation and the Democrat delegation for this appointment.

Q.      So that was going on at the time of this investigation, correct?

A.      It actually began before this investigation.

Q.      And was still in play at the time of the investigation, correct?

A.      Yes sir.  This has been an ongoing process since approximately December of 2016 until today, and as of today I have no idea where I stand in that appointment process.

Q.      You had been given that and you decided to investigate this yourself dealing with the U.S. Attorney's office and Mr. Frye, correct?

A.      Well, the appointment is not for a position with the United States Attorney's office.  The appointment is with the U.S. Marshals.

Q.      I understand that, but you decided to go forward with this decision even with that in the background, correct?

A.      I did not make a correlation between the two.  They were mutually exclusive of one another, and I don't find a connection between the two.

Q.      Let's go ahead and turn back to Exhibit 4.  That's the September 15th, 2017 letter that you charge the misconduct in, correct?

A.      And that's the red tab?

Q.      Actually it's the white tab Number 4, and then the red tabs are, yours is red, but all the tabs are your attachments.

A.      Okay.  Yes, Tab 4 is Page 1of my investigation.

Q.      Fair to say that the details of your investigation, all the charges of misconduct you brought are contained in this Exhibit 4 of this September 15th, 2017 letter, correct?

A.      Yes sir.  Essentially it's an investigation and it's also a timeline of each of the meetings I had with various officials related to this matter, and of course the final pages are the findings of the investigation.

Q.      That's what I was going to get at.  So you have a timeline and you list all of the witnesses you spoke in there, correct?

A.      Yes sir.

Q.      Do you think you put down everything relevant that they had to say to you regarding the case?  Did you report that in your report?

A.      Yes sir.  I mean they are not, where you see quotation marks, it's a quote.  Where you see not quotation marks, it's obviously a summary of what I was told in that meeting.

Q.      Did you list every witness you spoke to regarding this investigation and when you spoke to them in this report?

A.      To the best of my knowledge, yes.  The only exception may be in a couple of conversations I had early on before I knew the magnitude of this situation that I had with Mr. Frye.  I think there may have been a couple of times where he came to my office and we had conversations about this and those I did not document because I did not know the time nor the date in which they occurred.  I think there may have been a case or two where I put "During the week of" or something to that effect, but there was a time that I recall Mr. Frye coming to my office and stating, "Hey, you're going to be possibly getting a Giglio letter from the U.S. Attorney's office in Harrionsburg.  I have already spoken with them about that."  Those conversations were not unlike conversations I have on a daily basis that are work related with the other 24 officers in my Department.  It wasn't something that at that point in time rose to a level that I was beginning to take notes.

Q.      So for this panel, Exhibit 4 contains all the bases of your analysis of why you think there was misconduct in this case, correct?

A.      Yes sir, that's accurate.  Like I said, with the exception of a couple of conversations I may have had with Mr. Frye.

Q.      So what I want to do is go through your letter.  Let's start on the first page there.  You see there in the second paragraph -- in the first paragraph you said that "The investigation is

predicated upon receipt of the Giglio letter from the United States Attorney's Office, Harrisonburg on or about May 8, 2017." Do you see that?

A.      Yes sir.

Q.      That actually is not correct, is it?

A.      To the best of my knowledge it is, yes sir.

Q.      Let's look at Attachment Number 1. Are you with me on Attachment Number1?

A.      Yes.

Q.      What's the date at the top of the letter?

A.      May 3rd.

Q.      So that was not correct? It was actually May 3rd, 2017, correct?

A.      No sir. That's the date that they typed the letter. The date that I received it was on or about May 8th.

Q.      So you're saying you received it about five days later?

A.      Yes. It came through the mail and then of course we get our mail through a mail service and it comes through the Town Manager's office, and then it's placed in a mailbox up here with the Police Department on it, and then it makes its way down to me in the Police Department. So unfortunately some days can pass, but I tried to put an accurate reflection of when it landed on my desk because that's when I recall receiving it.

Q.      So there was a little delay before you got the letter?

A.      Yeah. It's not an efficient system we have with the mail and I understand that.

Q.      I understand. We all have that problem. Exhibit 5 is the charge that contains your standard that it has to be a willfully false statement to officials, correct, when you reference the charging orders? That's contained in Exhibit 5, General 3-9, correct?

A.      Let me see. That's going to be the white five?

Q.      Yes sir.

A.      I'm sorry, sir.

Q.      My question is that is General Order 3-9, correct?

A.      Yes sir, it is.

Q.      I can tell you 1D3G is what you relied upon, "Charge of willfully giving a false statement to officials. That's the violation that you charged pursuant to that Order, correct? That's on Page 5 of that attachment.

A.      Thank you. That helps me.

Q.      It's "G", "Willfully giving false statements to officials". That's what you're referring to?

A.      Yes sir, that is correct.

Q.      So we know Exhibit 6, the next Exhibit, that's the other Order you're relying upon is General Order 1-4, correct?

A.      Yes sir, 1-4 and 3-9.

Q.      So we understand the charge of misconduct, if he intentionally lied in response to Giglio questions to Ms. Shelvey, you've charged him with that. He intentionally, willfully gave a false statement, correct?

A.      Yes sir. I used the language used in the General Order and that's how it's worded, yes sir.

Q.      And that's the basis for your misconduct, correct?

A.      Yes. He's in violation of these General Orders, 1-4 and 3-9.

Q.      Now since your investigation is predicated on Giglio and the proper answering of Giglio questions, I want to ask you about your training in this area. What training have you given to Craig Frye in the process of answering Giglio questions?

A.      Absolutely none.

Q.      None did you say?

A.      I haven't given Detective Frye any training pertaining to Giglio.

Q.      What training have you given to any of your officers that you ever see regarding how to answer Giglio questions?

A.      Since I've been here I've provided them with a brochure.  It's called, I have it down in my office, but "Brady and You", I think, or something and that's probably an incorrect title, but I believe it is a pamphlet provided by the Virginia Department of Criminal Justice Services.  It's a tri-fold and it explains Brady and how Brady affects us as police officers or we as police officers, and I have electronically disseminated or possibly photocopied, I can't recall, but I did put that out, but that's the only training I've given.

Q.      So you're telling me to your other officers you sent out a digital version of some document.  Have you actually had a training session on Brady for other officers?

A.      No, I have not.

Q.      What training have you received regarding the answering of Giglio questions in the Western District of Virginia for the Federal System?

A.      I have not received any training.  I'm familiar with it because of my past.  I've had two positions previous, or I've had the opportunity prior to this to being appointed Chief of Police where I supervised Federal Task Force Officers.  As a State Police Special Agent, Assistant Special Agent in Charge I supervised our members assigned to the FBI Joint Terrorism Task Force and the U.S. Marshall Service Fugitive Task Force.

Q.      Was that for the Western District?

A.      Yes.  They both operated out of Roanoke, and those State Police Special Agents assigned to those units were under my supervision.  So I became familiar with Giglio under those circumstances.  However, I have never received a Giglio letter before.  This was my first time at responding to a written Giglio request.  So training that I received would only be training that I would assume all our officers receive, which is through a Regional Criminal Justice Academy, Cardinal.  I'm just making an assumption here, and I guess I shouldn't do that, but that these items are covered.  I know

in my training at the Virginia State Police we did cover Brady and Giglio issues during in-service school

as part of our legal updates that we would go through every 24 months.

Q.      Is it fair to say that you had very little training on reviewing the type of

information before this event, the type of information that was responsive to Giglio and the Western

District?

A.      That's a very fair assessment, yes sir.  I've had limited training, but then I

decided to research this once I received the letter, which is what I did.

Q.      Now I want to talk to you a little bit about the bar room servant concept.  When

you started with the Town of Vinton, Mr. Frye was already a loaned employee of the ATF Task Force,

right?

A.      Yes, he was.

Q.      And most of Mr. Frye's time was actually working under the Federal System

with the ATF Task Force, correct?

A.      Yes sir, that's my understanding.  I think Officer Frye had been with the Task

Force some eight to ten years and had been there for a long time.

Q.      It's fair to say, you did not supervise his work as an employee of the ATF,

correct?

A.      No sir, I didn't.  When he is, for lack of a better term, on loan to the Federal

Agency of this Task Force, he is under their supervision.  There is limited supervision that we do from the

PD such as when I first came there, I met with Mr. Frye and gave him some expectations as far if you're

going to be conducting an investigation out of state, we would like to know that.  If you're going to be on

annual leave for a period of time and not available, we would like to know that.  Basic guidelines so that

we know where our personnel are, and I told him it was not necessary to share any information

concerning the context of this investigation, any confidential information.  We didn't need to know that,

but it would be prudent for him to notify us when he's operating out of state because we of course are

exposed to a certain level of liability for any of our employees.  So I felt it was prudent to do that.

Q.      So what I hear you saying is as far as supervising the day-to-day activities and his criminal investigations, you weren't doing that because he was loaned to the Federal System, correct? Is that a fair statement?

A.      Yes, that is a fair statement and his immediate supervisor, actually there's a couple levels of supervision between me and him anyway, but yes, that's a fair assessment.

Q.      And his immediate supervisor is Billy Cunningham, correct?

A.      That's my understanding, yes.

Q.      So that's one of the reasons you really didn't have a lot to do with Giglio because you're in the State System. He's in the Federal System. You're just not dealing with that aspect of the law on a daily basis, correct?

A.      Yes. That's a very fair assessment, yes.

Q.      Going back to Exhibit 4, if you'll take a look at your first paragraph. You said you did some research and tried to educate yourself in this. I want to start with the second paragraph of that page and review the legal framework you got, you said from SAUSA Munro. Do you see that there? You had a conversation with her about the circumstances, under what circumstances an officer must disclose Giglio material.

A.      Yes, absolutely. Could I elaborate on that?

Q.      Well, I tell you in the extent that you feel like have to to answer your question today, please do. I'm not trying to cut you off, but to some extent with expediency, I'm covering certain things and to the extent you can keep your answer limited to that, I think it would be helpful to the panel and we could get through a little quicker, but I'm not cutting you off. If you feel like you need to expound, please do that.

A.      I just wanted to say before I made this contact with SAUSA Munro, I did some research and pulled up the Federal document that went actually back to 1996. The signatory on that document was Attorney General Janet Reno. It went through what must be disclosed under Giglio. I read that document to educate myself before I spoke with the U.S. Attorney's office so I would have some

background and context in making this discussion.  I felt like it was better to educate myself a bit before discussing it so that I had some understanding of what we would be talking about.  So again, that's something prudent to do and that's what I did.

Q.      Now you didn't put aspect into your investigation and report, did you?

A.      Yes sir.  It's a tab in my investigation.

Q.      I'm talking about the fact that you did that, that you reviewed that.  You didn't say that in this report, that you reviewed that before talking to Munro, did you?

A.      I may have just made it an attachment.

Q.      Okay.  I just wanted to clarify that.

A.      Yeah.  I think it may be an attachment.

Q.      Let's look at, so you're speaking to Ms. Munro to determine the scope of what Giglio is required to respond to.  That's the purpose of your conversation with Ms. Munro, correct?

A.      Yes.

Q.      Relying on the information Ms. Munro provided, you state, and this is Page 2 of your report, the second top paragraph.  You say, "Having the full information regarding the nature and scope of Giglio disclosure requirement, you then orally divulged a list of information contained in Pages 2 and 3 of your letter to Ms. Munro," correct?

A.      Absolutely, yes sir.

Q.      And that comprises, as we said Attachments 3 through 11.  You orally told her about the documents you had, correct?

A.      Yes sir.

Q.      Now going back to Page 1, and you're relying upon Ms. Munro to give you the straight scoop on what you're supposed to do here, correct?

A.      Yes sir.  That's who I was directed to when I tried to initially reach out to Ms. Shelvey.  I was transferred by telephone to Ms. Munro and told that she could help me with the Giglio questions.

Q.      And you put this in your report as to who you were relying upon and what you understand the scope to be, correct?

A.      Yes sir.

Q.      The scope of Giglio disclosure you state first, "The timeframe includes the entirety of one's career including events even before one's career." Do you see that?

A.      Yes sir.

Q.      And then state that all information, this goes to the second page, all information whether founded or unfounded fell under the parameters of Giglio. Is that what you stated?

A.      Yes sir.

Q.      Did I correctly read what you said in that report?

A.      That is a correct reading, yes sir.

Q.      And you based what must be disclosed under Giglio on your understanding of that scope, correct? That's how you applied your analysis?

A.      Yes sir. I applied the analysis of how I understood the Giglio ruling.

Q.      To the issues of misconduct and to the issues of what you're disclosing to Ms. Munro, correct, that scope?

A.      Yes.

Q.      Now go back to the first page. You see in front of Ms. Munro's name, it's SAUSA. Do you know what that stands for?

A.      I believe it stands for Special Assistant United States Attorney, but I actually did not know at the time I spoke with her what that position was or entailed and actually it was Detective Frye who educated me about that.

Q.      There's a lot of different letters and words so we're all kind of going through this process, but do you now understand that SAUSA Attorneys over there are just voluntary people? They are not paid attorneys. Do you understand that now?

A.      That's what Detective Frye conveyed to me and I did not know that at the time, but my source of information regarding that is Detective Frye and I assume that that's accurate.

Q.      They're not the same as AUSA, which are Assistant U.S. Attorneys, correct, because they're paid attorney, full-time employees, correct?

A.      That's my understanding.  I believe these may be folks that are trying to get into Federal prosecutorial careers and that's the doorway.

Q.      I'm going to have you flip to Exhibit 7 of this document.  It's the tab that says your internal investigation notes.  Are you with me?

A.      Yes sir.

Q.      These are notes that you wrote down as part of your investigation of this case that you ultimately transferred into your final report, correct?

A.      Yes sir.  It's my procedure from again being an Internal Affairs Investigator that I keep a running timeline and then merge these notes into a bold report and Investigator's Finding Report, but this is a running timeline that I kept on my computer.

Q.      I'm glad you did.  Let's look down at one, two, three, four, five, six dots.  It says "The next day".  Do you see that?

A.      Yes sir.

Q.      You say the next day you're contacted by Officer Shelvey who informed you she was the Giglio appointed contact and that you should only speak with her regarding these issues.  Do you see that?

A.      Yes sir.

Q.      And she tells you, "I informed her, I advised Mensinger of the nature of my call" and Ms. Mensinger is the one who put you in touch with SAUSA Munro, you did not request her.  So you're just saying, "Listen, that's who they gave me," right?

A.      Yes, that's right.  I told them the purpose of my call and that's who I was transferred to to answer my questions, and I was very clear on the nature and reason for my call.  Then I was transferred to Ms. Munro I guess, I assume to the unavailability of Ms. Shelvey.

Q.      You agree that the nature and scope of what the Giglio disclosure requires is extremely important because handles the decision of misconduct?

A.      Absolutely.

Q.      And if material is not considered Giglio material and Mr. Frye did not disclose it, then he's not committed misconduct, correct?  If it's not Giglio material and he did not disclose it, it's not misconduct, correct?

A.      If it's not deemed to be Giglio material and he didn't disclose it, then it's in applicable.

Q.      Yet you are citing SAUSA Munro's legal advice, a voluntary attorney over there, when you've been cautioned only to be speaking to Ms. Shelvey.  You're citing Ms. Munro's legal advice at the beginning of this report setting forth your schedule, correct?

A.      No sir, not correct.

Q.      Well, does it say that you spoke to Ms. Munro and these are the things she told you?  That's what it says at the beginning of your report, right?

A.      Yes, the timeline is not correct, not the facts is what you're saying.  I was actually informed by Ms. Shelvey that I should only be speaking with her regarding Giglio after I had spoken with Ms. Munro.

Q.      Now I'm talking about before you wrote this report on September 15th, 2017, you had already been cautioned you were only supposed to be speaking to Ms. Shelvey, correct?

A.      No.

Q.      You were not?  That's after you wrote this report you were told that?

A.      After I wrote the report —

Q.      So going back to —

A.      I'm confused, sir.  I'm not trying to be –

Q.      I want you to be clear on my question.  Early on in this case when Ms. Shelvey found that you were speaking to Ms. Munro, she said, "Whoa, I'm the point of contact.  Only speak with me and get information from me"?

A.      Correct.

Q.      But yet when you wrote this report, September 15th, 2017, this is after that conversation with Ms. Shelvey that we just talked about, right?

A.      Absolutely, it was after.  It would have to be, yes.

Q.      And this report defining the scope, you are attributing the information you got from Ms. Munro as to the scope of what this Giglio inquiry is supposed to be.  In your report you do that, correct?

A.      I see what you're saying.  Yes sir, I was still relying to a certain degree on that because I had not been told yet the information was inaccurate.  In fact, when I met with AUSA Rottenborn, she confirmed that the information given to me by Ms. Munro was in fact true and a good interpretation of the Giglio letter. Even though I was unfortunately led to a person that was not the Giglio point of contact, the information she provided was still accurate and I verified that information with the Assistant United States Attorney Rottenborn.  So for that reason I saw no reason to not continue with the assumption that these were Giglio violations.

Q.      We talked earlier about the fact that you documented your conversations with people, the relevant information.  You put this in your report, right?

A.      Yes.

Q.      What you just said to us is nowhere in your report, is it?  You spoke to Rottenborn and she confirmed that.  That's nowhere in this report?

A.      Oh, yes sir, it is.  It's there.

Q.      Well, in your beginning paragraph you don't say Laura Rottenborn confirmed the scope of this, correct?

A.     No, I don't use that verbiage, but I did go over these same documents with Ms. Rottenborn in a personal one-on-one meeting at the U.S. Attorney's office.

Q.     I understand you did, but on Pages 1 and 2 when you're defining the scope of your analysis, you don't mention Ms. Rottenborn also confirmed that, correct?

A.     No, I don't say that, but actually when this report was being written, it's the totality of interpretations from both Ms. Munro and Ms. Rottenborn and Mr. Mountcastle. As I draft this report, these bullet points that I have are simply notes that I have been taking through the course of my investigation. When I prepared the final investigative report, it is the totality of information that I received throughout that investigation and so those statements that I make in my report are encompassing a variety of sources that I deemed to be reliable and I'm basing my opinions on legal opinions given to me by attorneys. So I think that's the best that I can do.

Q.     Again, in fairness, looking at the report on Page 1 and 2, you're saying you're relying upon Munro? You don't say you're relying upon anybody else. Isn't that correct?

A.     I assume that you're correct. I'd just like to see it again.

Q.     Yes, Exhibit 4. Please look at it, Page 1 and 2. You say you spoke to Ms. Munro. She gave you the legal principles and that defined your scope. Am I stating that correct as to what you put in your report?

A.     Yes. I put "My efforts to reach Ms. Shelvey were initially unsuccessful, resulting in a few phone tag calls in an attempt to resolve the Giglio issue. I once again called Mensinger and was subsequently transferred to SAUSA Munro to clarify some of the issues I had relating to particular questions. These included, but may not have been limited to whether or not," so yes, the statements that I am making here do make reference to SAUSA Munro.

Q.     As the source of the legal advice you're taking, correct?

A.     Yes sir. That is -- yes.

Q.     I want to take what you've done with that legal advice and then the analysis and the core principles you're applying in determining there's misconduct here. So at the very bottom of Page

1, the last sentence you say, "We also discussed the fact that any complaint or issue related to one's truthfulness whether founded or unfounded fell under the parameters of Giglio." Do you see that?

    A.    Yes sir, I do.

    Q.    That's one of the principles you applied here for Mr. Frye to determine if he had committed willful misconduct, correct?

    A.    Yes.  If there was an allegation for sustained because that was the interpretation I had and that is also the interpretation I received in doing my independent research on the Reno memo.

    Q.    Well, we'll get to that because I've got the memo and we'll go over it.  Let's look at Page 13 of your document as well.  This is last full paragraph beginning with "Detective Frye's assertion".  Do you see that?

    A.    Yes, "Detective Frye's assertion that information provided".

    Q.    "To the United States Attorney's office contained new findings as false" and then you state the following: "Further such findings are irrelevant under Giglio guidelines." Is that what you said?

    A.    Yes sir.

    Q.    And that's also the structure you used to apply determining whether there was misconduct, correct?

    A.    Yes, with one caveat and that being assertions that were unfounded that fall under the categories enumerated in the Giglio letter, not just unfounded in all the complaints.  Quite frankly, there was 81 documents in a file that I reviewed and I gleaned out just a few that were turned over to the U.S. Attorney's office.  So things that were irrelevant to Giglio such as coming to work late or other things that were in that file, I did not pull those documents out because of my understanding and interpretation and based on the advice I'd been provided by the attorney were not Giglio.  So I say that in the context of they must be reported if they are allegations that deal with providing false statements to a Judge, providing false statements to a Prosecutor, allegations of anything that falls under Giglio.  So that's the context with which I meant that.

Q.      Again, when you say "Findings are irrelevant under Giglio guidelines", you believe that the aspect of whether it's founded or unfounded has no analysis in whether it's Giglio material, correct?

A.      In certain instances.

Q.      In certain instances? Not in all instances? I guess I'm saying you've already made the statement "We discussed the fact that in the complaint, whether it's founded or unfounded, fell in the parameters of Giglio", you said that first sentence, and then you said this next sentence that Giglio has no relevance for finding relevance to Giglio". So is that the analysis that you applied in this case?

A.      Well, to read that statement it could be interpreted that way, but that is not the intent. It would have actually been, Question Number 2, that allegation, it would have no basis. Under 3, it would be a sustained finding under the Giglio questionnaire. So it would depend on which Giglio question we're talking about as to whether or not a sustained finding was applicable.

Q.      Officer Foster, look back at Page 1, the last sentence. This is what you put down as your scope. You say, "We also discussed the fact that any complaint," any complaint, "issue related to one's truthfulness, whether founded or unfounded, fell under the parameters of Giglio." Did I just read that sentence correct that you put in your report?

A.      You did, and that would be, I said, "Findings of truthfulness or untruthfulness" and it says in Question 2, "Are you aware of any allegation or finding by a Judge, Magistrate, or Administrative Hearing Officer, or Prosecutor that may reflect on your truthfulness, bias, including a finding of lack of candor".

Q.      But I'm going back to your report, your actual report. You say "Whether founded or unfounded, it fell under Giglio, the parameters of Giglio", correct? That's what you said your scope was?

A.      That's what I was told, yes sir.

Q.      Okay. I want to make sure that's what I understand.

A.      Yes sir, we're on the same page.

Q.      We're on the same page, okay.  Let's now look at the Giglio policy.  That's Attachment 2.  That was the policy that was sent to you by the U.S. Attorney's office in their May 3rd, 2017 letter when they were requesting the information, correct?

A.      Yes.  What tab number?

Q.      It's Attachment 2 to your Exhibit 4.  It's going to be the colored Tab 2 to Exhibit 4.

A.      Policy regarding disclosure to a Prosecutor, Potential Impeachment?

Q.      Yes, and that is a policy you received from the U.S. Attorney's office when they forwarded their letter of May 3rd, 2017 to you requesting the information, correct?

A.      No sir.  That's one I independently researched.

Q.      So you researched this document yourself?

A.      Yes.  This is the document that I researched myself.  I found it again in trying to educate myself.  It was from Justice.gov from the U.S. Department of Justice.  I thought it to be a reliable source.  It was signed by then Attorney General Janet Reno, and I tried to educate myself on Giglio before making my final call to the Harrisonburg office, and this is the document that I used.

Q.      That's the document you relied upon, correct?

A.      To prepare for the telephone call, yes sir.

Q.      Were you aware, and you said that document is December 9, 1996, right?

A.      Yes, it's an older document.

Q.      Were you aware that that policy underwent significant revisions on July 11, 2014?  Were you aware of that?

A.      No sir.  I did a Google search to educate myself on this particular issue.  This Department of Justice document was the one that populated when I did the search.  I found it and I read it and I used it as a general framework to educate myself again in preparation for a phone call.  I was not aware of any updates that occurred to it, but it certainly would seem reasonable that there could be updates since 1996.

Q.      So you never reviewed those updates, correct?

A.      I didn't know they existed.

Q.      Let's look at the document that you're using.  This is the information related to Department of Justice employees.  This document doesn't even apply to the town, does it?  I mean you're not a Federal Agency, correct?

A.      No sir, we're not a Federal Agency.

Q.      So did you know that this document doesn't even apply to the Town of Vinton? Did you know that before you were disclosing it?

A.      No, I would not know that.  I would assume that it would apply to anyone was going to be a Federal witness.

Q.      Okay.  This document, when you disclosed these records to the U.S. Attorney's office, you believed that this document was governing what you should or should not send?

A.      No, I didn't use this so much.  I used the advice of legal counsel.

Q.      Ms. Munro, right?

A.      Ms. Munro.

Q.      Let's look at this quickly to address this issue, Tab 1.  Do you see the letter of May 3rd, 2017?  Attachment 1, I'm sorry.  I'll rephrase it.  Exhibit 1 will be the white sticker, Exhibit 1, the letter of May 3rd, 2017.  Are you with me?

A.      No sir.  May 3rd, 2017?

Q.      Yes.  Do you see the second paragraph there?  This is a letter asking that you give them documents, right?

A.      Yes sir.

Q.      Do you see there the second paragraph beginning with the words "Our District Policy"?  Do you see that?

A.      Second paragraph, "Pursuant to the Department of Justice regulations this office developed and maintains"?

Q.      Yes.  Then in the second sentence, and if you'll follow with me, "Our District Policy directs us to seek such information from non-Federal Agencies in certain circumstances and sets out guidelines for the identification and handlings of material.  Unlike the Department of Justice agencies, your agency is not required to provide us with the requested information."  Do you see that?

A.      Yes sir.

Q.      That's because that policy didn't apply to you.  Did you know that?

A.      Okay.  I don't know that I know that that's the reason that it doesn't, but it definitely says that the reason why it doesn't.  I don't want to make a statement and said, "Yes, that's it" because I don't independently know why they say that, but there may be a Federal law, I assume, that says it doesn't.  I want to be careful about answering that.

Q.      Were you aware when you gave these documents that it was voluntary on your Department?  There was no law.  It wasn't required by law.  It wasn't anything that made you do it.  Were you aware of that?

A.      Yes.  I very carefully read this document.  I feel that the Town of Vinton Police Department shares the common goal with the United States Department of Justice in insuring that the constitutional rights of all persons are protected.

Q.      Including your own employees?

A.      Absolutely.

Q.      The privacy rights, and there are other laws that you also have to take into effect regarding Mr. Frye?

A.      Absolutely.

Q.      Going back to Exhibit 2, which is the Procedure Disclosing Essential Information.  Are you with me?  I want to take you down to Paragraph 5, "Agency Review and Disclosure".  Do you see that?

A.      Yes.  Can you tell me Red 2 or White 2?

Q.      I sure will.  When I say "Exhibit", that is the white.

A.      That's the white, okay.

Q.      Yes, and the colors are the attachments to you report.  So Exhibit 2 would be the white 2.

A.      Yes sir.  I got it.  Thank you.

Q.      Are you with me?

A.      Yes sir.

Q.      Do you see Number 5, "Agency Review and Disclosure"?

A.      Now the white 2 for me is --

Q.      I apologize.  That is an attachment for you, right.

A.      Yes, I do see it.

Q.      Is everybody with me?  This is Attachment 2 to Exhibit 4 and it's the policy.  It's information relating to Department of Justice employees."  Are you with me, Mr. Foster?

A.      Yes sir.

Q.      In Number 5 you see "Agency Review and Disclosure"?  Do you see that paragraph titled that?

A.      Yes sir, I do.

Q.      I'm going to read this sentence.  It says "The Agency officials from the employing agency, the OIG and DOJ, shall each conduct a review in accordance with a respective agency plan for potential impeachment information regarding the identified employee.  The employing Agency officials, the OIG and DOJ, shall advise the Requesting Official of (A) any finding of misconduct that reflects upon the truthfulness of or possible bias of the employee, including a finding of lack of candor during an administrative inquiry; (B) any past or criminal charge brought against the employee, and (C) any credible allegation of misconduct that reflects upon the truthfulness or bias of the employee that is the subject to a pending investigation."  Did I read that correctly?

A.      Yes sir.

Q.     You see that (A) is dealing with findings of misconduct, and the only time you're sending something without a finding is if it's involved in a current pending investigation under (C).  Do you see that?

A.     That's what it says, yes, under Paragraph 5.

Q.     Now let's look at Paragraph 6.  Now this is something, it says "Allocations".  Is that supposed to be "Allegations which are unsubstantiated, not credible or have resulted in exoneration"?

A.     Yeah.  I caught that type as well.  I assume it's allegations, yes sir.

Q.     "Allegations" and if you'll follow with me, "Allegations that cannot be substantiated, are not credible or have resulted in the exoneration of an employee generally are not considered to be potential impeachment information."  Did I read that correctly?

A.     Yes sir.

Q.     Then it goes into a set of circumstances under which the responding agency could produce that.  Your attorney was talking about that.  I want to read the last sentence of that paragraph.  It's on the next page.  "The agency is responsible for advising the Prosecuting office to the extent determined whether any aforementioned allegation is unsubstantiated, not credible, or resulted in the employee's exoneration."  Do you see that?

A.     Yes sir.

Q.     And that means that you have the responsibility to make sure that the documents you are sending and you researched to determine if they were unsubstantiated, not credible, or resulted in the employee's exoneration, correct?

A.     That's what that paragraph states, yes sir.

MR. WEBB:  Do you need to take a break?  If you need to take a break at any time, just let us know.

A.     Spring allergies are hitting me right now, but I'm fine.  Thank you, sir.

Q.     So when you say in the thing with Ms. Munro that any complaints whether unfounded or founded had to be turned over, that's opposite of what this policy says.  It says "Allegations

that cannot be substantiated, are not credible, or have resulted in the exoneration of an employee are generally not considered impeachment information." That's what the policy actually says, correct?

MR. CARROLL:  Where are you reading from?

MR. WEBB:  That's Number 6 again, "Treatment of Allegations which are Unsubstantiated, Not Credible, or Have Resulted in Exoneration".

Q.      Make sure you are with me, Mr. Foster.

A.      Yes sir, I am.

Q.      That's what the policy actually says, right?

A.      Yes, this is the 1996 policy states.

Q.      You don't see there in the policy it says all complaints whether founded or unfounded have to be turned over.  That's not what that Number 6 says, does it?

A.      Not in Paragraph 6, no sir.

Q.      Now in addition to what material has to be revealed, and we now know allegations that cannot be substantiated or not credible or result in exoneration do not have to be revealed. They're not impeachment information.  The second issue is addressing prior disclosures.  I want to talk to you a little bit about that.  That issue, Mr. Foster, deals with, so that we're talking about the same thing, if an ATF officer previously disclosed this information to the U.S. Attorney and then they have a subsequent Giglio Inquiry, do they have to go back and provide that information again?  Do you understand the concept?

A.      I do understand the concept, yes sir.

Q.      I refer to that as prior disclosures and whether you have to update it.  That's what I'm talking about.  Okay?

A.      Yes sir.

Q.      Now prior to terminating Mr. Frye on September 15, 2017, did you know the answer to that specific question before you terminated him?

A.      I'm thinking back to my conversation with AUSA Rottenborn and it is my belief that we addressed that issue, but I cannot recall if that specific issue came up, but I believe that it did and I certainly was not basing my decision on that every Giglio disclosure had to go back to the beginning of time on my opinion. I would have based that on the advice and the opinion of legal counsel either at the U.S. Attorney's office in Roanoke or Harrisonburg, but I honestly cannot independently say whether I learned that. I know I received a document from United States Attorney Mountcastle that said it's a clean slate every time you fill one of these out and that it has to start from the beginning and there had never been a disclosure of any type prior to so there was no refreshing of any information.

Q.      That question you asked Mr. Mountcastle though, whether it's an update or whether you have to go back to the beginning of time, you asked that question after Mr. Frye was terminated?

A.      Yes sir, that's correct.

Q.      So the reason you asked that question is you didn't know the answer to it, right?

A.      Well, the reason I asked that question, I was asked by Assistant Town Manager Pete Peters, who was one of the step respondents in the Grievance Procedure, if I would get a written opinion from the United States Attorney's office so that he could use that information in formulating his response. So at the request of the Assistant Town Manager, I sought that opinion and that's why I got it.

Q.      So on September 26, 2017, after you had already terminated Mr. Frye, you're asking the U.S. Attorney's office "Is this just an update or do you have to go back to the beginning of time?" You agree with that correct?

A.      I did. I was asking on behalf of another person, but yes sir, that's correct.

Q.      And you didn't have the information to answer that fully to whoever was asking. You had to go back and ask the U.S. Attorney's office that, correct?

A.      Well, no sir. I felt that I had the information. I just didn't have anything in writing and I wanted to provide it to him. Like I said, I feel certain I received – I'm not going to independently make these assumptions. As I expressed to you earlier, I had no expertise in the Giglio

procedure. This is the first time I've really been exposed to a Giglio response. My knowledge of the Giglio regulation is simply limited to some training that I received in in-service school just as every police officer does and how to respond and to make sure that when these questions come up we divulge everything. The rule is that over disclose and explain later. So I certainly wouldn't take it upon myself, I'm not an attorney. I realize I'm not an attorney and this is well beyond my area of expertise and I was relying on the opinion of one of these United States Attorneys who told me that, but at the request of the Assistant Town Manager, I got a written opinion from the United States Attorney.

Q.      So again, the first time you asked a written question about that was after Mr. Frye was terminated? That's on September 26th, 2017 that you asked that question?

A.      Yes sir, absolutely, Mr. Webb.

Q.      That's in the record?

A.      Yes. The first time I would have asked for a written one would have been after we had met with Mr. Frye on the termination. You're exactly right.

Q.      That answer, whether it's correct or not, that answer is crucial to your analysis of misconduct because if Mr. Frye had already previously disclosed the stuff and did have to go back and disclose it again, he had to have committed with misconduct. You agree with that concept, correct?

A.      Well, if that were true and that was the factual representation of the Giglio rule, then that would certainly make sense, but that is not the case.

Q.      That's not my question. I'm asking you to assume if that is the policy, you don't have to go back. If you've already give a disclosure, you don't have to give it again. If that is the policy that was in place, Mr. Frye would have not have committed misconduct on those cases where he had previously disclosed them, correct?

A.      If that were the case, then I would agree with what you're saying, yes sir.

Q.      Now on this issue as far as your investigation, because we're trying to find out if Mr. Frye intentionally did this. That's what we're looking at. Did you interview Mr. Frye to find out what his understanding was regarding his obligation to respond to Giglio regarding private disclosures?

A.   I did not, and this situation was a little bit unusual, if you'll give me the opportunity to just give a little more information here.  Knowing that this was a complex issue when I presented Detective Frye with his letter of allegation, our normal protocol is that I would go ahead and do an interview of that employee, but due to the fact that we received a very lengthy and extensive report, I state this in my report, I decided to give Mr. Frye the opportunity to thoroughly review the report to so call in, so to speak, and see what the allegations are the U.S. Attorney and also by letter of allegation.  So I put in my report that I chose not then to put him on the spot, so to speak, because I didn't feel it was fair to him.  So I told him that I wanted to give him five days to respond and we would talk then.  He then asked for a 10-day, 10-workday extension and I allowed him the 10-day extension.  Then rather than coming to meet with me, I was met with a private civil process server who presented me with your report, sir, that was his response.  That did not afford me an opportunity to meet with him, and since I received a letter from legal counsel, I felt that the report I received from you would stand alone and that was the response of Mr. Frye and his legal counsel.

Q.   Do you mind if I approach you and the panel?

A.   No sir.

Q.   I don't want to make you feel uncomfortable.

A.   No sir, we're all good.  We're here for the same reason and that's to –

Q.   Trying to get to the truth.  So this answer Mr. Frye then gave you, that's what you're referring to, that's under Tab 3, that's August 29th, 2015?

A.   Yes sir.

Q.   He tells you, this is a reference to the Holohan complaint, he tells you that Detective Frye, he says that, this is on Page 12 of my answer.  This is regarding Number 2, the allegation of whether he lacked candor regarding the Holohan complaint.  It says, response to Question 2, "During the time of the complaint, this was disclosed to AUSA Attorney Wolthius"?

A.   Yes.

Q.      "And then when the allegation was unfounded", this was also disclosed to AUSA Wolthius, "Detective Frye would not have had to disclose this at this point as it was unfounded and previously disclosed"?  So you knew from our response that Mr. Frye was of the position that once he disclosed it, he filled his obligation, he didn't have to respond again.  You knew that was his position?

A.      I apologize.  I misunderstood the context of your question.  I thought in my meeting with him that he told me that, not in that response I received from you.  I just misunderstood the context and I apologize.

Q.      No problem.  So we're clear here, from Day 1 consistently Mr. Frye has let you know he believed the policy to be that one, if he gave a prior disclosure, he didn't have to go back and disclose again.  You knew that?

A.      Yes sir, absolutely.  Without question Mr. Frye has stated that in his response. I've read it and it's very clear.  Your position and Mr. Frye's position in your response is clear that that was that he felt that each response was an update.

Q.      Now given that and trying to determine, did you question the validity of his belief as to whether that's the way it was?

A.      No sir.

Q.      So you did not obtain any interview or statement from Billy Cunningham, his supervisor, regarding if that's the way it was for their office, correct?

A.      No sir, I did not.

Q.      And certainly Billy Cunningham, who is his supervisor, dealing with those officers would have known how they were doing it there.  You would agree with that, correct?

A.      Yes sir.  Well –

Q.      He was their supervisor, correct?

A.      He's their supervisor, but I think any statement –

MR. CARROLL:  I'm going to object just to the extent he's asking for the ATF to speculate.  For the Chief to speculate about whether the ATF can speculate about how the U.S. Attorney's office –

MR. WEBB:  I'll rephrase the question.

Q.      You are aware that Billy Cunningham was the supervisor for Craig Frye and the other ATF officers, correct?

A.      Yes.  I'm very familiar with Billy.  I've worked for him for many years both here and at the State Police.

Q.      And you did not interview him to find out what the common practice is, whether a private disclosure was enough to respond to a Giglio question?  You didn't ask him that, right?

A.      No sir.  I felt that the best source would be the Department of Justice United States Attorney's Office.

Q.      But if we're trying to figure out if Mr. Frye intentionally violated this policy and he willfully did it, that is important.  What he was trained to do there, how they were doing it, that would be important to determine is he somebody who's lying or is this something that he thought that's the way it was and this is a mistake?  Would you agree with that?

A.      To a certain extent, yes sir, but I would assume that any training would be done by legal counsel for members of the Task Force just as my training at the Virginia State Police on Brady was done by legal counsel.  I would think that they would not be having Special Agents train their personnel on issues involving the law and legal procedures, that they would rely on counsel.

Q.      But if all the ATF is treating this, once you give a private disclosure you don't have to go back and replow the ground, that's pretty important information to know as far as your analysis whether he's actually lying or that that there's a mistake here, correct?

A.      Yes.

Q.      Okay.  Tell me what you know about the Giglio officers with the U.S. Attorney's office?

48

A.     I believe Ms. Shelvey is a Giglio officer.  Possibly Jennie Waering, I'm not sure, but I know there are certain Assistant United States Attorneys that are designated as Giglio officers.  How they get that designation or how that's done, I don't have any idea.

Q.     That's kind of important.  You don't know what their role is with the Federal officials?

A.     No sir, I do not.

Q.     Do you know what their role is with maintaining Giglio file material for their officers?  Do you know anything about that?

A.     No sir, I don't.  As a matter of fact, I was told I can't even see Giglio records.  They're so confidential that if Detective Frye's has filed one in the past, I'm not, that's why I received a blank one.  I'm not allowed to even review them.

Q.     So you don't really know what they do as a Giglio officer?  You don't know what type of material they maintain.  Is that a fair statement?

A.     Yes sir, that's a very fair statement.

Q.     So when you fired Mr. Frye, you didn't know the answers to that information.  Is that a correct statement?

A.     Yes, it is and it's not information I'm sure that would even be, that I could even receive.

Q.     I'm not talking about what information is there.  I'm talking about their procedure and how they get it.

A.     Yes sir.

Q.     You didn't know that, correct?

A.     No, I did not know their procedure.

Q.     Did you know who Mr. Frye's Giglio officer was at the time of the events of this alleged misconduct?

A.     No.  I could only make an assumption, but I do not know.

Q.    So you never interviewed Mr. Frye's Giglio officer, correct?

A.    I may have, I don't know.

Q.    Because you don't know who the person is?

A.    Exactly.

Q.    You didn't interview them in the capacity of them being a Giglio officer.  Is that a fair statement?

A.    Well, I was directed to Ms. Shelvey who I was told was the Giglio officer after I had spoken with Ms. Munro, but whether or not she was his Giglio officer, I don't know.

MR. WEBB:  I do think if I can take a five-minute break, if you guys are okay.

JUDGE APGAR:  Okay.

(FIVE-MINUTE RECESS)

JUDGE APGAR:  Did you have any more questions?

MR. WEBB:  Yes.

Q.    Mr. Foster, are you ready to go again?

A.    Yes sir.

Q.    Mr. Foster, we're starting back up again.  I want to move to the topic of disclosure of the documents that you gave.  On Page 3 of your Exhibit 4, you reference that on June 19th you met with AUSA Attorney Rottenborn and an Ethics Attorney.  Who is the Ethics Attorney?

A.    I didn't write her name down, but I believe it is Bochorst.  I mentioned her in another one, but I realized when I left that meeting that I had not gotten her name, but I reference her on another page.  I believe it is, I'm not sure if I'm pronouncing her name right.  I believe it is Bochorst.  I think is that attorney, but Mr. Webb, I'm not a hundred percent positive.

Q.    That's fine.  You provided them with the documents you listed on Page 2 of this letter, your charging letter, 2 or 3 of that letter, correct, and that was Attachments 3 to 11.  That's what you gave the U.S. Attorney's office?

A.    Yes sir.

Q.      Now turning to Page 10 of your charging letter, under Investigative Findings, and you know we made much of the fact that we knew that we believed due diligence wasn't done by this town before giving these documents.  You know our position on that?

A.      Oh, absolutely, yes sir.

Q.      You state there that the documents were released in good faith.  Do you see that in the first paragraph?

A.      Yes sir.

Q.      And you say "At the direction of two Assistant U.S. Attorneys who advised your recording member that the information must be disclosed under the Giglio Rule."  Is that what they told you?

A.      Yes.  They told me these were relevant, I guess "must" is my word, but whether they used the word "must" or these are Giglio applicable, but yeah, the inference I drew from that conversation was these are records that needed to be turned over in response to the Giglio letter.

Q.      But you agree that legally there was no requirement for you to do that, meaning that you weren't required by law to send those records?  You agree with that?

A.      Yes.  Based on the letters that they sent me I believe on May 3rd or dated May 3rd, it said that that was not required to be disclosed, but she did state to me that if we did not disclose them, she was going to subpoena them.

Q.      It was interesting.  What case did she have outgoing that she was going to issue a subpoena for?

A.      She did not say.

Q.      But she was insistent she was going to get those documents?  "I'll subpoena them if you don't give them".  That's what she told you?

A.      That's exactly what she told me.  I had the documents.  She asked if I would turn them over to her.  I told her that I would like to consult Town Management, mainly our Human Resource Director before I turned over those, and she stated "You can either turn them over or if it's easier, we'll

subpoena them." I then said, again here in the spirit of cooperation, I wanted to cooperate with the United States Attorney's office and so I asked if it would be okay to make a phone call. I believe actually Captain Drumond who was with me, he was the Deputy Chief of Police, was with me on this occasion. He contacted our Human Resource Director which is Donna Collins and she said, "Go ahead and release the documents." So we did.

Q.      Did you consult with your own attorney?  I mean you have great Counsel, Mr. Carroll, to have the --

A.      Teresa Fontana, yes.

Q.      Did you consult legal Counsel as to the obligation and under what circumstances these documents should be disclosed before you released them?

A.      These particular documents, no sir, I did not.

Q.      Now you did though afterwards speak to Randy Leach to determine if there was a criminal violation in the IA Files being destroyed and then releasing these documents?  You asked him if it was a criminal violation, right?

A.      Yes sir, I did.

Q.      And you said, and I have never alleged that that's a criminal violation.  I've alleged it's a civil violation, right?

A.      Yes sir.

Q.      Did you seek any legal advice from Mr. Leach as to whether releasing information dealing with expunged records or information coming from expunged records was a criminal violation?

A.      No.  I think we brought up the fact that the expunged arrest had been turned over, but we did not get into a discussion as to whether or not it was legal or illegal, and if I might add, the reason why we sought the opinion of Randy Leach on any violations of law that might have occurred with destroying the IA Files, that again was done at the request of the Vice Mayor and the Town Manager.  I had no concerns about those.  They were in keeping with the Library of Virginia Regulations that said

they could be destroyed, but they wanted I guess some reassurance that there was no problem there.  So I reached out to Mr. Leach to read the report and to review the documents pertaining to the destruction of those files.  I personally, if I can state to the panel, again as a former IA Investigator, I would never destroy those files.  I did not think it was prudent.  I don't think it was a good idea.  Was it unlawful?  No, it wasn't.  It was done by a previous Chief, but decision was made before I was appointed and before I came here, but the reason for that was just to get some reassurance to the Town Management that the previous Chief did not engage in something that was unlawful in destroying those records.  Again, not a particularly good idea, but not unlawful, not a best practice certainly.

Q.     I understand and I'm not blaming you for the prior actions of some former Chief in destroying all the Internal Affairs files.  I'm not blaming you for that, but you understand our position is that at that point you knew that, and then the issue is the documents you did have, whether those gave the complete picture to what you're getting ready to send to the U.S. Attorney?  You understand our position on that?

A.     Absolutely, yes sir.

Q.     So I want to, while it's not a criminal violation, I want to review a couple of Civil Statutes.  Turn to Exhibit 9, is you would.

A.     Is this 2.2-3800?

Q.     That's exactly right.  Just let me know when you're there.

A.     Yes.

Q.     Under "C" do you see "Recordkeeping agencies of the Commonwealth and Political Subdivisons shall adhere to the following principles of information practiced to insure safe guards of personal privacy."  Do you see that?

A.     Yes sir.

Q.     And under 5 it says, "Information shall not be used unless it's accurate and current."  Do you see that?

A.     Yes sir.

53

Q.      And under 8, "Any agency holding personal information shall assure its reliability and take precautions to prevent its misuse." Do you see that?

A.      Yes sir.

Q.      And you agree that you are under those parameters of the civil law in sending out this information to the U.S. Attorney, correct?

MR. CARROLL: I'm going to object to that to the extent it's calling for a legal conclusion. That's case law which says it doesn't.

MR. WEBB: I'll retract the question. I'm not going to ask him –

Q.      Were you aware of that Dissemination Act before you sent this information?

A.      No sir, I was not.

Q.      So you would not have reviewed it in determining whether it governed your acts at the time?

A.      No. At the time I reviewed this Code Section was when I received Mr. Frye's response on your letterhead and where you referenced that Code Section, that's the time that I reviewed that.

Q.      So you stated you're aware that the Internal Affairs file had been deleted, had been destroyed?

A.      Yes.

Q.      But you said that you guys found some documents on a Disciplinary Scanner File maintained by Ms. Alterio, correct?

A.      That's correct.

Q.      Now does that Disciplinary Scanner File have all the records, all the Internal Affairs records, all the complaints? Is it a complete file?

A.      No sir, it is not.

Q.      I know you've got your Personnel Records and I know you've got the Internal

Affairs because I looked at your policy.  I haven't seen anything in there about a Disciplinary Scanner

File.  What was your research into what that was?

A.      Well, I didn't know the file existed until I asked Ms. Alterio to give me some

disciplinary records.  I had gone up to the Personnel, or HR Director's office and had reviewed his

Personnel Record and his background investigation and going through some of those things.  I then asked

Ms. Alterio to provide me with any other Disciplinary Records she had.  We have what's called a an

(Inaudible) on a T Drive, and I'll be the first to admit I'm not the most technologically savvy person in

the world when it comes to computers and data storage, but I rely on her for that.  That's her area of

expertise.  She has worked very hard to make us as paperless as possible when it comes to records

retention and she created this file apparently many years ago.  There's a file through each individual

employee and there are subfolders within that file that pertain to various aspects of a person's

employment, for lack of a better way to put that, and one of those is disciplinary, and any time there is a

document, and how it was explained to me by Ms. Alterio, if I were to provide a written reprimand to an

employee, I furnish a copy of that to our HR Director and she gets that.  Now this is something rather

new.  I'm told the previous Chiefs did not necessarily pass along as much information to HR as I do, but

when I came here, I meet with HR pretty much every disciplinary, other than just verbal issues.  But I

provide her with a copy of that document, whichever employee it might.  She scans it into this

Disciplinary File, which is again I'm told is a subfolder under that employee's name in the computer

database, and then of course a hard copy is then provided to our HR Director who files it in the

employee's Personnel File.  Now that has not always been the procedure, I'm told, but it's the procedure

that I put in place so that there's duplication and that we are keeping files down there in the Police

Department that aren't on record with Human Resources.

Q.      So when you sent these records to the U.S. Attorney's office, you knew the IA

file was destroyed.  You knew that that scanner file did not have the complete record, correct?

A.      Well, completeness, it's difficult for me to make an opinion on that.

55

Q.      Well, let me ask you this.  Let's address that concept.  If there's a complaint that somebody did something wrong and then there's an investigation that fully looked at it and said it's unfounded and that's part destroyed.  Would you agree that just sending a complaint is an incomplete record?

A.      It would not be, yes, a complete investigative report.

Q.      And that happened here on a number of occasions, did it not, for Mr. Frye for which you sent?

A.      Yeah.  Some of the documents that I found or were provided to me, I shouldn't say I found them.  Ms. Alterio actually sent me that file for me to peruse on my computer to go through that 81 pages, and I did that after she forwarded me the link to that file, but it contains again memos for showing up late for work.  There's some memos in there about some other day-to-day corrective type things that were not pertinent based on my understanding of Giglio, which I've learned from the attorneys and the opinion of Janet Reno and whatever other sources.  So I don't know the completeness.  Some of them will be complete because it might be a written memo saying in the future you will follow Department protocol regarding this issue.  That could be a complete file.  I don't know.  It's a memo to file.  There are others that were documents that may have been used in an internal investigation and the internal investigation is not there.  So my best answer I can give you, Mr. Webb, is some may have been complete, some may have been very incomplete.

Q.      I want to talk about the very incomplete ones.  You can understand that sending very incomplete records where you're just sending a complaint and where there had been an investigation saying "Unfounded, Mr. Frye did nothing wrong," you can understand that sending on that incomplete record to a U.S. Attorney can have disastrous consequences?  You understand that, correct?

A.      Well, yes, but I also believe that I should not be the person who's making those decisions.  I should be relying on legal counsel to make those determinations and provide me with advice on what I should turn over and what I didn't, and that's what I did in this case.  I did not make the decision as to what should be considered Giglio information.  The United States Attorney did that.

Q.      Let's talk about the legal advice concept.  The U.S. Attorney, they were not the town's attorney, were they?

A.      No, they're not the town's attorney.

Q.      And you did not seek your own legal advice as to what to do, correct?

A.      Not on releasing these documents, no.  Now of course my report was reviewed by –

MR. CARROLL:  Objection.  I think that's getting into attorney/client privilege.  I'm not sure what he's getting ready to say.

JUDGE APGAR:  Tread carefully.  Don't disclose your communications with your attorney.

A.      Okay.

Q.      So you agree that when you sent the documents, you did not obtain your own legal advice, correct?

A.      I did not obtain independent legal advice outside of the United States Attorney's office.

Q.      And Number two, you knew that some of those documents were very incomplete, correct?

MR. CARROLL:  Objection.  I'm not sure that's his testimony.

MR. WEBB:  Well, I think it is.

Q.      Do you not agree that some of those documents were very, you used the word "very", incomplete?

A.      Yeah.  That may not be a very good adjective to use.  I know that some of them were part of a bigger file.  You know it's an assumption you're making because you're reading it, these are alluding to other conversations in some of those, they're alluding to internal investigations because one of them or two of them I think at least resulted in sustained allegations.  So one should be able to read

that document and infer that there's more to it. Now how much more there was to it, honestly I have no idea. I don't know.

Q.      But in situations where you're sending only the complaint and there was in fact an investigation that said it was unfounded, that is very incomplete when you send it to the U.S. Attorney. Would you agree with that?

A.      Yeah, I believe it's not a complete file, but like I said, the extent it's incomplete, I guess it goes back to the "I don't know what I don't know". I don't know what was in there. I don't know what's missing. So it's difficult for me to make a determination on the completeness of the file, but I can make some inferences that based on verbiage that's used in that document that there may be other documents related to it.

Q.      We're going to go over some instances where a complaint was sent and yet there was an investigation and it was unfounded that was not sent. So we'll look at that and we'll come back around and give you a specific example here, okay?

A.      Okay.

Q.      I want to go your actual policies. I'd ask you to turn to Exhibit Number 10. That is the white tab. It's Roman Number VII.

A.      Criminal Affairs Procedures.

Q.      Yes, and you see there "B" it starts with "Completed investigations"? This is on Page 7 of that Exhibit 10.

A.      "B", Completed investigations classified as unfounded.

Q.      Go ahead and read that for the record, if you would please.

A.      "Completed investigations classified as unfounded, exonerated or not sustained will be maintained in the Internal Affairs Office of the Chief of Police for a period of three years after the close of the investigation. Sustained complaints shall be filed in the individual employee's Department Personnel file with a copy in the Internal Affairs' file.

Q.      And that was the Town of Vinton's policy, correct?

A.      Yes.  I don't think I was in this.  Whose signature is on this?  This one doesn't have a Chief's signature on it.  Yes, I would assume that's correct.  Yes sir.

Q.      Also turn back to Page 4 of that same Exhibit under the very top there, "He".  Let me know when you're with me.

A.      I'm there.

Q.      If you'd read that into the record please.

A.      "Investigations completed by the Internal Affairs Unit will be immediately submitted to the Chief of Police.  All Internal investigations will be filed in a locked file cabinet in the Chief's office along with all statistical data collected."

Q.      That was at the time the policy of Vinton in reference to Internal Affairs documents, right?

A.      Yes.  It still is the policy of the Department.  They are maintained in my office in a file.

Q.      So in simplified form, Internal Affairs kept all the documents.  They kept the unfounded ones.  If it was an actual founded complaint, it would be in the Personnel file for the person, correct?

A.      My understanding of that, yeah, it should be a dual file.  It says that a copy will be maintained and then another file will be kept in the employee's Personnel record.

Q.      But only founded complaints are in the Personnel record, correct?

A.      I believe so.  Let me look at that one more time please.

Q.      Go back to "B".  Let's make sure.

A.      Like I said, we've got so many tabs.  It's hard to remember it all.  I'm trying to prep as much as I can, but I can't remember it all.

Q.      That's Page 7.  I'll read you the sentence.  "Sustained complaints shall be filed in an individual employee's Department Personnel file with a copy in Internal Affairs' file."

A.      Yes, that's how I read it.  Yes sir.  It says sustained should have a copy in the employee's Personnel file in HR and then another copy in my office.

Q.      And your language actually tracks similar to what the Giglio impeachment information is.  If you see "Completed investigations classified as unfounded, exonerated, or not sustained will be maintained in the Internal Affairs file."  That's what your policy, Vinton's policy says, right?

A.      You're saying not sustained?

Q.      Yes.  I'm reading "B".  It says "Completed investigations classified as unfounded, exonerated, or not sustained will be maintained in the Internal Affairs files and the Chief's office for a period of three years."

A.      Yes.

Q.      So we're clear on that.  Unfounded is in the Internal Affairs files and they have founded ones there too.  The only ones that are in the Personnel file are sustained complaints?  Would you agree with that?

A.      Yes sir, that is my understanding and interpretation of the policy as it's written.

Q.      Let's turn to Exhibit 11.  It says "Records Management".  Do you see that, Chapter 11?

A.      Yes sir.

Q.      I want to go to Paragraph 3, "Confidentiality of personnel files and personal information".  Do you see that?

A.      Yes sir.

Q.      I want to read this to you for the record.  "All files and records concerning employees are the property of the Town of Vinton.  These files and records are confidential and will not be released to outsiders unless the employee authorizes the release of his or her records in writing or unless otherwise allowed or required by law."  Then the bottom part of that second paragraph says, "Any

disclosure of such information to outside parties must have prior approval of the Town Manager." Did I read that correctly?

A.      Yes. I mean there were some other sentences preceding that, but your last sentence, yes.

Q.      So let me ask you in this case, did you ever receive a signed authorization from Mr. Frye to review what you're sending to the U.S. Attorney, the outside party in this case?

A.      No, I did not.

Q.      Did you ever, in accordance with the requirements of your policy, receive prior approval from your Town Manager before you sent those documents to the U.S. Attorney's office?

A.      I had told the Town Manager that I had shared the existence of these documents after my conversation with Ms. Munro and I also told him, he was aware of what information I would be sharing. He was not aware that I'd actually turned the documents over until the day that I met with AUSA Rottenborn after we'd consulted the HR Director. So the answer to that is he was aware of the existence of the documents. He was aware of the situation. However, he did not sign a – well, it doesn't say that he had to sign. So he was aware of it and he did not instruct me not to disclose, and then of course I was operating under the provision of the preceding paragraph where unless otherwise allowed or required by law.

Q.      We'll go over that one. I think that's important. Let's drill in this answer about the Town Manager. It's a pretty specific question. Did you get his prior approval before you sent those documents to U.S. Attorney Mountcastle?

A.      As often happens in the course of business, especially in town local government, I informed him of it and so I assumed that that was implied permission. He did not object or tell me not to supply the documents, but I made him aware. I briefed him with each stage of this investigation, what was going on once we determined the serious nature of it. So I would have to say in all candor, I would interpret it as implied permission, but I was never said, "Yes, you may turn over those documents".

Q.      So you're telling us today that you believed you had implied permission, but you can't say he gave you prior approval?

A.      That's correct, Mr. Webb.  I cannot.

Q.      You've already said Mr. Frye never had an opportunity to review what you were sending and be involved in that process, correct?

A.      That's correct.

Q.      He never signed an authorization, correct?

A.      He did not sign an authorization.

Q.      And you say, "unless otherwise allowed or required by law".  Now we've already went over the fact that this was not required by law.  There's no law that required you to do that, correct?

A.      No.  The Giglio letter I received said that there is not a legal requirement that I do this.  I guess I was acting in what I would phrase as the spirit of the law in trying to cooperate with the United States Attorney's office, which I feel I have an obligation to do as the Chief of Police.

Q.      Well, you have an obligation really first to your employees, to Mr. Frye, right, and his privacy and his rights?  That's your first obligation?

MR. CARROLL:  Objection in that he's calling again for a legal conclusion.

MR. WEBB:  I'm not calling for that.  I'll rephrase the question.

Q.      You had an obligation to Mr. Frye, his privacy rights, in following this policy.  You're supposed to follow the policy of your town, correct?

A.      Yes.  Obviously, I have an obligation to Mr. Frye, but if you want my principle, my obligation is the Rule of Law.  I've been in this business for 32 years June 1st and that's where my obligations lie.  It's the Rule of Law.

Q.      Okay, and the law here is the Data Dissemination Act.  That's the law, right?  The Rule of Law, right?

MR. CARROLL:  Objection again.  You and I can argue about the application of that, but I don't know that it's for him to testify as to whether that act applies.

Q.      That's one of the laws that I forwarded to you, correct?

A.      Correct.

Q.      And the other things that you had to follow were your policies in getting an authorization from Craig Frye, and that wasn't done, was it?

A.      In this particular instance, no, it was not done in this particular instance. I didn't feel that it was, there was an investigation being conducted, an Internal investigation, and because of my conversations with the United States Attorney's office and under their advice, I released this information. I did not get a signed authorization.

Q.      Now wait a second. When they sent you a letter asking for these documents, there was no investigation going by you or them, was it? They're just asking for you to send documents. That was their request?

A.      That's correct.

Q.      So let's don't say there was some investigation going on when there was not. There was no investigation at that point when you turned the documents over, correct?

A.      No, not at that point.

Q.      Okay. So you've got a policy that says Craig Frye's got to sign an authorization before you send them and you ignore that, right? You don't do that, correct?

A.      Can I clarify?

Q.      Well, "yes" or "no", you ignored that, correct? Did you ignore that law, the policy that required you to get a signed authorization?

A.      I did not ignore the law.

Q.      I'm not saying the law. I'm saying the policy. Did you not follow the policy in this case? You didn't get a signed authorization? Do you agree with that?

A.      I did not get a signed authorization, yes sir.

Q.      The policy required you to do it, correct?

MR. CARROLL:  I'm going to object to the characterization of the policy.  It clearly says "unless otherwise allowed or required by law".

Q.      All right.  Well, the law in this case, you've already said it wasn't required by any law.  You agree with that, right?

MR. CARROLL:  He testified that the letter from the U.S. Attorney's office indicated that, yes.

Q.      Is that what your understanding, it wasn't required, from the U.S. Attorney it wasn't required by law, correct?

A.      That's what's stated in their letter, yes sir.

Q.      I'm trying to understand why, because you've got these documents.  If you'd have gotten Craig Frye involved, he could have said, "Wait a second, Chief.  That's not complete.  Here's the rest of this document.  If you're going to send it, I understand you feel like you want to send it.  I will sign an authorization once you make this record complete and send it. Here's the investigation.  I've got it.  Here's the investigation findings."  You never gave him that opportunity, did you?

A.      Prior to releasing them?

Q.      Correct.

A.      No.  I released them before – yes, I did not.

Q.      So your answer is he never had an opportunity to sign an authorization or have input in that process, correct?

A.      I did not, but there is some reason for that.  If given the opportunity to explain maybe on cross, I can do that.

Q.      Well, when you're saying there's some reason you wouldn't allow him to look at the documents and then say, "Hey, I need to make them complete".  You're saying there was a reason for that?  I want to hear it.  Let's say it now.  The panel is here.

A.      I'll tell you.  Mr. Frye had come to my office and had told me that the Giglio letter would be coming.  He told me that he had responded "No" to every question.  I went and reviewed

the scanner file that was there and found contradictory information that would indicate that there were some items that should have been disclosed. At that point in time, I would guess you would call it in a pre-investigative stage because I found contradictory information from what I found in the file and what I was told by Mr. Frye. I was trying to, and as any of us who have been in law enforcement, you're in this stage where you've got to be careful about what information you release and what information to not. I always notify in Internal Affairs matters the person who is being investigated when it doesn't interfere with the conduct of the investigation. We were at the point where I had found that information had been provided to the United States Attorney's office that may not have been accurate. I did not know what type of investigation they may conduct as a result of that. Therefore, I did not feel it was prudent to this particular situation to contact him at that point and tell him what I was releasing because I did not know where this was going to go after I found this conflict.

Q.      Well, if you knew that the scanner file had incomplete, some of the records were incomplete, you said that, very incomplete, right?

A.      Yes sir.

Q.      And then you're not letting Mr. Frye have the opportunity to make them complete and talk to you about it, right? You never let him do that, right?

A.      Not at that stage. No, I did not.

Q.      And the policy required you prior to to get his signed authorization before you sent it, correct?

MR. CARROLL: Objection to a legal conclusion.

Q.      This policy says that unless it's allowed or required by law, you must get his authorization. That's what the policy says, correct?

A.      The Town Policy says that, yes sir.

Q.      Okay. What I want to do, we're going to kind of change gears. We're going to actually get into the charges. So I'd like you to turn to, this is Exhibit 4. If you'll turn to Page 10 there. You have the section you talk about investigative findings. Do you see that?

A.      Yes sir.

Q.      After you get all the background, information reviewed, and then here are your findings, correct?

A.      Yes sir.

Q.      And on Page 11-13, those are, I let the panel know and this is what I've done and it may help is that on Page 11 for the first bullet point I put an "A". Then on Page 12 for each assessment bullet point I put "B", "C", "D" and then "E" because those are the bullet points. Those bullet points are your charges of misconduct and why you found those charges. Right there, Pages 11, 12, and 13, correct?

A.      Yes. These are my findings, yes sir.

Q.      Those paragraphs that you've indented, you've said here are the facts, here's the rules we're going by, and then you make the finding of misconduct for each one of those, correct?

A.      Yes.

Q.      So let's start, I'm starting with "A" and so you can see that's the first bullet point and you'll see there, you allege that Mr. Frye's failure to disclose a prior arrest had been previously expunged in response to Question 6 of the Giglio questions violates Mr. Frye's obligation to be truthful and was intentional misconduct. That's your allegation, correct?

A.      Yes, based on – well, I'm representing a finding. This represents my finding based on the information provided to me by the United States Attorney's office that withholding this information was in violation of the Giglio Rule.

Q.      But you make your own independent decision, or you make your own independent finding that this was willful misconduct that he failed to disclose a prior arrest that had been expunged? That's the issue here, correct?

A.      That is the issue here, the simple issue, yes sir.

Q.      You say there in that second paragraph, you say "During my meeting of June 16, 2017, I was asked by AUSA Rottenborn if I was aware of any arrests of Detective Frye prior to his being employed as a police officer. I replied by asking if this included charges that may have been expunged by

Court Order." Now is it fair to state that when you asked that question regarding whether expunged arrests needed to be disclosed under Giglio, that's because you did not know the answer yourself?

A.        I was reaffirming what my understanding of the opinion of that because I again had spoken with SAUSA Munro and had done some research on my own, but before I released information that was expunged, I wanted to get a clarification with the Assistant United States Attorney. So I once again clarified that issue before giving that information. I was under the impression that it was, it was my understanding. However, I wanted to once again reaffirm through legal counsel that this was correct before I released that information, and that's what I did.

Q.        So we're talking about legal counsel. That's not your legal counsel. That's the U.S. Attorney who has come to you trying to get some information from you, right?

A.        Yes, and you know what, that's a question that I have, that I've had all along in this procedure. What is our relationship in that situation? Is there an attorney/client relationship? Does it invoke – I don't know

Q.        You're not paying them, are you?

A.        No.

Q.        Then they're not your attorney.

A.        Well, they're public attorneys.

Q.        That's normally a good indication.

A.        Whether or not you write a check, I understand, but I really haven't been clear on that attorney/client relationship in that situation. I don't know.

Q.        Well, you clearly asked her, you clearly in this thing indicate that you asked her the question. You replied by asking her do expunged arrests and information have to be turned over? You asked her that question before you give it to her, right?

A.        Absolutely, yes sir.

Q.      Now if you contend that the answer to that question was so obvious that Frye willfully failed to disclose information regarding expunged arrests, why was it not so obvious to you at this point?

A.      Well, I won't say it wasn't obvious to me, but I did want to take an opportunity when I've got an Assistant United States Attorney sitting across the table to take advantage of her knowledge and understanding of the Giglio Rule and get, again verify my understanding before I released the information.

Q.      Did you find anything in your research that said expunged arrests have to be turned over?

A.      Yes, I did.  I believe it's in the memo from Janet Reno.  I think it talks about expunged.  It's not clear.

Q.      It's not clear at all, is it?

A.      It's not clear.  It kind of says it depends.

Q.      So did you ever give Mr. Frye any training as to whether an expunged arrest needed to be disclosed under Giglio?

A.      No. I've never given Mr. Frye any training regarding that.  Apparently it's not clearly established law at this point.

Q.      I agree.  Prior to terminating Mr. Frye, did you ever review with him regarding what his understanding was as to whether an expunged arrest had to be disclosed under Giglio?

A.      No sir, I did not, Mr. Webb.

Q.      I want to have you turn to Exhibit 12.  That's the white tab.  We've previously sent these documents over.  Had you had an opportunity to review them before today?

A.      Yes sir, I have.

Q.      So you've seen them.  You know where I'm going on this.

A.      Yes sir.

Q.      So Section 19.2-392.2.  I want you to go to "F" of that.  That's on the next page. Do you see that?

A.      Yes sir.

Q.      It says "After receiving the criminal history record from the CCRE, the Court shall conduct a Hearing on the petition.  If the Court finds that the continued existence and possible dissemination of information related to the arrest of the petitioner causes or may cause circumstances which constitute a manifest injustice to the petitioner, it shall enter an order requiring expungement of the police and Court records, including electronic records, relating to the charge."  Did I read that part correctly?

A.      Verbatim, yes sir.

Q.      Let's turn to Exhibit 13.  Are you with me there?

A.      Yes sir.

Q.      This is an Order of Expungement that was entered by the Circuit Court of the City of Roanoke and this looks like it was signed by Judge Broadhurst dated July 22nd, 2005.  Do you see that?

A.      Yes sir.

Q.      On that second page it says, "Whereas at further appearance of the Court that the continued existence and possible dissemination of information relating to the arrest of petitioner, Craig Roger Frye, may cause circumstances that constitute manifest justice to such petitioner.  Now therefore, in consideration foregoing it is hereby a Judge's Order in the language of expungement."  Did I read that part correctly?

A.      Yes sir.

Q.      You were aware that an Expungement Order was in place before you sent the documents, correct?

A.      I had not seen the Expungement Order.  What I read was a statement in a background investigation conducted when Detective Frye was hired by the Vinton Police Department that

stated that he had a prior arrest. It did not give specifics, any details, or anything of that nature. It just said that there had been an arrest and that the record was expunged. So I did not see arrest record documents at that time and I did not see the Order of Expungement, just simply a statement by the background investigator.

Q.    This Order is filed in the Town of Vinton. You don't have any record in your files, all these files you keep, and you don't even have a record of that Order of Expungement in the Town of Vinton?

A.    No. The only thing that I've seen is what's in his Personnel file which is a background investigation that I believe was done by Craig Harris, if I remember correctly, and Craig Harris has died.

Q.    But it's fair to say that before you sent the records to the U.S. Attorney, you knew, had the information there was an expungement of the arrest, correct?

A.    Oh yeah. I had certainly information that would lead me to believe that an expungement had occurred. I had no question to, I had no reason to question the accuracy of the background investigation that was conducted. It stated it was there and I had no reason not to believe that.

Q.    Let's look at Exhibit 14, 19.2-392.3A. "It shall be unlawful for any person having or acquiring access to an expunged Court or police record to open or review it or disclose to another person any information from it without an Order from the Court which ordered the record expunged." Did I read that correctly?

A.    Yes.

Q.    And "C" it says this is actually a crime, "Any person who willfully violates this section is guilty of a Class I misdemeanor." Is that correct?

A.    That's what it says, yes sir.

Q.    In your position as Chief for the Town of Vinton, you're getting in other circumstances Orders of Expungement, are you not?

A.      I haven't received one, I don't think since I've been here.

Q.      Two years, never received one?

A.      Not that I recall.

Q.      Are you familiar with what the procedure is if you get an Order of Expungement, what you're supposed to do with the Town of Vinton?

A.      To remove all those documents.  I don't know the exact procedure.  I know that they go to the Central Criminal Records Exchange in Richmond which is maintained by the Department of State Police and they remove all records and fingerprint cards and things of that nature, but it's one of those items I haven't researched a great deal because I don't know that one has come through.

Q.      So you've not dealt with it before?

A.      It's not something I would rely on by memory.  If I did get one, I would read up and follow the procedure properly, and I don't have first-hand recollection of the process.  It's not something I've dealt with.

Q.      I've just read you though the Code Section for this criminal violation.  It says "Any information from it."  Do you understand what that means?

A.      Yes.

Q.      You can't disclose the record or any information you got from that Court record. Do you see that?

A.      Yes.

Q.      Then Exhibit 15.

A.      And just for the record, I didn't do that background investigation.  It was many years before me.  So whatever was contained in there wasn't information that I went out and saw.  It's just there.  That it shouldn't have been there is the question, is a valid question, but how it got there, as I state in there I've seen it and once I'd seen it and I know that it exists, I can't unsee it and unknow that it's there.

Q.      I know that you said that before.  Look on Page 11 of your charge here.  Go back to that bottom paragraph.  I think you said you saw some of the background checks, but let's look at what you say.  Let me know when you're there on Page 11 of Exhibit 4 of your charging letter.

A.      Page 11?

Q.      Yes sir, last paragraph.

A.      Yes sir.

Q.      You say there "It should be noted that I was shown an arrest document related to the aforementioned charge containing a mugshot of Detective Frye by the former Supervisor of the Vinton Police Department." Who showed you that?

A.      That would have been Lieutenant Mark Vaught.  It was a photograph.  If I remember correctly, it wasn't an arrest document.  I mean it wasn't a fingerprint card or anything like that, but it was a photograph of Mr. Frye.

Q.      His mugshot?

A.      That's what it was reported to me to be, yes sir.

Q.      And that is an arrest document?  That's actually, you know, there's internet sites that if your mugshot gets up there, you have to pay a lot of money to get them down.  That's a big issue now with mugshots.  Are you aware of that?

A.      No, I'm not aware of that, but yeah, it was one that Mark Vaught had and where he got that, I don't know.  I was told that these records were turned over by the Roanoke County Police Department to our background investigator because my question is the same as yours.  If these were expunged, how did we get them, and I was told that the Roanoke County Police Department turned them over to Craig Harris who was the investigator because I was quite surprised that this information was available.

Q.      Well, we are too because there was a Court Order saying it shouldn't be.

A.      Exactly.

Q.      And the reason it shouldn't be is circumstances just like that, is that it's used and then there's devastating consequences to employees and it shouldn't sent, right?  You understand that?

A.      I completely understand that, yes sir.

Q.      So when you're shown this mugshot and you knew that it was an expunged record, did you take any actions against Mark Vaught?

A.      Not for this, but I did actually investigate Mark Vaught for a separate matter involving untruthfulness and was proceeding to terminate him when he resigned.

Q.      Mark Vaught I guess showed you that at the time to create some negative impression of Craig Frye.  What was the reason he was showing you that?

A.      I think he was showing me that document to create a negative impression of Craig Frye, yes sir.

Q.      And there's a number of other employees here.  They've had a love/hate relationship with Craig Frye.  You've seen all the complaints?

A.      Yes.

Q.      You actually saw, in that Disciplinary Scanner file you told Mr. Frye that it looks like some people are after you?

A.      I think I used the word in talking with Mr. Frye, "piling up".

Q.      Piling up?

A.      It did seem like there were a lot of things that were documented in there that went beyond.  I've been a Police Supervisor since 1995 and I believe in progressive discipline of people that I supervise and I believe that the least amount of discipline should be used as necessary to correct whatever the problem is, and I think there's lots that can be done in conversation with the employee.  It doesn't necessarily need to be put on paper.  It looked like a lot of things had been documented on paper with Detective Frye, more so than what I would probably have done as a Supervisor, but you know, there's the norms of every organization, what the expectations are and how things should be documented, and again, this precedes me by many years, but I can tell you that I did tell Mr. Frye at one point that some of the

documentation seemed to be, a lot of things were put in writing that I think could have been handled differently..

    Q.      Chief Foster, looking again at the bottom of Page 11. We know the law. You can't disclose to another person any information from it, from the Court record, and this mugshot is from that arrest record?

    A.      I make an assumption. I don't know where it came from.

    Q.      Okay, but you're saying based on this mugshot you knew he was arrested. That's what you're saying here in this charge, right? You relied upon the mugshot to prove he was arrested?

    A.      No. I was actually relying upon the background investigation that was done by Craig Harris, which is in the HR thing. To be quite honest with you, I didn't really give that picture that I saw a whole lot of credence one way or the other. One of the things that I found when I came to the Vinton Police Department, there were factions that existed in this organization where people didn't get along with one another. They were oftentimes very eager to put people in a bad light. I took that as that being the case when I saw that from the senior ranking supervisor in this agency, and I became very aware that Mr. Vaught was engaging in showing a lot of favoritism and had employees that he didn't like, and quite honestly, when the opportunity presented itself, I moved to terminate Mr. Vaught when he asked if he could retire and I gave him the opportunity to retire, but I was in the process of firing him.

    Q.      Well, we know the law says you can't use any information from the Court records regarding this arrest. We know that's the law. We just read it. So you're saying you got some background information that shows the arrest. Do you know why that still exists? Why hasn't that been expunged pursuant to the Court Order?

    A.      Out of his Personnel Record?

    Q.      Yes.

    A.      I don't know.

    Q.      You agree it shouldn't be in there according to this law?

A.      According to the law there shouldn't be anything in there, but I do know that I was told and the only place it could have come from, it was given to our Investigator by the Roanoke County Police Department.

Q.      So you're saying you're basing your knowledge of the arrest on the improper stuff you have in your file about the arrest, it should have been expunged, correct?

MR. CARROLL:  I'm just going to object to the extent you're calling for a legal conclusion on whether the, and we don't really know where the reference in the background document came from, whether it came from a Court record or not.  There did seem to be some speculation about it, but it does call for a legal conclusion is all I'm talking about.

MR. WEBB:  No, we do, there's a record that shows in the background investigation that Vinton did when he was hired, he was arrested and that's been expunged.  We know that.  That's a record.

MR. CARROLL: I understand that, but where did the information in the background information come from?  It depends on if it was from Mr. Frye as opposed to from a Court record.  I'm just talking about the implication of this Code Section you're talking about.

Q.      You understand the principle here, that's supposed to not exist, you're not supposed to be using it?  You know that according to the law, right?

A.      According to this, yes, what you've read to me and again, that's where we get into this gray area from the memo, from the Reno Administration, and from the U.S. Attorneys.  It's not clear.  It is not clear in the case regarding Giglio and disclosure to Federal authorities on what's proper and what isn't, and I again acted on the advice of these attorneys and you know, how I came to know this information was simply doing what I think any Supervisor would do and reading the background investigation of their employees to learn about them as a new Chief of Police.  So that's when I became aware of this.  Did I ever hold it against Mr. Frye?  Absolutely not.  There was a point in time when I brought Mr. Frye in before all this happened where I wanted to promote him to a Lead Detective and even drew up a job description to move him in to that position because I thought that he would be able to

conduct drug investigations within the town, and we had a drug problem here just like every other jurisdiction. So although I had this knowledge, I did not use it against Mr. Frye.

Q.      In fact, you told Mr. Frye at the time you were given these charges that what we found out about these things from Rottenborn that he had outstanding character? That's what you told him? And that people in your office respected him highly. You told him that, didn't you?

A.      I don't know if I used the words "outstanding character".

Q.      You didn't?

A.      No, I don't.

Q.      You don't recall that?

A.      "Outstanding character"?

Q.      Yes.

A.      No, I don't. I don't recall that. I may have said, you know, I think he displays a lot of drive and initiative, and his experience and as an investigator would be beneficial. We're a young office. We're a very, very young Department here. I've got a lot of new folks down there and I wanted to recreate, and I even met with HR and did a salary study to look and see how we could compensate him as a Lead Detective that would offset his loss of overtime money if he came off the ATF Task Force. So what I'm getting at right there, there's no animosity, there's no animosity towards Mr. Frye, and whether or not he was arrested when it said it was expunged, in my mind it's expunged.

Q.      It should be gone?

A.      Yeah, but again I went back to the thing, I'm not going to tell the U.S. Attorney "No, this isn't there" when I'm asked if it's there because the truth has got to be the truth no matter what.

Q.      Wait a second. You are if the law says you're not supposed to know it. The law says that document isn't supposed to exist. It says "Any information from it" so if that's the law, you're not supposed to reveal that. Do you agree with that? Because it's a misdemeanor to reveal it.

MR. CARROLL: Objection to the calling for a legal conclusion.

Q.      Let's get back on track. Let's look back at Page 11. I want to read your last paragraph. It says "It should be noted that I was shown an Arrest document related to the aforementioned charge" meaning he was arrested, "regarding a mug shot of Detective Frye by a former supervisor of the Vinton Police Department. This occurred shortly after my being appointed Chief of Police. Therefore, Detective Corporal Frye's failure to disclose the arrest on question six of Giglio illustrates a lack of candor and truthfulness and is a violation of General Order 3-9." So you used the mug shot to confirm the arrest and the charge, did you not?

A.      Well, that and again the totality was the preceding paragraphs that talked about the information contained in the background dealing with a past charge. So that was part of it, yes sir. I guess what I'm saying here, I'm presented with what's purported to be a mug shot, and then I had the statement by a background investigator that said an arrest occurred, and I take those two things together and say, "Well, it looks like maybe an arrest occurred."

Q.      Based on Court records that you have coming which should have been expunged, right?

A.      I assume so. Again, you know there are plenty of situations. If every record can never be considered then how and why is there a policy in the United States Attorney's office that says that expunged records may be considered? If we go on to think that it's a hard set rule that never can anything ever be disclosed that's expunged, then why is there a policy that says that they can be considered? I understand, but again I'm not an attorney and I've got to rely on what I'm told by an attorney.

Q.      But you're an employee of the Commonwealth of Virginia, are you not?

A.      Yes, in the Town of Vinton.

Q.      And you have to follow the laws of the Commonwealth of Virginia in whatever you do?

A.      Absolutely.

Q.      You're a policeman. You enforce the laws?

A.      I follow them to the best of my ability, yes sir.

Q.      And if there's a law that tells you that you pull all that stuff out and you don't

disseminate it, the law of Virginia tells you that's what you've got to do, right?  You can't choose to

ignore that law just because the U.S. Attorney comes along and wants you to help him out, correct?

A.      Well, I wasn't doing this to help out a U.S. Attorney, but sometimes, and again

I'm not an attorney, but I know that in often cases Federal decisions, Federal rulings trump State law.

Q.      Is that what you thought at this time?  Honestly, did that go through your mind

that somehow Federal law trumps, was that going through your mind at the time you gave these

documents up?

A.      I don't know.  You know I've studied public policy and political science.  I

attended graduate school where I studied Public Administration.  My undergraduate is in political science.

I've studied the law.  I studied Federal law.  I studied State law.

Q.      But you're not a lawyer?

A.      But I'm not a lawyer, no sir, but I have an understanding of –

Q.      To answer that question, you should have gotten advice from your lawyer?  That

would have been more prudent, correct?

A.      Well, I had what I presumed to be an expert on the Giglio rule and Federal law

sitting across the table from me and on the telephone with me and I thought that their expertise in that

area would suffice in giving me a clear answer on what I should disclose and what I should not disclose.

Q.      They weren't giving you advice on your duties under the Commonwealth of

Virginia law, were they?

A.      No.

Q.      They didn't care because they wanted the document.

A.      They were advising on Federal law.

Q.      Well, let me show you how bad this got.  This is such a big issue.  Let me show

you how bad this got.  Let's turn to Attachment 13 of your documents.  This is the July 28th, 2017 letter

from Rick Mountcastle. I want you to turn to Page 3 of that document. I know it's a lot to follow here. It's Attachment 13. It will be one of the red ones. Then that's the July 28th, 2017 letter. Then go to the third page.

A.     Okay, I'm there.

Q.     This is what Rick Mountcastle says you told him when you spoke to him. "In addition, you" meaning Foster "orally advised that Officer Frye had disclosed on his employment paperwork that he has an expunged conviction for grand larceny." Why in the heck would you ever say that Mr. Frye had a prior conviction for grand larceny to the U.S. Attorney?

A.     I did not say "an expunged conviction". I told him, and as I stated in my letter of response, I cannot control how what I state to the United States Attorney is put into writing. I'm very familiar because I've had people call the Police Department, I've had people ask me over the years, "Can I get a conviction expunged?" and I'm very much aware that convictions cannot be expunged, only charges that are dismissed or I assume nol. prossed as well. I told them that it was my understanding based on reading his background that there was a charge. I do not believe nor would I use the term "convicted" because I have a clear understanding of the law in that area, and I think it was a misunderstanding on their part in transcribing our conversation that they used the term "conviction".

Q.     That's a pretty big difference in telling somebody that there was a prior arrest that was expunged than somebody had a prior conviction of larceny. That's a pretty big difference, right?

A.     Oh yeah. Only the governor or the President can pardon a conviction.

Q.     So when he says "you", Mr. Foster, orally advised him that he had an expunged conviction of grand larceny, you're saying to this panel that you didn't say that?

A.     No sir. I do not recall saying that to him at all. It's not my understanding of the law and I did not make that statement. If I did say or use the term "conviction", it was a mistake, but I feel very, very confident that I did not use that word. I know the law.

Q.     So are you saying that you may have told him it was a prior conviction?

A.     No, I'm not going to say that.

Q.      So you didn't say it.  He got it wrong?  Rick Mountcastle got it wrong?

A.      Well, Rick Mountcastle wasn't even in the room.

Q.      Laura Rottenborn got it wrong?

A.      Yeah.  There's more room for –

Q.      Yeah, there's a lot of parts going here.  Laura Rottenborn got it from you, right?

A.      Yes.

Q.      And somehow the translation from Laura Rottenborn to Mountcastle turned into a conviction for grand larceny?

A.      There's a lot of opportunity for things to have been –

Q.      There is a lot of opportunity, I agree.

A.      Yeah, and I did not.  Mr. Mountcastle was not a party to this meeting.  He was, I assume he wrote this letter or drafted this letter basing it on information he had received again from a third party, which would be Ms. Rottenborn.  She was the one that was in the room.

Q.      So they're all U.S. Attorneys, Rottenborn, Mountcastle, and they're getting their information from you?

A.      Yes.

Q.      You're saying you never gave that, that's an untrue statement?  Do you agree with that?

A.      I gave the information, but I would have used –

Q.      Is that an untrue statement?

A.      I would not have used the term "conviction".

Q.      I'm saying, but what he said there that he had a prior conviction of grand larceny, that's, I'm not going to say a lie, but that's false?

A.      It's an inaccurate statement.

Q.      That's inaccurate, a huge inaccuracy?

A.      Yeah, because a false statement has to show again, we're talking about intent. Was somebody intentionally trying to put a statement in here that was inaccurate?  No.  We're all human beings and sometimes words can get turned around.  It's just like some of the stuff that you're bringing up in my report.  I wish I could write a report that addresses every question everybody has, but I don't.  I just draft an investigation and report it to the best of my ability.

Q.      Well, let's stay on this topic because I know you're kind of, I want to stay right on this topic.  My question to you is this, when you got, you got this letter, this July 28, 2017 letter, you received it from Mr. Mountcastle, right?

A.      Yes.

Q.      And you see he's quoting you?

A.      Yes.

Q.      He's quoting you saying that Foster said Mr. Frye had a prior grand larceny conviction?

A.      Yes.

Q.      You knew it was wrong.  You knew that was inaccurate.  You just saw it, right?

A.      Yes.

Q.      Did you correct that with Mr. Mountcastle?

A.      I don't recall correcting it with Mr. Mountcastle.  So no, I did not.

Q.      He's attributing a statement that he is Giglioing your officer, Craig Frye, and part of what he's using is a statement where you said he was convicted of grand larceny.  You know it's untrue and you don't go back and say "Wait a second.  You made a mistake here."  You don't have that conversation with Rick Mountcastle?

A.      I've had a couple of conversations with Mr. Mountcastle in the past, but I don't know if we addressed that.  I don't think so, no.  I don't know.  I don't remember.  I really don't on that particular issue.

Q.       So there's this statement from you, he says, that Craig Frye has been convicted of grand larceny. I'm Giglioing him. He can never testify in Federal Court. You're saying you never correct it. How bad does it get after that when you don't correct that statement? Do you know?

A.       Well, the letter had already been drafted and the report was out. Whether or not we're talking about divulging an arrest or divulging a conviction, both of them are applicable under the interpretation of Giglio. The letter, Giglio says in the question "Have you ever been arrested –

Q.       Chief Foster, he wasn't convicted of grand larceny. That's untrue, right?

MR. CARROLL: Mr. Webb, he is trying to answer that question.

Q.       I'm not sure you are. I mean my question to you is he was convicted of grand larceny, and my question to you, do you know what happened after this when you didn't correct it? Do you know what else happened? Are you aware of that?

A.       I'm aware that – what was the date of this? This letter is dated –

Q.       July 28th, 2017. You know that he went, you know that they went to Randy Leach and shared this information that you said he had been convicted of grand larceny and didn't reveal that, and Randy Leach now won't let him testify. Do you know that Rick Mountcastle had that meeting?

A.       I had a conversation with Randy Leach about the terminology of conviction versus an arrest and made Randy Leach very much aware that he was not arrested.

Q.       You know that they did that though, right, Laura Rottenborn had met with Randy Leach to tell him that. You know that, right?

A.       I know that they had a conversation with Holohan. I don't know if they did Randy Leach. I know they had a conversation with Holohan.

Q.       Let's look what else happened. I want you to turn to Exhibit 16. When you didn't correct that lie or that falsehood that he'd been convicted of grand larceny – Exhibit 16, do you see that? It's a letter of November 27, 2017. Do you see that?

A.       Yes.

Q.       That is a letter, if you look at the back, have you seen this letter before?

A.      Yes.

Q.      I know you've seen it.  It's a letter from Rick Mountcastle to the Defense

Counsel, to attorneys in our community.  I want you to turn to Page 2 of that letter.  He says there, this is

under Number 3, for the reasons he's now telling all the lawyers and Mr. Frye's Giglio attorney, "Frye

reported an expunged conviction for grand larceny on his employment application."  That continues to be

false and inaccurate, correct?

A.      It would appear so, yes.  But if I might, I did have a conversation with Randy

Leach where we both discussed that so if Randy Leach had a conversation with the U.S. Attorney's

office, he is as a matter of fact, in reading that letter, Mr. Mountcastle's letter drafted to me, pointed out

that convictions cannot be expunged.  So we had that discussion in his office with Brian Holohan present

and I believe Mr. Lavender, who is now the Assistant Commonwealth's Attorney.

Q.      This isn't the only – I want you to turn to Page 4 of your charging letter, Exhibit

4, Page 4.  Are you with me there?

A.      Yes sir.

Q.      Coming down here on June 16th you and Deputy Chief Drumond met with Laura

Rottenborn and the Ethics Attorney.  Do you see that?

A.      Yes.

Q.      Do you remember that meeting and the questions that Laura Rottenborn was

asking you that day?

A.      Very much, yes sir.

Q.      I'm sure you do because she started asking questions of you about his fiancée,

she started asking questions about his 2016 hospitalization, about whether he had multiple sclerosis.  Do

you remember those questions?

A.      Absolutely.

Q.      And Drumond, who was in your office, told you that she seemed to be acting personal, she was actually unhinged in what she was saying.  He had a conversation with you about that, didn't he?

A.      Yeah.  We talked about it afterwards and he did make statements to that effect, yes.

Q.      So you see these bazaar questions being asked of you, you see them representing a complete change in your words saying he had been convicted.  You know that's happened, right?  You've seen that?

A.      Well, I know of the verbiage that was used in the letter and I know the questions I was asked.  Now can I made a nexus to that she's unhinged and this is something personal, that's not a conclusion I can reach.  The first time I had ever met Laura Rottenborn was on that day.

Q.      The conversation after that conversation, you and Drumond, you had the conversation this seemed to be personal.  You all had that conversation?

A.      Yes.  Drumond, I think, made that statement, yes sir.

Q.      Who did?

A.      I think it was Drumond, yes sir.

Q.      You agreed with it too, didn't you?

A.      I tried not to make a lot of statements or opinions.  I will say this, I went in there feeling that every question I was being asked, they already knew the answer to, which is any Prosecutor or police officer, I think that's standard.  It's good practice to know the answer to questions before you ask them, that some sort of investigation or inquiry had incurred and I was being asked questions that –

Q.      Were improper, right?  These questions about his health, his fiancée, all that, you know you can't be talking about somebody's health?

A.      I told her I didn't know anything about his health.  The only thing I knew was he had told me that they were testing him for arsenic and they were also going to check his well.  Mr. Frye

didn't tell me anything about any further diagnoses until later on, but this was just information she shared with me. Where she got it, I don't know.

Q. Chief Foster, on this first charge (A), given the fact that you were relying upon mug shots and documents that you should not disclose, are you willing today to withdraw that one charge, this arrest charge that he didn't reveal, are you willing to withdraw that as your claim that he committed misconduct?

A. No.

Q. All right. Let's turn to, I call it (B). This is on Page 12. This is your second charge in a document dated December 5th, 2005. Do you see that?

A. Yes.

Q. So this next bullet is, I've listed it as (B) and it's got Attachment 5 and Attachment 6, correct?

A. Yes.

Q. Attachment 5, if you turn to it is a claim that he was racially insensitive in a story he told, correct?

A. Yes.

Q. And that has a written reprimand to it, correct?

A. Yes, it does.

Q. Then Attachment 6 is a claim dealing with him playing a joke, changing a co-worker's website to a homosexual website, correct?

A. Yes.

Q. Now we can agree both these incidents, it's December 5th, 2005 and January 25th, 2006. Did both of these incidents predate your position with the town?

A. Yes sir, they did.

Q. And you don't have any personal knowledge regarding either of these incidents, correct?

85

A.      None whatsoever.

Q.      Now former Chief Herbert Cooley was the Chief at the time, correct?

A.      Yes, he was.

Q.      Did you interview, as part of your investigation, Chief Cooley regarding these incidents?

A.      No, I did not.

Q.      Now former Chief Cooley had personal knowledge of these incidents at the time, did prepare a letter back on October 22nd, 2009.  You're aware of that, right?

A.      Yes, I am.

Q.      Let's look at that.  That's Exhibit 27.

A.      Twenty-seven?

Q.      I'm sorry, 17.  I apologize, Mr. Foster.  Exhibit 17.

A.      Okay.

Q.      And you should have in front of you an October 22nd, 2009 letter, correct?

A.      Yes, I do.

Q.      I read this in the opening, but your review of this, do you agree that the Department at that time looked into any, based on what Cooley is representing, looked into any and all complaints, there was no exception.  Nothing in these matters rose to the level of disciplinary action against Detective Frye nor did they put his honesty into question.  Do you see where he said that there?

A.      I see where he says that, yes sir.

Q.      And under one, he says "There's no findings of misconduct that reflect upon truthfulness or possible bias."  Do you see that?

A.      Yes, I do.

Q.      And at the bottom line he says, "I would further state if I felt Detective Frye, if he was not completely honest and trustworthy, he would not be working in this Department."  Do you see that?

A.     Yes sir.

Q.     So this was part of an in camera review by Judge Conrad.  It was an Exhibit by Waering, "looking into all complaints as of that point", correct?

A.     It appears to be, but it's not accurate.  Yes sir.

Q.     Well, you see the date of this letter is October 22nd, 2009, correct?

A.     That's correct, yes sir.

Q.     And the two charges that you're bringing against him for misconduct are dated before that date, correct?  They're dated 2005 and 2006, correct?

A.     Yeah.  There's sustained allegations prior to 2009, and that's why I respectfully disagree with Chief Cooley.

Q.     Well, he was the Chief at the time, was he not?

A.     He was.

Q.     And he did the review and investigation and provided an opinion at that time, correct?

A.     He did.

Q.     And Mr. Frye would have known – are you aware that that information is out?  The Chief has made a finding there's nothing there.  That's in the record, correct?

A.     There was obviously a letter that was sent to the U.S. Attorney's office, yes sir.

Q.     Chief Foster, you claimed, you charged that the first violation of misconduct is that Mr. Frye should have responded to Giglio Question Number 8, and for the panel again, Giglio questions are under Exhibit Number 1 of the Exhibit book.  If we look at Number 8, that question is "Bearing in mind that anything you post on social media may be used as impeachment of the witness by showing a lack of bias, lack of credibility and professionalism.  Is there anything we need to know so that we can properly prepare for it?"  Let me know when you are with Exhibit 1, Giglio Question 8.

A.     What tab is that again?

Q.      That's actually not a tab.  It's an Exhibit.  It's a white one.  The very first one.
Do you see the Giglio questions there?  Just keep going to the very beginning of the book.  The very first
one.

A.      Yes.

Q.      You say that him failing to turn these two documents over violates Number 8,
and I just read Number 8.  It's dealing with social media, correct?

A.      Possibly if you'd bear with me a minute.  I want to look because I think there
could be a discrepancy in the numbering.  I'm looking for my letter.  The original letter sent to me by the
U.S. Attorney's office dated May 3rd has seven questions and three sub-questions.  I just want to make
sure we're referencing the same Number 8, and to answer your question before I get there, I don't know
of any issues with social media with Mr. Frye at all.  I'm looking at the one provided by Mr. Mountcastle
and Number 8 does deal with social media.

Q.      You're saying that Craig Frye is fired, has committed misconduct for violation
of Question Number 8.  I want you to explain to this panel your basis for that?

A.      Well, let me go back to my report.  Can you direct me to where I say that in my
report?

Q.      Yes.  On Page 12, I denoted that second charge as "B", that's the first full bullet
in document dated December 5th, 2005.  Do you see that?

A.      December 5?

Q.      Yes.  Come on down there about halfway and this is your charge of misconduct.
You said, "The incident was documented and was therefore required to be disclosed under Question three
and eight.  Do you not see that?

A.      "Required to be disclosed under Question three and eight (finding of bias)".

Q.      Okay, and if we're looking at eight, it's dealing with posting on social media, and
you fired him for violating Giglio Question Number eight.  Explain to this panel your basis for stating
that.

A.      I did not terminate his employment based on any finding dealing with Number eight.  All I can explain is that that's a typographical error.

Q.      So you had no basis for him violating Giglio Question Number 8.  Is that a correct statement?

A.      Not with social media, no sir, not at all.  That's a typographical error on my part apparently.  That's the first time I've seen it and obviously, I'm not aware of it.  It's clear you're correct.  I made an error.

Q.      And you are aware that Chief Cooley has already prepared a letter looking at all of this in 2009 saying nothing prior to that date constitutes impeachable information?  You are aware of that before you bring this charge of misconduct, correct?

A.      Yeah.  I saw where he and Ben Cook both said there was nothing pertaining to Giglio in there, and then after my research and interviews with the U.S. Attorneys, I found contrary findings.

Q.      Well, your research is being done in 2017, is it not?

A.      Yes, but 2005 and 2004 were prior to 2009.

Q.      But his research is being done and his answer to that is in 2009 as to whether it needed to be turned over at that point, correct?

A.      Yes, and that's where I say I respectfully disagree with both of them because –

Q.      The law has changed?

A.      No, because the Giglio ruling says it should have been turned over.

Q.      So there's a glaring difference of opinion between Chief Cooley, who is his Chief, his opinion at the time and what you're saying now, right?

A.      Yes.  We have a respectful disagreement.  I don't know, I have no idea who he contacted to reach his conclusions.  I don't know if he researched it the way I did, if he reached out to U.S. Attorneys and asked for professional opinions.  I don't know if he did that, but when this letter landed on my desk, I took it very seriously.  I spent a great deal of time, as you can tell, responding to it

because when a Judge or a Prosecutor or anyone in the Criminal Justice System asks me to sign my name to something, I'm going to do my due diligence to make sure, now do I make mistakes?  I make mistakes every day in my job.  When I put Number eight down when maybe it should have been Number four or six on there, that's definitely possible, but if I'm given a few minutes to review I can tell you which one I'm referencing in there, but putting Number eight in my report is a typographical error, but I did the research and I felt it was necessary and reached the conclusions I thought was necessary because I was going to sign my name to this document and send it to the Department of Justice and I wanted it to be a true reflection to the best of my ability of what the record states.

      Q.      Well, let's look at what Chief Cooley did at the time and maybe he did a little bit more than you.  Let's see what he did.  I want you to turn to Exhibit 18.

      A.      Motion for In Camera Review?

      Q.      Yes.  Do you see that?

      A.      Yes.

      Q.      Attached to that is an Exhibit Number 1 of the U.S. Attorney and Exhibit 2 of the U.S. Attorney.  Exhibit Number 2 is the Chief Cooley letter, is it not?

      A.      Yes, it is.

      Q.      So you've got Mr. Cooley saying what he has and we've got a U.S. Attorney using that document on this issue.  I want you to turn to Page 2 of the In Camera Review, okay?  You see where it says at the top, "The United States has discussed this memo as well as to take Craig Frye's personnel file with Chief Herbert Cooley of the Vinton Police Department in response to the government's inquiry, Chief Cooley provided a letter that states in part 'This Department looks into any and all complaints and there are not exceptions.  Nothing in either of these matters rose to the level of disciplinary action against Detective Frye nor did they put his honesty into question.'"  Do you see that?

      A.      Yes sir.

Q.      This is a U.S. Attorney at the time reviewing, having his personal file, having a letter from Chief Cooley and making a Motion to the Court saying that in their opinion that these documents that you're now relying upon are not Giglio.  Do you see that?

A.      Yes, I do.  It doesn't say that the U.S. Attorney had his Personnel File.  It just says that they discussed it.

Q.      Well actually, that's not the case.  Let me ask you turn to Exhibit 19.  If I can approach you, it might make it a little faster.

A.      Absolutely.

Q.      Exhibit 19, that is the Personnel File that was turned over, and this is a prior authorization.  All these documents are the Personnel File that was turned over and reviewed as part of this Motion in Camera.  Do you see that?  I want to turn, I put a sticker because it takes too long.  If you can confirm, I'm turning, I can tell the panel, it's 1, 2, 3, 4, 5, 6, 7, 8, it's the 9th page into the Personnel File, and therein is the memo you're charging him with, the actual charge and the actual disciplinary part of that, December 5th, 2005.  That was in the Personnel File at the time?

A.      Yes, it is.  It appears to be.

Q.      So Mr. Frye now, this Personnel File is being reviewed by the Court, the U.S. Attorney has it.  The charge you're now saying he didn't disclose, correct?  That's the same charge?

A.      Yeah.  It would be one that I was told by United States Attorney Mountcastle it had not been disclosed.

Q.      And we see here Attorney Mountcastle is incorrect because this is in the Personnel File.  You're looking right at it, right?

A.      Yeah, I'm looking at it.  Yes.

Q.      Now it's your position, so the panel clearly understands here, it's your position that if Mr. Frye doesn't once again when he speaks to Attorney Shelvey, if he doesn't once again disclose this at a subsequent conversation with her, he has committed misconduct and must be fired.  That is your position, correct?

A.      If he didn't disclose.  He's not being fired, he's being fired because of his inability to testify and he was terminated because of violation of Town Policy.  These things, they're items that constitute a totality of circumstances.

Q.      Let's make it clear here then.  He is being fired for misconduct?

A.      Yes sir.

Q.      That's clear, that he willfully lied to these Giglio questions?  That's the basis for the firing, correct?

A.      Yes sir.  Mr. Mountcastle told me that he had replied "No" on every occasion to all the Giglio responses.

Q.      So even though it's clear, we have evidence he has disclosed this at that time, it's your position that prior disclosure is insufficient, that he has to re-disclose it when Ms. Shelvey asked the question in 2017?  Do I understand your position?

A.      That's what I'm told, yes sir.

Q.      And that's the basis, even though he's already disclosed it, he was honest and truthful and gave it then, you're saying that –

MR. CARROLL:  Object to the lack of foundation.  The Personnel File was turned over by Chief Cooley, I think.

MR. WEBB:  To the Court.  This is the In Camera Review.  They've got it and the U.S. Attorney has got it.

MR. CARROLL:  Correct, but nothing says that Mr. Frye disclosed it.

MR. WEBB:  The U.S. Attorney has it.  Yes, he gets the file.  Yes, absolutely.

Q.      So do I understand your position, Chief Foster, that's not enough?  You're saying that he has to disclose this again to Attorney Shelvey.  If he doesn't, that's misconduct.  Do I understand your position correctly?

A.      I'm saying that the United States Attorney's office told me it has to be disclosed each time and nothing has ever been disclosed, and I based my decision on that information.

92

Q.      We know it was disclosed.  Here it is, right?  You're looking at it.

A.      Again, I'm not sure – I see the document that you've provided me.  I don't know, I'm not questioning you, but I don't know how this got there.  I don't know, you say this was part of the In Camera Review?

Q.      Yes.  Do you not see –

A.      These documents were obtained from the Federal Court?

Q.      Yes.  We just reviewed the Motion in Camera where they had the Personnel File and they were reviewing that.  The U.S. Attorney had it at the time.  I just went over that.  I can read it again.  "The United States discussed this memo as well as Detective Frye's Personnel File with Chief Cooley."  So the U.S. Attorney has it.  They got it for the purpose of this In Camera Review.

A.      Okay.

Q.      Again, from your position, that doesn't matter.  He's got to disclose it again to Shelvey.  If he doesn't, that's misconduct.  Do I understand that correctly?

A.      Yes.  I would like to answer, first of all, I didn't know this exists and second of all, it's not my opinion.  It's the opinion of the United States Attorney's office.

Q.      But you're adopting that opinion for misconduct, are you not?

A.      Well, I'm told that they were trained that that was the case.  So yes sir, it would be.

Q.      Again, prior to this, before, you didn't investigate to determine what the common practice was for the ATF and Mr. Frye as to what he believed his obligation was regarding prior disclosures, whether he has to give it again?  You never looked into that, correct?

A.      I offered and provided the opportunity for Mr. Frye to meet with me.  He chose to have his response served on me by a Civil Process Server.

Q.      And in that response he told you "The policy as I understand it is once you do the prior disclosure, you don't have to do it again"?  I showed you that earlier, correct?  Do you want me to show you again?

A.    You told me that that's his belief, but that's not the opinion of the U.S. Attorney's office.

Q.    Yes.  That's how his belief and how he acted.  That's how he implemented the policy.  That's what he told you.  That was his position, correct?

A.    That was his belief, and the opinion of the U.S. Attorney's office is different.

Q.    And the opinion of the ATF, local ATF was different, or do you know?

A.    I don't know the opinion of the ATF.

Q.    Okay.  We're going to find out.  That covers that charge.  Will you concede this, that if the policy is that prior disclosures are sufficient, if he's disclosed it, then it's not misconduct?  If that policy I've represented to you is correct, then it would not be misconduct.  Do you agree with that?

A.    On the one, you're saying here the written reprimand dealing with making racial comments?

Q.    Yes.

A.    If that one had been put in and made a part of the file, again I have to go back and echo Mr. Carroll.  I don't know who disclosed this.

Q.    My question to you though is this –

A.    His responsibility is to disclose it.

Q.    Right, and my question to you is this, and the U.S. Attorney has it.  It's disclosed in the Personnel File.  My question to you is if the policy is that prior disclosure –

MR. CARROLL:  May I interject for a second?

MR. WEBB:  Absolutely.

MR. CARROLL:  Whose policy?

Q.    If the policy that Mr. Frye understood it to be is correct, because he understood the policy to be that prior disclosures are –

MR. CARROLL:  I didn't want you to say that it was a U.S. Attorney's file.

MR. WEBB:  Yes.  I understand.

94

Q.      So if Mr. Frye is correct, that's the policy that they're operating on and let's say that is the correct policy, do you agree if he's disclosed it, then it's not misconduct?  Do you concede that?

A.      If he believes that it is the policy of the United States Attorney's office, Giglio, the ATF that prior information disclosed to the U.S. Attorney under the Giglio Rule does not have to be provided again and it is his understanding that he provided that through this release, then it would seem reasonable for him to have felt that he had complied on this one particular situation.

Q.      Thank you, Chief Foster.  And you just have a difference of opinion.  Chief Cooley looked at this stuff, you have a difference of opinion as to what he said?  You agree your opinion is opposite of what Chief Cooley said, correct?

A.      Yes sir.  Again, I said I respectfully disagree with his opinion because I just have a different interpretation, but I can only say that my interpretation is based on information provided to me by persons who should be experts in the area of Giglio, which is a Giglio officer and the United States Attorney.

Q.      But if Craig Frye has already known this In Camera Review has happened, he knows his Chief has looked at it, he knows the U.S. Attorney has looked at it, are you saying that despite that, he has to now release that information again?  Is that your position?

A.      It's the position of the United States Attorney's office.

Q.      That you've adopted?

A.      Yes, I adopt the position that I'm told it's correct.  I don't have a policy.  I don't have a policy on releasing information to Giglio.  It's Tom Foster's personal policy to rely on legal experts to present, to provide them with that information.

Q.      But you have a duty in looking at whether there's misconduct to determine what his training was and what he was told as to how to do it to see if he actually did it intentionally or if it was a mistake.  Do you agree that that's an aspect this panel has got to look at?

A.      Yes, and I did inquire to the U.S. Attorney's office as to whether or not member of the ATF Task Force received training in Giglo and was told that they did.

Q.      Okay.  We're going to hear about that.  I know you're quoting somebody, but we're going to hear what training they got.

A.      I just want to make it clear, I'm not trying to frame this as the word according to me and Giglio Policy.  That's not it.  This is based on information provided to me by people who are experts in this area.  That's how I made my decision, not based on my opinion.

Q.      Let's move to Charge C –

MR. CARROLL:  Dale, can we take a break?

MR. WEBB:  Absolutely.

JUDGE APGAR:  As long as it's this time of day, do you want to take a lunch break?

MR. WEBB:  We are at your mercy.  Whatever you would like to is all right?

JUDGE APGAR:  All right.  We'll take a lunch break.  Do you want to meet back in about 45 minutes-ish?

MR. WEBB:  Yes.

(LUNCH BREAK)

JUDGE APGAR:  Everybody is back.

MR. WEBB:  Chief Foster, are you ready to go?

CHIEF FOSTER:  Yes sir.

CONTINUED DIRECT EXAMINATION – QUESTIONS BY MR. WEBB

Q.      For your next charge, this is Page 12.  I've marked this block as "C".  It says, "A document dated November 23, 2009".  Do you see that?  Just let me know when you're with me.  Page 12 of Exhibit 4 and it's what I marked as "C", November 23rd, 2009, "Disciplinary Action" and references Attachment 10.  Page 12 of Exhibit 4.

A.      Yes sir.

Q.      And you see the paragraph that starts "In a document dated November 23, 2009"?

A.      Yes sir.

Q.      I've marked that as "C" so I can kind of keep up with it and simplify it for myself. It references Attachment 10, correct?

A.      It does.

Q.      Your allegation is that, and Mr. Carroll kind of gave some description of this earlier in his opening statement, that Mr. Frye is alleged to have made sexual comments to April Alterio and alleged to approximately two years before simulated a kiss of Detective Valerie Cummings, that he didn't disclose that and that was in violation of the Giglio policy, correct?

A.      Yes.

Q.      So let's look, first you say these incidents were required under Giglio Questions three and eight. I'm going to start with eight. That's the social media one. I guess, well, you tell me, do you have any basis that this is a violation of your social media policy?

A.      It is not a violation of social media policy. It is obviously an error on my part, which I apologized for.

Q.      Let's go look at three. That's the only thing left. Let's see if we can get through that. The Giglio Question 3, and that's in Exhibit 1, is "Are you aware of any sustained finding that relates to past complaints, investigation or disciplinary actions in asserting the performance of your official duties or any off duty conduct or anything negative in your Personnel File?" That's the one you say he violated, correct?

A.      In my report, yes, that's correct, and that one is a violation, a sustained finding.

Q.      So let's see if you're correct about that. Maybe this is one we can get rid of. Turn to Tab 10, if you would. That's what you're referencing. Do you see that this says "Rate Disciplinary to allege you have made comments"? This is the actual complaint, is it not?

A.      Yes. It appears to be I guess what I would call a Notice of Allegation.

Q.     So it's a complaint.  "We're alleging", it's an allegation, we're alleging you did this, right?

A.     Yes.

Q.     This is not a finding, is it?  In fact, this is saying he's got a right to respond, go through a Grievance Process.  So the document you attach is only the complaint, correct?

A.     That is a complaint, yes.  That's the only document under Tab 10.

Q.     So that's not a finding.  So Giglio Question Number two says there has to be a sustained finding.  Tell the panel your basis for there being a sustained finding of this complaint.  Where's the finding?

A.     All right.

Q.     While you're looking for that, whatever you're looking for, would you agree with me that if a complaint was withdrawn, you could not have a sustained finding?  Would you agree with that principle?

A.     If it's withdrawn, could it not be sustained?  I would not necessarily agree with that.  Sometimes victims will withdraw a complaint, but that doesn't mean that it didn't occur.

Q.     Well, whether it was sustained, meaning whether it happened, if the person withdraws the complaint, how could you ever have a sustained finding if the complaint no longer exists?  You agree with that principle, do you not?

A.     Yes.  I guess it's kind of like where a witness refuses to testify in a criminal matter and the Prosecution goes ahead, and can in some cases, I think, but yeah, it would be very difficult.

Q.     So here the only attachment you sent to the U.S. Attorney is a complaint?  You didn't send them sustained findings like the policy said you're obligation is to do.  Do you have a sustained finding based on this complaint?

A.     No.  I was referring to an allegation, and under that question of Giglio, which is where the problem occurs with my referencing eight, and I should have been referring to an allegation of bias.

Q.      I can't fight ghosts here.  You put eight down.  You're saying that was inapplicable, right, and now you're saying three?  I want to know, that's what you put in this charge of misconduct and you fired him for it, what's the basis under Number three there was a sustained finding?

A.      (Looking through documents)

Q.      You're still looking for it?

A.      No.  I'm reading through the Giglio questionnaire for the one that I was trying to reference, which I referenced as eight, which I should not have.

Q.      Well, I mean the one you charged him with was three so let's focus on that first.

A.      Three deals with social media.

Q.      No, eight deals with social media.

A.      I'm sorry.  Three is a sustained finding.

Q.      Yes.  So do you have a basis before this panel today to support your firing of him there was a sustained finding?  Yes or no?

A.      I do not have a record of a sustained finding on that particular allegation.

Q.      In fact, Lieutenant Corbin who did an investigation back then, this is in Attachment 17 of your charging letter.  I'll just show you this if this will make it a little quicker for you.  These are your attachments? (Showing to witness)

A.      Okay.

Q.      In Attachment 17 you attached Lieutenant Corbin's stuff.  He says, and this is dealing with the supposed kiss, the smack on the butt, and all that.  Jeremy Carroll got up and said that the pat on the butt and all that, that complaint didn't happen.  That complaint, Since this matter was not pursued criminally or internally at the time, it is presumed to be dropped, and Corbin didn't investigate it because she withdrew it.  Is that your understanding from your investigation?

A.      No, it is not my understanding that she withdrew it.

Q.      Well, I just read this to you.

A.      Well, I didn't produce that document.

Q.      Well, this is the Lieutenant at the time who did the investigation.  You weren't here then, right?

A.      No, I was not.

Q.      So you're going back and looking at what happened?  That's what I'm doing.  So here's Lieutenant Corbin.  Let's look at the document.  That's April 6, 2010, right?  Did I read this correctly into the record?  "Since this matter was not pursued criminally or internally at the time, it's presumed to be dropped.  I did not investigate it further."  Did I read that correct?

A.      Yes, you read that correctly from that document, but I'm not familiar with that document.

Q.      But you agree you had no basis to claim he had a sustained finding, correct?  This document came from you.  This is your Attachment 17 I just gave you.

A.      Attachment 17?

Q.      Yes.  You gave me this document.  I'm just going by what you gave me.  See, these reds are all yours.

A.      Yeah.  This is from the investigation that Corbin —

Q.      So that's your document and your town's document?

A.      Yes, it is.

Q.      So he says that it was dropped and you're telling us today you have no basis for a sustained finding, is that a correct statement?

A.      Well, I'm still looking through my documents, but based on what I've got in front of me right now.  I cannot put my hands on that.

Q.      I doubt you're going to find it.  If you do, we'll reopen our process on that.  Let's move on.  We got that one out of the way.  Let's move on so we can get to the next one.  Going back to your charging letter, Page 12, Exhibit 4, and this is "D".  This is the bottom one, to give you some reference here.  This is your allegation under "D" of dishonesty by an Assistant Commonwealth Attorney that he failed to disclose an allegation of dishonesty.  Do you see where I am?

A.      Yes.

Q.      I want to first address with you the obvious answer why this isn't misconduct and then we'll delve deeper into how this kind of unfolded.  In Exhibit 3, we went over this a little bit earlier. I'll just bring this to you.  That will be quicker.  This is Exhibit 3.  That's my letter in Mr. Frye's response as to what happened, right? (Showing to witness)

A.      Right.

Q.      I'm turning to Page 12 of that document.  Do you see, and we went over this, this is Mr. Frye's response at the time.  He told you that he disclosed the complaint to Wolthius and then when it came back unfounded, he disclosed that, and it's his position that once he's done that, he's fulfilled his obligation.  That was his response to you in this document, correct?

A.      Yes.

Q.      And you said that you had no doubt in your mind of the accuracy of that and he represented that to you and you're not questioning that happening, correct?

A.      I'm not questioning what happened?

Q.      That he reported this and turned this over to the U.S. Attorney at the time, Donald Wolthius?

A.      No, I don't know if he turned it over to him or not.

Q.      Well, you didn't investigate it?  You didn't interview Don Wolthius, did you? He told you he did that.  You never interviewed Don Wolthius, right?

A.      No, I did not.

Q.      So do you have anything, any evidence here to say that that didn't happen?

A.      Do I have any evidence to prove that something didn't happen?

Q.      No.  Do you have any evidence to dispute, Mr. Frye has told you that's what happened, do you have any evidence to the contrary?

A.      I have evidence from the United States Attorney's office that nothing was disclosed.  That's what I was told.

Q.     Well, I just told you he gave it to Don Wolthius, and my question to you, do you have any evidence that that didn't happen, he didn't report it to Don Wolthius at the time?  Because he's been consistent that that's what happened.  Has your investigation shown anything different than what he just told you?

A.     Yes.  My investigation shows that nothing was turned over to the U.S. Attorney's office.  That's what I was told.

Q.     Did you interview Don Wolthius?

A.     No.

Q.     So if Mr. Frye previously disclosed this allegation to Don Wolthius and it's Mr. Frye's position that a previous disclosure satisfies the Giglio requirements and that in fact is the case, if the panel finds that, do you agree Mr. Frye would not have committed misconduct based on your analysis?

A.     You're asking me to reach a conclusion that —

Q.     Let me state it a different way.  I'm going to make this easier.  So the panel understands your theory of this, you're saying that failure to disclose this incident was deemed illustrative of a lack of candor.  That's what you say.  What you're really saying is that even though you fully disclosed it to Don Wolthius in 2012, your failure to disclose it to Shelvey in 2017 is misconduct?  That's what you're saying, right?

A.     I don't know anything about any disclosure made to, I know you presented that to me today.

Q.     No, let's go back.  I don't think I presented it to you today.  We presented this to you in our response.

A.     In your response?

Q.     Well, let's look here.  I don't want you to think we're making this up.  That letter is August 29, 2017.  I told you, and Mr. Frye said he disclosed that to Don Wolthius.

A.     Okay.

Q.      And you never interviewed Don Wolthius, right?

A.      No, I never interviewed Don Wolthius.  I relied on the information provided to me by the United States Attorney's office.

Q.      Well, you need to rely on some of the information Mr. Craig Frye has given you too.  This is the whole picture.  It's not one-sided.  So my question to you is, so the panel to understands your theory, if the failure to disclose the incident you say was deemed illustrative of a lack of candor, and what you're saying there is even though you fully disclosed it to Donald Wolthius in 2012, your failure to disclose it again five years later to Shelvey is misconduct?

A.      Yes, according to the United States Attorney's office.  It has to be disclosed every time.

Q.      Every time?

A.      Every time.

Q.      Every time you have to plow through that same ground again and go through your whole life, each candid conversation.  That's your understanding of the policy?

A.      Yes.  That is what I am told is the policy of the Department of Justice, United States Attorney's office.

Q.      That's what I wanted to make sure is clear.  So to support your theory of misconduct here, this panel is going to have to believe that Mr. Frye fulfilled his obligation under Giglio to provide the information to the U.S. Attorney back in 2012, but he decided to some reason intentionally hide the information from Shelvey in 2017, right?

A.      I don't know what his motivation is, but he did not disclose it, which is a violation of the policy.

Q.      Well, but according to your theory, if the evidence is he disclosed it in 2012, for the panel to agree with your theory, they now have to find that he intentionally refused to give that in 2017?  It is misconduct.  It can't be a mistake.  It has to be intentional, right?

A.    Well, we cannot supply information to an act or omission, in this particular case he has admitted the information.  So therefore, it's a violation.

Q.    Well, you don't, he's already disclosed it.  Can you explain to the panel what motivation would he have to intentionally refuse to give it again five years later if he thought he had to give it?

A.    Well, there are two different U.S. Attorney's offices.  I know they're all Western District of Virginia, but the one where we're talking about today deals with the Harrisonburg office in this specific case.

Q.    Also Western District?

A.    Western District.

Q.    She's under Rick Mountcastle, all the same district?

A.    All the same district, Western District.

Q.    So there's not two different.  It's one district under Rick Mountcastle?

A.    One district, two offices and a different Giglio office.

Q.    Yes, no question, but to buy your theory of this case, this panel is going to have to agree that he gave it in 2012 and he intentionally refused to give it in 2017.  That's what your theory is to prove misconduct, correct?

A.    Yes.

Q.    Now the Giglio information I reviewed with you before shows that allegations that have resulted in exoneration of employee generally are not considered potential impeachment information.  Do you remember me going over that with you?

A.    Please state that again.

Q.    The Giglio policy I went over with you before says allegations that have resulted in exoneration of an employee generally are not considered to be potential impeachment information.  Do you remember me going over that with you?

A.    Yes.

Q.      Chief Foster, given that Mr. Frye revealed this information to the U.S. Attorney in 2012 and given his expressed statement to you, he believed the policy was that you don't have to re-disclose it if it's a prior disclosure given, you can't rule out that Mr. Frye's failure here is simply the result of a mistake versus an intentional act, can you?

A.      I can't rule out that it was a mistake versus a –

Q.      An intentional act that he did that, given those facts.

A.      I guess I could not rule it out, but it would certainly be something that I think he should remember.

Q.      Okay.  Given that answer, let's take a look at kind of how this unfolded because I think this is important to understand why you need to be forwarding complete records in your obligation to do that.  Let's see what's happened here.  So you forwarded, under your charging letter, Attachment 11, if you'll turn to that.  That's one of the red tabs under your Exhibit 4, Attachment 11.  That's the document you sent to the U.S. Attorney's office, right?  Attachment 11, it should be a one-page document that's got a list of complaints.

A.      Yes.

Q.      So in there is a complaint, it's got Holohan, it's got Craig Frye and it's got March 19, 2012.  That's what you sent to the U.S. Attorney's office, right?

A.      I gave that to them, yes.  It shows that Commonwealth Attorney Holohan and the officer involved, Craig Frye, it shows that there was an IA complaint of the record.

Q.      You did not send any information to the U.S. Attorney's office to explain whether there had been an investigation or whether that was founded or unfounded at the time, correct?

A.      I gave them verbal communication about it because that's all that I had.

Q.      Verbal communication of what?

A.      When I met with Laura Rottenborn, I had spoken with Brian Holohan, and I've spoken with him recently, and the information that he conveyed to me was that –

Q.      I'm not interested in Holohan.  Listen to my question and this will go a lot quicker.  You sent this complaint which is Attachment 11.  Did you send any additional documents showing that there was an investigation and whether it was founded or unfounded?  That's my question.

A.      No, that record had been destroyed.  Can I clarify one issue?

Q.      Sure.

A.      One of the problems that we're having here, this whole Question Number eight versus the social media, I've got two letters here, the one report from the United States Attorney's office dated May 3rd, 2017 goes over a review of Giglio questions and there are seven of them, and the one that I'm referencing here, "Any allegation of misconduct bearing upon the truthfulness, bias, or integrity that is the subject of a pending investigation is part of that now –

Q.      But the word, the word "pending" meaning yes, if there's something ongoing that hasn't got resolved, we're going to make you send it over, if there's a Trial coming up.  You said "pending", right?

A.      Yes.

Q.      So that only deals with pending.  So I agree, but you don't have anything – so we're clear, the questions of Giglio you are charging him with are the ones I showed you on Exhibit 1, right?  That's the questions you're looking at saying that there are sustained findings or not, correct?

A.      Um –

Q.      Are you changing that?

A.      No.

Q.      So what you just told us is that you sent this complaint over to the U.S. Attorney's office showing that Brian Holohan had made a complaint about five years ago at the time and you didn't send any documents over regarding whether there had been an investigation, whether there had been a conclusion.  You think those were destroyed, right?  That's what you said.

A.      That's what I've been told.

Q.      Of interest on Attachment 11, we were talking about the prior sexual complaint, you don't see that listed here in the list of complaints, do you?  The complaint you listed before about Valerie Cummings and Alterio, that's not listed here as one of the complaints, right, on this list, Attachment 11?

A.      No, not on Attachment 11.

Q.      Now Mr. Frye, he sent a FOIA to the Town of Vinton and we received a number of documents for that.  Do you recall that?

A.      Yes.

Q.      I want to turn you to Exhibit 20.

A.      Is this the Freedom of Information Act request?

Q.      Yes.  Do you see that Freedom of Information Act request?  There's a large number of documents you sent.  One of those, if you'll turn behind it, and look what we have here.  This is actually an investigation by Ben Cook done on April 10th, 2012.  He first starts off with the complaint. Do you see "There was an internal complaint filed against you by Brian Holohan"?  Is that the same complaint that you referenced in that document sent to the U.S. Attorney's office?

A.      Uh-huh.

Q.      Your answer is "yes"?

A.      Yeah.  I'm just trying to read it here.  You're asking me questions before I can have a chance to review.

Q.      I apologize.  I thought you had seen these documents.  I had already sent them over to you guys.  Go ahead and read it.

A.      Well, we've got a lot of documents here.

Q.      Please take your time.

A.      (Reads document)  Okay.

Q.      So it's an internal complaint and it looks like it was actually from Benjamin Cook. It looks like a complaint from Benjamin Cook to Craig Frye. It says "You're advised of an internal complaint". Do you see that?

A.      Uh-huh.

Q.      "Filed against you". When it says "internal complaint", does that mean internal within your Department?

A.      Yes. We have different classifications. Internal is internal, citizen complaint coming from outside.

Q.      If this was an actual complaint filed by Brian Holohan, that he filled out a complaint, it wouldn't say "internal", would it?

A.      Yeah, it could. It depends. The Internal Affairs, IA stands for Internal Affairs, not necessarily an internal complaint.

Q.      But it says in the first sentence, "This is to advise you that an internal complaint is filed against you." Do you see that first sentence?

A.      Yes, and that's the document prepared by Chief Cook, not me.

Q.      I understand. Do you know when it says "internal complaint" if that's being filed by Ben Cook or if that's being filed by Holohan? Do you know?

A.      It appears to me by the person in Paragraph two, "Assistant Commonwealth Attorney Brian Holohan asked me to meet him regarding a complaint. I spoke with him and he advised me that a concern has surfaced in case involving defendants." It sounds to me like the complaint is coming from Commonwealth Attorney Holohan.

Q.      Okay, that's fair enough. So this document would not have been sent to the U.S. Attorney's office, correct?

A.      I don't believe it was.

Q.      Well, we know you referenced the attachments to your thing were the ones that were sent. This isn't one of them, right?

A.      No.

Q.      Now I want to turn to the second page of this Exhibit 20.  Are you with me?
May 9th, 2012 from Ben Cook, do you see that?

A.      Uh-huh.

Q.      I'm going to read this, if you can follow with me.  "The investigation of the
above referenced complaint has concluded there was no inconsistency found between the Court testimony
and your account of the situation and we find no factual information that would support either a breach in
the Department Policy or a Brady issue."  Are you following me, Chief Foster?

A.      Uh-huh, I am.

Q.      Do you see the bottom sentence there where it says, "The allegations in this case
are unfounded.  This matter is closed."  At least we thought it was closed.  "This matter is closed.  If you
have any questions, please don't hesitate to contact me."  Did I read that correctly?

A.      Yes, you did.

Q.      So I want you to explain to this panel why when you got a request for relevant
information, you chose to send to the U.S. Attorney only that there was a complaint, yet we now know
you had these documents because I FOIAed and got them, why wouldn't you send the fact that there was
a complaint, but it's nothing, it was resolved?  Why didn't you send this?

A.      I'm not sure where this document came from.  Obviously, it came from us under
the FOIA.  It does not appear to have been in the Scanner File that I had for disciplinary records.  So I
don't know if I didn't have it available to me at the time or that it was found as a result of the FOIA
request, but the basis for including the complaint in my report is in reference to the Question Number two
of the Giglio Report which is are you aware of any allegation or finding of a prosecutor to reflect upon
your truthfulness or bias.

Q.      I know why you sent it, but my question to you is why wouldn't you send not
only the complaint, but the fact that it had been investigated and found out to be nothing?  Why wouldn't

you send the findings?  That's where we get back to this thing of very incomplete records.  Why wouldn't you send this?  Why didn't you send this?

      A.      I don't know.  I cannot explain why that was not a part of it.

      Q.      Do you have an appreciation sitting here today that by sending a complaint that a Commonwealth Attorney had made a complaint and not sending at the same time that it had been fully investigated and found closed, unfounded, do you appreciate the picture, the improper picture you've given to the U.S. Attorney when you send only the complaint?

      A.      I disagree it's improper because I've since met with him, as you see in my timeline of my investigation.  I met with Brian Holohan again and re-interviewed him and he still asserts that Mr. Frye was not truthful to him, and as of the day before yesterday, he said Mr. Frye was not truthful with him and if he were still in the Commonwealth Attorney's office, he would not accept his testimony.

      Q.      Well, you know what?  I asked Holohan to be here today.  I want him to be here today, but you know he has hidden from our investigator and won't take our calls.  Did you know he's running from us bringing him here today and asking him questions?  Did you know that?

      A.      I know that he has been contacted, but your characterization of why he's not here, I'm not aware of that.  I've spoken with him.  He's spoken candidly with me multiple times and he is steadfast in his belief and his assertion is he was never told by Chief Cook of the conclusion of this investigation what the findings were.

      Q.      Let me ask you that.  That's an important point here.  So the Town of Vinton did an investigation, came to the conclusion that it was unfounded, and you agree that they never told Holohan about that result?

      A.      That's what he's conveyed to me, yes sir.

      Q.      So he had this suspicion and continued with his suspicion and never knew that the investigation found differently, correct?  He was never told that?

      A.      That's what he has conveyed to me.

Q.      So certainly he had suspicion before he even continued because he doesn't know it was investigated. That's what he told you, correct? Your answer is "Yes"?

A.      Yes, the answer is he's told me he did not know the results of the investigation and he still steadfastly believes that he was not told the truth.

Q.      Because he hadn't seen the investigation, doesn't know the outcome, hasn't seen the details? He wasn't told back then, right?

A.      I assume he wasn't. I wasn't here then.

Q.      Did you reveal the investigation findings and go over what happened with Ben Cook? Did you bring Ben Cook in and have him talk to Holohan and say this is what I found?

A.      I interviewed Ben Cook.

Q.      Did you take Ben Cook to Holohan and get this fixed? Did you ever do that?

A.      There's nothing to fix. He still believes that he was not told the truth.

Q.      Well, absolutely because he doesn't know about the investigation. My question is did you give the investigation findings to Holohan?

A.      No, I did not and I don't know about ---.

Q.      Why not? If you're taking care of this man and his reputation as an employee, why wouldn't you say, "Wait a second, Holohan. I know you said that you had a suspicion, but here is the finding and it came back that it was just wrong." Our office spoke to Holohan initially. He said, "I had a suspicion. I didn't know one way or the other whether Craig Frye was right or the other issue, but I thought it needed to be looked into." It seems reasonable to me, but once it's looked into, the results have to be given to him. You agree with that, right?

A.      Actually, no. We don't ever release the results of an investigation.

Q.      Are you telling me that if a Commonwealth Attorney has a complaint, you don't give the results of the investigation whether that complaint was founded or unfounded?

A.      The standard letters that we issue and again, in my tenure with the State Police –

Q.     I'm not talking about the State Police.  I'm talking about the Town of Vinton

back in 2012.

A.     I don't know what their policy was in 2012.  My policy is it's a personnel matter

and I took the appropriate action.

Q.     Your policy is that a complaint by a Commonwealth Attorney is a personnel

matter and you won't let him know the outcome of it?

A.     We would take appropriate action that if the matter was sustained, he would not

have applied to a Prosecutor.

Q.     What we do know is back in 2012 it was investigated and it was unfounded and

the matter was closed.  We know that from this document here, right?

A.     That's what the document states, yes.

Q.     Now I want to understand if the town already fully looked into, why the heck are

you going and calling Brian Holohan and asking these questions again of him and investigating the

complaint when it's already been investigated?  Why are you doing it again?

A.     I did not have the results of the investigation.  As I've stated to you, Mr. Webb, I

did not have this document at that time.  It obviously was presented to you as a result of the FOIA request

so it came from somewhere, but it wasn't presented to me when I asked for documents initially.

Q.     And that's the result, the reason for that is your record retention policy here is

pretty bad.  You didn't know this existed.  That's the reason you had to reopen another investigation that

had already been done?

A.     Well, it was supposed to be part of an Internal Affairs investigation and I was

told and provided documentation that those files had been completely shredded.  So I didn't see a lot of

reason to search for documents that no longer existed, and I had a Certificate with the Library of Virginia

signed off on by the Chief of Police, April Alterio, and the Town Clerk stating they had all been

destroyed.  So I didn't think that it would be fitting to spend a great deal of time looking for documents

that had been destroyed.

Q.      Well, I just sent a FOIA over here. I didn't come look at the documents and I got it. I mean did you not go search? Once you know the Internal Affair documents are destroyed and now you've got these bits and pieces of documents, didn't you spend some time and say, "Wait a second. Let's get all the information we have in one place so before we start putting Craig Frye out to dry here. Let's make sure all the documents are correct"? Did you not go through that procedure?

A.      Obviously, I attempted to go through that procedure to the best of my ability and get the facts together as best I could.

Q.      In this case you failed then, correct? If this document existed and you sent a complaint up and it started another investigation by you, it started another investigation by Laura Rottenborn going to speak to Holohan when if you had sent this, it's concluded, it's done? This would resolve that whole issue, but you didn't send that, correct?

A.      No, I did not think it would resolve the issue because it says "any allegation". It does not say a sustained finding. It doesn't say if it was ruled to be unfounded. It said, "Have you ever been accused?" and that's all that matters. That's all that matters.

Q.      We were going over that in the beginning. Craig Fyre disclosed that to Donald Wolthius right when it happened. Do you know why he did it? They had a case going on so if this came up, it would have affected him testifying in that case. So he had to reveal it and Donald Wothius is okay, keep me advised. "Keep me advised of what's going on." Then it came back unfounded. You gave that to Donald Wolthius and that's what you put in your answer, you gave it to Donald Wolthius. "Okay, it's unfounded. We're done. No problem, let's move on." So if Craig Frye did that then and it comes back unfounded, what would be his motivation for not turning this over again if he really had to? What would be the motivation? He's already disclosed it. It's unfounded. I mean why would he intentionally jeopardize his job and not turn it over again?

MR. CARROLL: Objection to the speculation you're calling for. He testified earlier he doesn't know what Mr. Frye is thinking.

Q.      You can't rule out that this was not an intentional act, that it was simply mistaken.  You can't rule that out, can you?

A.      Well, based on the fact that I've been informed by the U.S. Attorney's office that the agents and Task Force officers are trained to disclose everything each time that they're given a Giglio letter regardless of past filings, then I can only speculate that either there was an intentional not failing to disclose or somehow a breach of communication at the U.S. Attorney's office if they had these documents and they chose not to look at them.  I don't know.  I was told by them that nothing had ever been disclosed.  You've got a copy of United States Attorney Mountcastle's e-mail stating that nothing had ever been divulged on any Giglio request by Detective Frye.

Q.      That is simply untrue.  We got the information.  He gave it to Wolthius.  That's simply untrue.

A.      That's where I say there's apparently a communication issue at least on a couple of these issues with the U.S. Attorney's office.

Q.      Maybe that communication issue is with the U.S. Attorney's office.  Maybe it's not with Mr. Frye.

A.      It's possible, yes sir.

Q.      I want to have you look at Attachment 13 to your charging letter.  I'm going to go through.  It might be easier if you don't mind me putting some together.

A.      I don't mind at all.

Q.      We're looking at Ben Cook's statement and complaint.  This is Exhibit 20, correct?  Am I stating that correct for the record?

A.      Did you say 20?

Q.      Yes, that's the FOIA.  We're looking at his letter again.  He says this, this is in the first paragraph.  "Assistant Commonwealth Attorney Brian Holohan asked me to meet him in regard a complaint.  I spoke to Holohan and he advised me he had a concern that surfaced during a Court case."  Did I read that correct?

A.      Yes, you did.

Q.      When you spoke to Brian Holohan, this is Exhibit 4, this is your charging letter, right, September 25th, 2017?

A.      Uh-huh.

Q.      You quote Mr. Holohan as saying the following, you already asserted that the March 19, 2012 against Detective Frye.   "He stated", meaning Mr. Holohan, "filed a complaint regarding his suspicions that Frye had not been truthful with him regarding a criminal investigation as such determined criminal prosecution."  Did I read that correct?

A.      Yes.

Q.      Now I want to show you what the U.S. Attorney said. The U.S. Attorney says this in his letter.  This is Attachment 13.  He made a complaint against him about his truthfulness and candor and that the complaint led to an Internal Affairs investigation and a determination by the ACA that he would not be allow Officer Frye to testify to any of the corroborating information."  That's Page 3 of Attachment 13.  That's the July 20, 2017 letter.  Did I read that correct?

A.      Yes.

Q.      That's a little deceptive, isn't it?  He says that Holohan made a complaint against him about his truthfulness and candor and that that complaint led to an Internal Affairs investigation and a determination by that ACA", but he doesn't say and led to an investigation and a finding that it was unfounded.  He doesn't put anything in there about this being unfounded, does he?

A.      No, he does not.  In his mind, it is not unfounded.

Q.      I understand because he doesn't know about the outcome of the investigation. Then he sends this letter out to Defense Counsel.  This is Exhibit 16.  This is on Page 2 of 3.  Let's look at the wording of the U.S. Attorney now.  He says, "Assistant Commonwealth Attorney in Roanoke County made a finding that Frye had been untruthful in communications to him in a Search Warrant and that he would not present evidence from Frye in a criminal case unless it was corroborated by other witnesses." So we went from a concern to your suspicion to now he's using the word "finding".  You have never said

that.  You have never said he made a finding because he didn't know.  He was sending information to you guys, right?

A.     This document is from?

Q.     This is from Mountcastle, November 27, 2017 and it's Exhibit 16.

A.     My discussion with Holohan is that he had an independent finding and his policy was going to be he was not going to accept his testimony.

Q.     My question to you is Holohan has suspicion and concern.  He didn't make at the time, because he says, "Holohan said he had a concern."  The finding was the investigation made by you.  Ben Cook made the finding at the time and it was unfounded.

A.     I didn't make the finding.

Q.     I know, but Vinton did.  Ben Cook at the time, the finding was it was unfounded, right?

A.     That's what the letter you produced indicates, but if I can elaborate upon that, regardless of whatever the findings were of the Vinton Police Department, the findings of the Roanoke County Commonwealth Attorney's office are that he would not be allowed to testify.  Holohan said he would not prosecute his cases in the Court.  Randy Leach said he would not accept his testimony unless it was corroborated by another officer.

Q.     Well, let's talk about that.  So you went to meet Randy Leach yourself, right?

A.     Myself, Captain Drumond, Brian Holohan, and I believe Lavender was in there as well.

Q.     What was the purpose of you going to meet Randy Leach?

A.     To determination exactly what the allegations were that were made against Detective Frye.  I did deal with what the specific allegations were because I didn't have a document, as you call it, a charging letter, what I would call a letter of allegation.  I did not have an allegation that specifically said what those allegations were.  So I met with him because I'm trying to clarify do we have

an accusation that is being made by a Prosecutor alleging untruthfulness which follows into the Giglio letter.

Q.      Did you see your actions of going, because we know there was an investigation that it was unfounded, when you went to Leach, did you say, "Hey, this has been fully investigated.  I back my officer, Mr. Frye.  It's been fully investigated.  Here's the findings of that.  It's unfounded"?  Did you turn those investigation findings over to Leach when you met with him?

A.      I didn't have the investigative findings, as I said, until you presented them to me.  Now were they somewhere apparently that I should have had access to?  You know they were brought up during FOIA request which is good.  It shows that we met the standard, but when I asked for my staff to provide documents for me, it was not one that was originally provided, and I can't give an explanation for that.

Q.      So the answer to your question is you did not and have not until today, even up till today you've not give the findings to Leach of the full investigation the Town of Vinton did at the time saying there was no Brady issue?  You never gave that to him, right, to Leach?

A.      There's a Brady issue because there was an allegation.

Q.      But the finding is it was not Brady.  The finding is there was inconsistent testimony by the Town of Vinton.  My question to you is --

A.      TOV cannot make a determination on what's Brady and what isn't.

Q.      He can decide if there is inconsistent testimony.  He can make a finding.  He did, the Town of Vinton.

A.      But not a finding of Brady.  Only that can be done by the trier of fact.

Q.      But he looked at the, he did an investigation, he looked at it and he's the one that was actually involved in the complaint.  He basically said, "After looking at this, it's not inconsistent," and he basically said it was unfounded.  I showed you the letter, right?

A.      Yes.

Q.      Did you take that to Leach to say --

A.      No.  As I said, I did not know the document existed at the time.

Q.      I'm going to show you, this is under Exhibit 21.  This is a list of subpoenas.  Do you see this on Exhibit 21?

A.      Right.

Q.      Craig Frye, okay?  He's been subpoenaed to Trial in Roanoke County.  This first date is September 23, 2015, correct?

A.      Uh-huh.

Q.      The next one is June 23rd, 2016.  Leach is at the bottom of all of these, correct?

A.      Uh-huh.

Q.      August 15th, 2006, correct?

A.      Yes.

Q.      June 28th, 2017, correct?

A.      Uh-huh.

Q.      December 19th, 2017, just recently, correct?  Leach is subpoenaing him, correct?

A.      Yes.  I discussed those with Commonwealth Attorney Leach and he said those are rubber stamped signatures on his and that he was not even aware that those subpoenas had gone out.  They're prepared by his staff and his belief that testimony would have to be corroborated still stands.

Q.      Well, I'm going to ask this of you.  If this panel here, on these charges of misconduct, there's a lot of problems here, I'm just going to tell you from my standpoint, if this panel here after looking at this says, "You know what, we don't think it is misconduct", if they rule that, if they rule that way, and they'll make their own decision, but if they do rule that way and there's a transcript of this and your finding, will you use the same vigor going back to Leach and saying "Here's the panel decision, here's this, here's our prior investigation findings, Mr. Leach.  Will you review once again whether this gentleman can testify in Roanoke County?"  Would you use that same vigor to do that?

A.      I would do what's right.

Q.      Would that be right?

A.      To share with him the findings of the panel?  I would think that would be right, yes sir.

Q.      You think it would be right?

A.      I would certainly hope, absolutely.  I can't, as I said, the reason for being here is to find the truth.

Q.      And I hope you understand my questions to you, that's all I'm trying to do.

A.      That's what I said.  You're doing your job and I understand that and I hope that you can see mine.  I'm trying to present the truth as best I can.  I've prepared what I felt was a thorough and accurate report and I relied on information provided to me by, unfortunately, people that I can't compel to be here today.

Q.      Same with me.  Same with me, and that's one of the problems with this Hearing. There's some people I want here today and I can't get them.

A.      Yeah.  If I could bring the people in here that I want to today too, it would help.

Q.      It would definitely help.  I think it would help me more than you, but we'll never know.

A.      Handicaps dispose of that and I understand that and I wish I could.  I can assure you and the panel here that everything I put in my report I believe to be one hundred percent factual and accurate.

Q.      You talked about Holohan never knowing about the upcoming investigation, but you said that Holohan said, "Craig Frye can't in my mind testify without corroborating documents or information."  Holohan never told that to Craig Frye, right?  You have no evidence he's ever mentioned that.  Craig Frye had never known that until –

A.      Yeah.  I've never been a part of any conversation with Mr. Frye and with Mr. Holohan.

Q.      And you were never told that?  Up until you going to speak to Holohan, you were never aware of that, right?

A.      That he would not accept his testimony?

Q.      Yes.

A.      No.

Q.      That was all moot news, right?

A.      As I said, I have been trying prior to this to explore opportunities for Mr. Frye within the Department.

Q.      You know when you met with Laura Rottenborn, and I know you shared documents with them, but when you met with them, you also shared information regarding your conversation with Brian Holohan, right?

A.      Yes.

Q.      I guess my question is if you had known about this prior investigation, that it was already done and concluded, would you have re-investigated this if you had all of the documents in front of you at the time?

A.      If I had the complete report?

Q.      Yes.

A.      There would be no need to, I would think, unless I found something contradictory that developed later on.  I mean if I find something that's factual and conflicts with what's in the report, I'd be remiss to not go back and follow up on that detail.  When I spoke to Laura Rottenborn, I found out after divulging to her by a conversation with Mr. Holohan, she had already interviewed him anyway.

Q.      I know.

A.      She told me what I told her was consistent with what Holohan had told her.

Q.      Sure she did.  Once you gave her that complaint, you're doggone right, but if you'd have gave the whole thing and said there's already been an investigation, that horse would have never got out of the barn.  I mean there's already an investigation that's unfounded.  You yourself said, "Well, if I had a complete report, I wouldn't re-investigate it," right?  Correct?

A.      You're saying I'm speculating, but yeah.  The premise is that if that report were available and it was one hundred percent accurate, contained all the necessary information, and I read it and there was nothing that came to me that would conflict with it, with the findings of the report, there wouldn't be, as I said, a lot, just as there's no reason to go searching for shredded reports.  There's no need to further on with reports that appear to be complete on their face.

Q.      Help me understand.  You know, I've got the investigation.  You sent the complaint.  You didn't send the investigation.  When I asked for the FOIA, I got the investigation findings, the Town of Vinton had it.  I mean where did it come from?  Where was it?

A.      I don't know.  I don't know who produced this.  I don't know if this was something that Susan Johnson got as a response to your FOIA request or if it was something that came from April Alterio.  I'm not sure.  I don't know if this was in a, there's what we call a New Scanner File and there's another that we call an Old Scanner File, and I asked for information from both of them.  I don't know.

Q.      Let me, Exhibit 4, your charging letter.  Can I get you to turn to Page 9 of that?

A.      Yes sir.

Q.      Now I know you weren't here when all of this was going on, but Lieutenant Corbin was here, right?

A.      Yes.

Q.      And you interviewed Lieutenant Corbin, right?

A.      Yes, and he's available if you'd like.  He's here.

Q.      I'm going to take you at your word as to what he said.  This is on Page 9 at the bottom of that.  Just tell me when you're at Page 9 of Exhibit 4, your charging letter.  Are you there?

A.      I'm there.

Q.      Do you see the bottom sentence, "Lieutenant Corbin"?

A.      Yes.

Q.      "Lieutenant Corbin volunteered an unsolicited statement that he recalled ACA

Holohan saying his complaint against Detective Corporal Frye did not constitute a Brady issue."  You put

that in your report, right?

A.      Yes, and I emphasized "not".

Q.      I thank you for that.

A.      Because I wanted to be fair in my assessment of this investigation and that the

information provided in Corbin's statement, which was going on memory, and as I said, I tried to present

everything as fairly as I can in here with the information that I was given and that's why I put "not" in

capitals for emphasis.

Q.      So let's consider that.  I ask you to keep an open mind here.  We are trying to get

to the truth, okay?  I ask you to keep an open mind in these charges.  If Lieutenant Corbin, his lieutenant

at the time, concluded Holohan statements were not Brady issues, there was nothing there, if Lieutenant

Corbin came to that conclusion, then why wouldn't Craig Frye come to the same conclusion?

A.      I can't answer that, but when it comes to what is Giglio and what isn't, we have

the United States Attorneys that file a Motion that the traffic stop was not Giglio, however Federal Judge

Conrad decided to rule against their opinion and say that his findings regarding the traffic stop was Giglio

material and entered an Order as such.  So sometimes a Prosecutor can have an opinion that maybe is

contrary to what a Judge might have.  So sometimes those things happen.  It happened in this case.

Again, I wish I could bring in some other people, but what I'm getting at here is we had a Federal, a U.S.

Attorney that said that that traffic stop and that whole issue with two miles versus two blocks was not

Giglio material, and the Federal Judge said, "Yes, it is" and entered an Order indicating that, and that's

not disclosed.

Q.      And that's the point, isn't it, is that we've got, you know, in this Giglio issue, it's

far from black and white.  There's a huge amount of gray here trying to figure out what's Giglio, what's

not.  We have attorneys fighting in In-Camera Reviews, we've got judges making certain rules.  Do you

agree that there's a lot of gray in the determination of what is Giglio and what is not?  There's numerous articles written on that.  You agree with that, right?

A.      Well, yes and no.  If someone asks me if I've ever been arrested, it's a clear cut answer.  If anyone were ever to ask me, "Have you ever been accused of lying by a Judge, by a Magistrate, by a Prosecutor," it's clear cut to me that the answer is "no".

Q.      But not the arrest if he's expunged.  That's not clear cut.  Even you said that. The law is not clear there.  In the stuff you read, it wasn't clear on the expunged arrest?

A.      I have to rely on the opinion of who I deemed to be an expert in that matter and that was the U.S. Attorney's office.

Q.      Yes, but you've also got to look at the policies and the questions and the common practice too in trying to see if he committed misconduct.  This isn't maybe, maybe he violated the policy, but if he believed, in his mind had a reasonable belief that he was doing the right thing, that might not be intentional, correct?  You agree with that?

A.      I can't state what's in his mind.  I mean really I can't.  It's unfair for me to have to say that I know what his intent is, and it would be unfair for him, for me to ask him to speculate on what my intent is.  You know intent is a difficult –

Q.      I hear you say that, but you've made a finding.  Your document is pretty clear. You're saying he lied.  You've said he intentionally lied and you got into his mind to do that.

A.      Because I said he did not disclose information.

Q.      Intentionally, willfully, right?

A.      Well, yes, the totality of a multitude, several things that were disclosed that should have been disclosed.

Q.      So you are getting into his mind because you're saying he intentionally, willfully did that?  That's your finding here, right?  That was your ultimate finding, correct?

A.      My finding was that he failed to disclose, which was a violation of the policy, which resulted in his inability to testify.

Q.      Willfully?  You cite in the orders saying he violated the willful, intentional misconduct?

A.      Yeah, I did state in my charging letter, as you call it, that I felt that the issues at hand were so significant that it would be willful and it would be difficult for anyone to not remember these.  I said something to that effect.

Q.      He remembered them though.  Most of them he's disclosed before.  The memory is not a problem.

A.      No.  We've still got a couple of others that we haven't covered.

Q.      Well, I'm anxious to get to those too, but you agree your own Lieutenant in this facility back then at the time who is his supervisor had concluded this was not Brady material, and Holohan had told that to him?  That's what you put in your report.

A.      That's what he says, but that's not – I put that in there again in fairness, it's not because I necessarily believe that to be the case.  This is the memory of a retired officer with this Department who was going back and said he thinks that was the case, but he put it in there, and in the interest of fairness, I included it, but he doesn't have any document that says that that was the case.  He said that that was what he remembers.

Q.      Well, you don't say he had a memory problem.  You just say, and I take you at your word that you're trying to be fair here, but you said Lieutenant Corbin volunteered an unsolicited statement.

MR. CARROLL:  Dale, I'm sorry, where is that?

Q.      Again, Exhibit 4, Page 9.

A.      Page 9 and 10.

Q.      Yeah.  You're saying Lieutenant Corbin volunteered an unsolicited statement. What you were doing, that's not really what you were looking for.  He gave you an unsolicited statement on that issue.

A.      But I felt it was important to include it.

Q.      Absolutely.  It's right on the issue, and that statement was that he said at the time that the Assistant Commonwealth told him, he said the Commonwealth didn't think this was a Brady issue.  That's what you quoted Corbin as saying, correct?

A.      Yes, that's what he stated, but where the problem lies is Mr. Holohan's statements to me would indicate otherwise.  So here we have a contradiction.

Q.      Yes, we do.  We've got a lot of inconsistencies and Mr. Frye has to rely upon what he knows at the time and this panel has to decide whether Mr. Frye is lying.  So that's the reason I want to make sure we get the whole environment of what he had available when he's making these decisions.  The last document, that was Charge "D".  Now we're going to get to Charge "E", and that is, if you go back to your charging letter.  That's on Page 13.  It's really the last charge.  It's the bullet point at the top.  Do you see that?

A.      Yes.

Q.      I think this is a great example of the prior disclosure issue because this hits at the button center.  You state Detective Frye stated AUSA Shelvey could speak to the Giglio officer in the Roanoke office concerning a written letter by a coworker claiming he had been untruthful about a traffic stop and that, as a result, a Court had ruled Defense Counsel could ask him if he had ever been accused of being untruthful.  Detective Frye stated, "The claims were not substantiated and there was a letter in his file by the Police Chief saying it didn't happen."  Am I reading that allegation correctly?

A.      That's a quote from a letter.

Q.      Okay, and you have quotation marks about what Shelvey said.  Are you representing that she made those exact statements word for word she said or are you paraphrasing?

A.      Well, the quote is from Detective Frye.  Detective Frye stated the claims were not substantiated and there was a letter in the file of the Police Chief saying it didn't happen.

Q.      And you concluded the failure to disclose this incident is misconduct, correct?

A.      Yes.

Q.     But in this document, in the information that even Shelvey says, "We've just confirmed Frye told Shelvey specifically about this incident. He directed her to go to the Giglio file, it contained information." So what you're saying is he said no to that answer, but his answer talks about the traffic stop, it talks about the Court ruling, and you're saying that because he said "No", even though he said that, it's misconduct and he's fired, correct?

A.     No.

Q.     All right. Give me your theory on this so we can understand it.

A.     What I'm saying is, and it might be better if I just read it instead of bits and pieces.

Q.     Where are you reading from? Page 13?

A.     I'm reading from Page 13.

Q.     Okay, let's go.

A.     "In a United States District Court Order dated October 26, 2009, Federal District Judge Glen E. Conrad found, 'Having reviewed the document in question, the Court concludes that it constitutes Giglio material.' This is referring to a previous allegation against Detective Frye for being untruthful. In spite of this finding, Acting United States Attorney Mountcastle's report dated July 28 indicates Detective Frye responded 'No' to every question provided to him by Assistant United States Attorney Shelvey. According to the report, Detective Frye stated AUSA Shelvey could speak to the Giglio officer in Roanoke Office concerning a 'written letter by a coworker claiming he had been untruthful about a traffic stop and as a result, the Court did rule Defense Counsel could ask him if he had ever been accused of being untruthful.'" That's the end quote, there from –

Q.     Shelvey. Shelvey's saying that's what Frye said, correct?

A.     Let me make sure. "According to the report, Detective Frye", yeah, that's coming from, it would appear to be a quote from Shelvey. "Detective Frye later stated, 'The claims were not sustained and there was a letter in his file by the Police Chief saying it didn't happen.'"

Q.     Okay.

A.      For whatever it's worth, I can't imagine the finding that says it didn't happen, but that's what he was told.

Q.      Well, yeah.  Chief Cooley said that that's not Giglio material, didn't he?  There's a letter from Chief Cooley, October 22nd, 2009, saying he doesn't believe that this is representative of him why?  He investigated it at the time.

A.      Judge Conrad would disagree.

Q.      Well, no, now there's where you're wrong.  Judge Conrad never rules that that traffic stop, that he lied.  There is no ruling of that.  Judge Conrad said that document can be turned over to Defense Counsel if, if he's asked "Have you ever been accused of lying" and he says "No", then that document can be used if at some point you were accused of lying.  Conrad makes no ruling anywhere in here that he was dishonest or that he was untruthful, does he?

A.      What he rules is the allegation of truthfulness is Giglio material.

Q.      Not that it's true, not that the material is true.

A.      He just says there's an allegation that he was truthful and that allegation is therefore –

Q.      Can be turned over?

A.      Can be turned over because it's Giglio material.  So therefore the answer to the question on the Giglio form, "Have you ever been accused" would be "Yes".

Q.      Not if it is a prior disclosure.  Not if he says, "I only have to update."  So do you see the ridiculousness of this charge?  He's actually telling Shelvey, "Hey, by the way" and he goes beyond what he has to do because he wasn't sure this In Camera thing fit any of the questions, but he remembered.  He said, "By the way, go see my Giglio file, Ms. Shelvey, because that's where all the information is.  Go see it," and in there you're going to find Exhibit Number 18.  That's the Motion in Camera, that's the traffic stop ruling, that's Chief Cooley's letter, that's the Order of Conrad.  He's telling Shelvey that information is in the file.  "Go look at it" and he answered "No" because he thinks between the last time and this time he's being Giglioed, there is no update.  He says, "No, there's no update" but

the stuff is in that prior file. Go look at it." How could you ever claim he committed misconduct when he's turning over, pointing her to the exact evidence that you're saying he didn't turn over in the Giglio file? How could that ever be misconduct?

A.    I don't know why he didn't disclose it.

Q.    He did disclose it.

A.    Judge Conrad made the ruling and it's required by the U.S. Attorney's office that it be disclosed each time, and he didn't disclose it.

Q.    It's in the Giglio file. It's in the Federal Officer's Giglio file. This is the U.S. Attorney doing this. They have that information.

JUDGE APGAR: Mr. Webb, repeating the same question at just a louder volume –

MR. WEBB: I apologize, Judge. I get a little excited.

JUDGE APGAR: He's already answered it.

Q.    So in this charge, Mr. Foster, it's your position basically that again even though he previously disclosed it, it's in a Motion in Camera Review, the U.S. Attorney has it, even though it already happened, that his failure to re-disclose that to Shelvey in 2017 is misconduct? That's your position?

A.    Number one, according to the U.S. Attorney's office, it is, and Number two, the extent to which it was disclosed to the U.S. Attorney's office, I do not know. That's not information that's available to me. If I were to request that information to stating exactly what was disclosed, what information they have, I don't know.

Q.    Turn to Page 18. We have it. I mean Exhibit 18, not the tab, the actual white sticker.

A.    The white sticker?

Q.    Yes. That's the information. That's the Court Order he's talking about. That's the Motion in Camera. You see this is the U.S. Attorney Waering who's actually filing the Motion.

They have this information.  Here's the traffic stop.  Here's the Cooley letter.  The U.S. Attorney has all of this.

      A.      Yeah.  ASUA Waering and Mr. Heaphy, this is where they're saying that it is not Giglio material.  However, the Judge rules that it is.

      Q.      Right.  So Shelvey is saying you didn't disclose the traffic stop when Frye in his answer to her says, "Yes.  You need to go see the Giglio file.  It has the traffic stop.  It has this Order from Conrad.  Please go look at that."  So he's telling her to go see the Giglio file with that in there.  How would that be misconduct?

      A.      Because he answered "No".

      Q.      And that's what you're saying, just because he answered "No" when he thought that meant an update, even if he pointed them to it, that's misconduct, you should fire him, right?  That's your theory?

      A.      Not on that sole issue.  No sir.

      Q.      On this it is.

      A.      No, there's a point.  As I said, the totality of the situations in here of situations that lead up to termination.

      Q.      No, no.  That's the reason we're taking them one at a time.  On this charge, you're stating that even though he previously disclosed it and he even responded at this time to the question, "Go see the Giglio file," you're saying because he said "No", that's a lie and he should be fired?

      A.      I think a reasonable person would check the block "Yes", I have been found that there's Giglio material.  If a Federal Judge rules to me that there's  Giglio material and they issue an Order saying it's Giglio material, I'm going to check "Yes" block.

      Q.      But he pointed them to it, Chief Foster --

JUDGE APGAR:  We keep covering the same material.

MR. WEBB:  I'm sorry, Judge.

      Q.      On the issue that you said you did not charge Mr. Frye with the threat, correct?

A.      No, I didn't say that.

Q.      So actually you took what he was saying at the time not to be a threat to you in any way, right, and you didn't charge him with any kind of misconduct regarding that?

A.      No. I don't have any reason to believe Mr. Frye would threaten me. I think he's, this is not personal. It's not personal, but no, that's one of the reasons I didn't write that in. Number one, I know he's concerned about this and sometimes you make statements when you're concerned, and I took it as a potential civil litigation against me and he certainly has the right to do that, and I didn't take it as anything other than that.

Q.      So if Rick Mountcastle in his letters and his findings says that there was a threat, you would disagree with that, correct?

A.      Where that they felt threatened?

Q.      That they felt that Mr. Frye was threatening you. You would disagree with that?

A.      No, I didn't feel it was a physical threat. I felt that it was just a statement that there would be pending litigation if I did not destroy more records like the IA files that had been destroyed, that I would be sued.

Q.      Basically he wanted his file to be complete, did he not?

A.      Or completely destroyed.

Q.      Well, now if he wanted whatever you revealed to be accurate and complete, and that's what civil law requires, correct?

MR. WEBB:  That's all the questions I have, Judge.

JUDGE APGAR:  Let's take a break before we begin.

(BREAK)

CROSS EXAMINATION – QUESTIONS BY MR. CARROLL

Q.      Good afternoon, Chief Foster. I'm going to go over, unfortunately, some ground that's already been covered. I'll try to do it as expeditiously as possible. You first became aware of the Giglio issue, I suppose, when you received a May 3, 2017 letter from the Department of Justice?

A.      That's correct.

Q.      You then initially, I believe your testimony was, set off to conduct your
background investigation as to what was required?

A.      Yes, I did.

Q.      That included obviously the May 3 letter that you received?

A.      Right.

Q.      And there were some bullet points in there about information that you should
consider disclosing.  I understand it wasn't a mandatory disclosure obligation, but they did ask for your
cooperation, is that correct?

A.      That's correct.

Q.      You I believe were referencing earlier in your testimony, and I'm looking at my
documents, and I'll bounce back and forth because at times it will be simpler, but I'm looking at my Tab
3 which is Document 00024 is the Bates number.  You mentioned Bullet Number 6 when you were
testifying to Mr. Webb as one of the pieces of information you received to provide to the U.S. Attorney?

A.      Yes.

Q.      Can you read that?

A.      "Information that may be used to suggest the witness is biased for or against the
Defendant."

Q.      Does that require, based on your reading of that sentence, information that is only
founded or strictly has been determined to be sustained?

A.      No.

Q.      Going to the preceding page, Number 2.  Is that one of the things you were trying
to provide to the AUSA?

A.      Yes, that's correct.

Q.      And what is that?

A.      "Any past or pending criminal charge brought against the witness."

Q.      And Number 4, is that another one?

A.      Yes, "Prior findings by a Judge that a witness has testified untruthfully, made a false statement in writing or engaged in an unlawful search and seizure, illegally obtain a confession or engage in misconduct."

Q.      So when you are beginning your journey into Giglio, this is what you're starting with, issues of bias, past criminal charges, allegations bearing on untruthfulness. That's Number 3, I'm sorry. Are those the things you're focused on as you begin this process?

A.      Yes. As I read through, these are things that I was looking at in doing my research into the disciplinary part.

Q.      Fair to say this letter doesn't narrowly restrict you to only things that have been judicially determined or found to have been substantiated or sustained? It's broader than that?

A.      That's correct. It is broader than that.

Q.      You proceeded to conduct your internet research and went to the Department of Justice website, is that correct?

A.      Yes. I did a Google search and was led to the DOJ website with the Reno memo.

Q.      I'm advancing a couple of pages. I'm now on Grievance Record 0027, which is the policy that's been referred to earlier. The Bate stamp is in the lower left-hand corner.

A.      Grievance Record 0027?

Q.      Yes sir.

A.      Yes.

MR. CARROLL:  Do you see that, Judge?   Do you see where the Bate stamps are?

JUDGE APGAR:  What tab are we on?

MR. CARROLL: I'm sorry, Tab 3 still of my binder.

Q.      Mr. Webb asked you about Paragraphs 5 and 6 specifically with regard to this policy, is that correct?

A.      Yes.

Q.      Paragraph 5 has Subset A, is that something you were considering as you were going through this process?

A.      Yes.  "Any finding of misconduct that reflects upon the truthfulness or possible bias of the employee including a finding of lack of candor during an administrative inquiry."

Q.      Possible bias of the employee?

A.      Possible bias.

Q.      Then proceeding to the next one we see "Past or pending criminal charges" again.  We'd seen that in the letter, correct?

A.      That's correct.

Q.      Now if we go also to Paragraph 6, what does Paragraph 6 deal with?

A.      "Treatment of allegations which are unsustained, not credible or have resulted in exoneration."

Q.      Does this section say "Thou shalt not disclose these types of records"?

A.      No.

Q.      Does this section permit the disclosure of those types of questions?

A.      Yes.

Q.      When you look at Subsection C and D, does it encourage consultation between the agency and the requesting official to determine if disclosure is appropriate?

A.      Yes.  It states, "On a request and the official and the agency official agree that such disclosure is appropriate based upon exceptional circumstances involved in the nature of the case or the role of the agency witness or when disclosure is otherwise deemed appropriate by the agency, the agency is responsible for advising the prosecuting office to the extent to determine whether any aforementioned allegation is unsustained, not credible, or the result of an employee's exoneration."

Q.      Mr. Webb asked you a couple of times about that last sentence.  That last sentence though does not say again you do not disclose this type of information.  It says to try to provide information if you know that it's been deemed unsubstantiated."

A.      That's correct.  My interpretation of that was disclose the information and let whether or not it's Giglio material be determined by the trier of fact or someone with the U.S. Attorney's office who is an expert in that area.

Q.      And that was your next step?  You reached out to the U.S. Attorney's office?

A.      That's correct.  That was my next step.

Q.      I'm going to try to not go through every conversation you had.  You initially spoke with Ms. Munro?

A.      That's correct.

Q.      Who is an attorney even if she is a volunteer attorney, is that correct?

A.      That's correct.

Q.      And you consulted with her about what should and should not be disclosed pursuant to the Giglio request that you received from Mr. Mountcastle?

A.      That's correct.  I made numerous phone calls trying to get an answer and I wanted to resolve this issue and get moving forward with it.

Q.      I want to narrow, I'm sure you asked her a lot of questions, but I want to focus on the issues Mr. Webb has brought up today.  Did you ask Ms. Munro about the timeframe of which you were to look back for records responsive to the request?

A.      Yes.  Ms. Munro stated to me that the Giglio ruling covers all of the person's career and may even apply to events that occurred prior to someone's employment as a law enforcement officer.

Q.      Did you speak with her about founded versus unfounded allegations?

A.      Yes, I did and she advised me that allegations of untruthfulness and things of that nature were to be disclosed.

Q.      Allegations?

A.      Yes.

Q.      And did you speak with her about bias?  We saw bias in some of the documents.

A.      Yes, I did.  I asked her if bias, and of course I knew the answer to these things. It's commonsense in some ways, but I asked her if bias extended to things dealing with the area of sexual harassment and racial discrimination, and she stated that absolutely bias covered those areas.

Q.      Now to keep the timeframe straight, before you called Ms. Munro, you had already spoke to Ms. Alterio, you had already generated those 81 pages of material from her Disciplinary file, from the Disciplinary file?

A.      Yes, I had.  I had those in hand and I had gone through and based on my interpretation of the information I had received from the Department of Justice memo, gleaned out however many there were, seven or eight documents out of the 81 that I felt might be subject to disclosure and reviewed those with her, and she confirmed that they were.

Q.      So that's your conversation with Ms. Munro, which I believe was in May sometime?

A.      That occurred on or about May 30th.

Q.      You were then told, and Mr. Webb asked you, that maybe Ms. Munro was not the point person for you to deal with.

A.      Yeah, I was later, the next day I was contacted by Ms. Shelvey who said that she was the Giglio point of contact and I should not have actually spoken with Ms. Munro.  I of course informed her that I was directed to Ms. Munro by the Administrative Assistant who answered the telephone.

Q.      Did Ms. Shelvey direct you towards Ms. Rottenborn when you went over to meet with the U.S. Attorney's office on the 16th of June?

A.      Yes, she did.  In speaking with her the week of June 5th, Ms. Shelvey contacted me and said that she wanted to schedule a meeting on June 15th.  However, we moved that meeting to June 16th and we met at the United States Attorney's office in Roanoke on June 16th.

Q.      Before you went over there and met with Ms. Rottenborn on the 16th, did you contact Brian Holohan?

A.    I want to make sure of the exact timeframe.  I met with him that same week.  I believe it was before, as a matter of fact, absolutely it was before because I conveyed to Ms. Rottenborn the statement that Mr. Holohan had made to me and she confirmed that it was the same information he had provided her.  So it would have had to have occurred before and I would think that it occurred probably June 4.

Q.    Again, I don't want to go over too much ground that we've already covered.  The statement from Mr. Holohan had to do with his unwillingness to use Mr. Frye as a witness in his prosecution?

A.    That's correct.  He felt that he'd been provided false information by Mr. Frye regarding the cause for a traffic stop and then a subsequent search warrant.

Q.    And you also testified to Mr. Webb you spoke to former Chief Cook.  Is it Chief Cook or Captain Cook?

A.    He was the Chief.

Q.    And you spoke with him about the Holohan issue?

A.    Yes.  I asked him if he recalled the issue and he stated that he did remember an allegation being made and he said he did not remember a great deal about it. He said but he was 99 percent sure that it was unfounded.

Q.    And indeed, even though the matter was unfounded, Ms. Rottenborn was concerned that it was information that should have been disclosed/

A.    Yes.  She said it had to be disclosed because it was an allegation of untruthfulness by a Prosecutor.

Q.    An allegation?

A.    Yes.

Q.    Which is consistent with, and I'm going to bounce around here a little bit.  Go to the Questionnaire which was Mr. Webb's Document Number 1.  It is my Document 13, a couple of pages

in.  So whichever is easier for you to refer to.  Question Number 2 is I believe the one we're talking about, and I'm looking at the Giglio questions.  In my document it's Tab 13.

A.    Giglio Questionnaire, yes, I've got that.

Q.    The second question is "Are you aware of any allegations – well, you can read it.

A.    Question Number two as provided by Mr. Mountcastle, "Are you aware of any allegation or finding by a Judge, Magistrate Judge, Administrative Hearing Officer, or Prosecutor that reflects upon your truthfulness or bias including a finding of lack of candor?  Yes or No?"  Then it states, "What was the name and position of the person who made the finding?"

Q.    Okay.  Your concern was that you were presented with an allegation by a Prosecutor that impacted his truthfulness or bias?

A.    That's correct.

Q.    And what has to be disclosed in a Giglio Questionnaire when an officer is asked is whether there is such an allegation?

A.    That's correct.

Q.    Now Mr. Webb asked about whether that information was known by the U.S. Attorney's office.  He referred a couple of times to Document 16 in his notebook, which is the letter to Defense Counsel.  If you would refer to the last two pages of that document please, 16 of his notebook.

A.    Yes.

Q.    The memos that we've been talking about coming up in the FOIA request, the U.S. Attorney's office had because this is attached to their letter to Defense Counsel.

A.    Yes.  Judge Conrad's Order?

Q.    I'm sorry, it's Exhibit 16, Tab 16.

A.    I think I may be there, 16.

Q.    But it's the last two pages of that.

MR. WEBB:  Are we looking at the November 27th letter?

MR. CARROLL:  Yes sir.

Q.      So at that point the U.S. Attorney had those materials that were deemed, exonerating that you were asked about why they weren't provided to the U.S. Attorney's office?

A.      Yes.

Q.      And you're not sure how they got to the U.S. Attorney?

A.      No sir, I'm not.

Q.      And the U.S. Attorney's office still, as that letter reflects and as the July 28th letter reflects, found that those were Giglio violations or that was Giglio information that should have been disclosed in response to the Questionnaire?

A.      Yes.

Q.      You obviously met with Ms. Rottenborn and you had spoken with Ms. Shelvey. When you met with Ms. Rottenborn, did she confirm for you, or what did she tell you with regard to the information you had gleaned from Ms. Munro about what to provide?

A.      I essentially went through the same process with Ms. Rottenborn as I did Ms. Munro. "Here's the documents, here's what they pertain to, are they Giglio material?" She said, "Yes" so I gave her the information, but she confirmed the opinion of Ms. Munro that these were Giglio documents and so that was my reason for turning them over. So essentially I was getting a second attorney's opinion at that point that this was in fact Giglio material.

Q.      Was it just a second attorney's or was there another AUSA in that meeting?

A.      There was another AUSA in that meeting and that was the Ethics Attorney.

Q.      Bob (Inaudible)

A.      Yes, who provided the opinion regarding expunged arrests.

Q.      Did you subsequently talk to Rick Mountcastle?

A.      Yes, I did.

Q.      And Rick Mountcastle is who wrote you the May 3, 2017 letter?

A.      Yes, he did.

Q.      And he's the U.S. Attorney?

A.      He is.  He was acting U.S. Attorney.

Q.      Has he contradicted what Ms. Munro or Ms. Rottenborn told you about the type of information that should have been disclosed in response to Giglio questions?

A.      No, he reaffirmed those findings.

Q.      Did he disagree with Ms. Rottenborn or Ms. Munro with regard to the information you should be disclosing in response to the May 3rd letter?

A.      He did not disagree.

Q.      Of the documents you took to your meeting with Ms. Rottenborn, you turned all of them over?

A.      Yes sir.  I had a stack of documents.  Again, there were seven or eight and at their request, I provided those documents to them.

Q.      And they affirmed to you that they should be disclosed in response to the May 3rd letter?

A.      Yes.  As a matter of fact, they told me that if I didn't disclose them, they were going to issue a subpoena.

Q.      I remember you saying that.

A.      We consulted HR and decided no subpoena was necessary and we turned them over.

Q.      Did you talk to Ms. Rottenborn about the arrest issue, Mr. Frye's arrest issue?

A.      I discussed with her that there was, actually she asked me the question "Do you know if Mr. Frye has ever been arrested?"  I did not answer the question immediately.  I followed up with a question, "Does that include arrests that have been expunged?"  She consulted with the Ethics Attorney and stated that yes, expunged arrests were required to be provided under Giglio.

Q.      So you revealed to her not only that there was an arrest, but you did tell her that it was an expunged arrest?

A.      I did.

Q.      There was no glossing over the fact that it was expunged?  She fully understood that?

A.      Yes, and I told her that I didn't know any of the details regarding it other than it was my understanding that it was an arrest of grand larceny and I had never seen a report or read it and did not know any details.

Q.      Did you talk to her about the fact that you had been contacted by Mr. Frye regarding the Giglio letter, the threat issue Mr. Webb asked you about?

A.      Yes.  I told her that, I think near the end of our meeting that we were talking about the fact that the Internal Affairs files had been shredded and that Mr. Frye had come to my office and had made the statement that it was his belief that the arrest document should be shredded and that it related to those investigations, and that if they weren't, there could be a problem.

Q.      The IA files, I digress here a moment, that were shredded, what is, if you know and I can show you a document if you don't recall,  what is the current Library of Virginia Rule with regards to the maintenance of IA files?

A.      The current rule with IA files is that Internal Affairs files retention has been changed.  I believe it was changed in 2013 to "Until no longer administratively useful to allow needed flexibility between Law Enforcement Departments."

Q.      So there's not a particular timeframe any longer for them to be retained?

A.      No.  It's just they're retained until no longer deemed useful to allow for greater flexibility for a Law Enforcement Agency.

Q.      Were the IA files before they were shredded, to your knowledge, I think that was before your time, but were they stored in the Chief's office?

A.      Yes.

Q.      They were required by policy?

A.      Yes sir, they were stored in the Chief's office in a locked file drawer as stated in the policy.

Q.      Are the ones that you still have, the more current ones, still stored in your office?

A.      Yes sir, they are.  The only style that I now currently have, there's one dated 2014.  Everything else is '15 to now.

Q.      The files that Ms. Alterio pulled out for you were a Disciplinary file?

A.      Yes.

Q.      Was Officer Frye the only officer to have a Disciplinary file on her Scanner?

A.      No.  I think there's one for each employee.

Q.      And it's not just Disciplinary files, there's any number of files for each employee?

A.      That's my understanding, yes.  Like I said, I know this sounds in conflict, but there's an old Scanner System and a new Scanner System, and it's when we went to a new software company so they are not necessarily interconnected, but again, that's beyond my ability in terms of IT and how those work.  So there's two sets in there apparently, and then she can explain that much better than I can.

Q.      But you had mentioned the IA files, that's why I wanted to make sure I understood.  These were not unique files, they were just for Craig Frye.  You pulled down his Disciplinary file because that's what you were asked for, but these are files that are maintained on all police officers?

A.      Yes sir, that's my understanding and with this electronic filing system, I'm a paper file guy.  That's what I've did all my life so electronic files are somewhat, you know, I use them, but the mechanics of them are, I normally ask her to pull those up for me rather than me going and getting them myself.  It's just I'm a little old school in that area.  I like being able to put my hands on files and paperwork.

Q.      Let me digress.  I apologize.  Let me go back to your meeting with Ms. Rottenborn.  You provided her the information on the arrest, the expunged arrest.  You talked to her about

your conversation with Frye and that he wanted additional material destroyed, and you talked to her about the Holohan issue?

A.      Yes.  I talked to her about the Holohan issue.  I also told her that there was a sustained allegation with an Employee Assistance Program referral for Mr. Frye related to making racially derogatory statements and that that allegation, of course she said would be deemed to be bias and was subject to disclosure under Giglio.

Q.      Did you talk to her about the sexual misconduct or sexual harassment?

A.      Yes.  I told her that there was a sexual misconduct allegation by Ms. April Alterio.  Ms. Alterio had shared that information with me where it was alleged that Mr. Frye came into her office and shut the door with an ATF Agent and told her to get undressed, and that there was a second allegation of sexual misconduct where he had put tape over his mouth and kissed Ms. Valerie Cummings, a detective, on the lips and had smacked her "on the rear end".

Q.      And you spoke to Ms. Alterio about her issue?

A.      I've spoken with both of them about those issues.

Q.      As part of this investigation?

A.      Yes, because I saw that memo in there and I asked about it.

Q.      As you sit here, do you recall any other information besides the documents and the issues we've just talked about you speaking to Ms. Rottenborn about?  Any other issues you shared with her?

A.      The computer being a complaint by a co-worker who apparently made a complaint because Detective Frye wrote a letter of apology or essentially a memo of apology where he placed a co-worker's internet homepage on a homosexual website.  There was also a couple of memos that talked about in Giglio regarding policy and procedure.  There was one dated December 14, 2004 where Craig Harris made a complaint to then Chief Cooley that there were "potential continuing problems regarding Officer Frye" and the memo stated that Department policy regarding informants and the proper procedures regarding proper handling of obtained drug information was not being followed.  There was

then again another e-mail that I shared with her from Detective Benjamin Cook, the memo stated

concerns that Detective Frye had failed to follow the proper procedures for handling drug enforcement

information. It says "The proper procedure for handling this type of drug enforcement in the future," that

memo is Attachment Number 4, and I disclosed that there was a memo from Captain Vickers dated

November 4, 2007 where there had been a complaint from a confidential source of information that

Detective Frye had asked the subject "to plant drugs in a suspect's vehicle".

    Q.      That one, to be clear, the memo you turned over stated that it was not deemed

credible?

    A.      Yeah. Apparently there was an undated investigative document attached to that

and it's Attachment 7 of report, and it states that the allegation was deemed not credible. Apparently that

investigation was conducted by the ATF into that allegation.

    Q.      So much like the sentence at the end of that policy paragraph, Paragraph 6 said

"If you have any information, disclose it if it's unfounded," that happened in that incident?

    A.      It did. I provided, because I had at my fingertips on that particular case, and as I

said, I wish I could come in here and tell you our recordkeeping was better, but I've been here 24 months

and trying to correct a lot of these problems, but I'm going on I guess is to take Court's best evidence.

I'm going on the best information I had in trying to comply with the wishes of the Department of Justice

and give them the information they requested. Some of it is a bit disjointed, but yes, in this particular

case I was able to provide the allegation of planting of drugs, the accompanying exonerating report, but as

Giglio requires, because that information was alleged, I was required to disclose it and I did.

    Q.      And you believe as you sit here, that's the universe of what you and Ms.

Rottenborn discussed that day?

    A.      There was another memo that was in there dated May 8th of 2007 that states, this

comes to of course, there was memo about him being on sick leave and he was seen at a bar in Roanoke

and made disparaging comments. Some of those ones, like I said, were ones that seemed to be a lot of

paper going in the file, but then there was also the traffic stop concern.

Q.      That's the issue that fed into Judge Conrad's Order?

A.      Judge Conrad's Order that it was in fact Giglio material.

Q.      Let me ask about the being in a bar while on sick leave.  Giglio Question Number 3, I want to know why you disclosed that.  Giglio Question Number 3 refers to off duty conduct, doesn't it?

A.      It does.

MR. WEBB:  Can I just note an objection?  That's not one of the charges.

MR. CARROLL:  It's not.  I'm just trying to understand why he was going through the process he was going through.

Q.      Your objective was when you sent that one to determine which information was responsive and to comply with the request?

A.      Yes, and I think from the response, they didn't necessarily use all of it either.

Q.      Correct, and I think that's Mr. Webb's point.  They took some of the information and didn't necessarily use it all as to determining the Giglio omissions.  The documents you turned over, we'll move through these quickly, to Ms. Rottenborn that day are, and Mr. Webb asked you this, between I think he said 4 and 11, but is it actually Tabs 3 and 11?  It would be 3 and 11 either the red or colored tabs that you have or it would be 3 and 11 in my book.

A.      I believe that's correct.

Q.      You can look at his red tab.  It's the same.

A.      You know I believe I turned over the exact same documents to Ms. Rottenborn that I turned over to Ms. Munro.  They were in the same file, same documents.  So yes, they would be actually on my tab, 3, one note of potentially continuing problem regarding Craig Frye.  That's Tab Number 1 on Mr. Webb's —

Q.      Hold on.  Let's make sure we're all in the same place because I'm not sure we are.  Tab Number 1 of the red is the DOJ letter.  Go to Tab 3 of the red tabs.

A.     Three is the red, okay. I'm there. Tab 3 of the red, yes. "Potential continuing problems regarding drug investigations and handling confidential sources of information."

Q.     And you testified just a few minutes ago, that was information about following procedures?

A.     Yes.

Q.     And 4 is similar?

A.     Yes. It says "Circumvented the correct procedures and protocols that our agency has put in place." The next one is of the same nature. It talks about, it ends with "Once again Frye was advised of the proper procedure for handling this type of drug enforcement in the future."

Q.     Then the next one would be continuing problems regarding Officer Frye. That's from Craig Harris to Cooley?

MR. WEBB: I'd not my objection in that the charges are what they are. I know there are a lot of documents and I know the point you're trying to make and maybe you need to do it, but I guess for the panel, I just want to make sure they're clear that these documents have nothing to do with the ultimate charges.

MR. CARROLL: Yeah, they were turned over and I want him to explain why they were turned over and why he was doing what he was doing.

MR. WEBB: I understand.

A.     The next one is "Disciplinary Action" is the title, dated November 23rd, 2005.

Q.     Let me start with 3 and 4. Were you asked to provide information regarding a failure to follow Departmental procedures?

A.     Yes, that's one of the Giglio questions.

Q.     That is why you turned that over?

A.     That is why I turned it over, yes.

Q.     Now Tab 5?

A.      Tab 5 is a memo to Police Officer Craig Frye from Herbert Cooley, Chief of Police, disciplinary action, IA investigation, 2005-3. It states that, it's alleged that on November 14th, 2005 he made comments that were racially insensitive and inappropriate. "These remarks were made in the presence of Dispatchers Tammy Doyle and Sharon Barrow and Police Officer Dennis Marion."

Q.      Now we've had some discussion about, does this go to the issue of bias?

A.      I asked if matters regarding race constituted bias under Giglio and was informed that it of course did.

Q.      Is that five pages?

A.      Yes sir, it is.

Q.      The second page of that, that begins a separate document, correct?

A.      It does. It begins a second document with a signature page as Page 2.

Q.      And that is a written reprimand that was issued to Mr. Frye?

A.      Yes. It states "Disciplinary Action, Written Reprimand with EAP Referral".

Q.      So we have a lot of confusion about whether things are sustained or founded or unfounded. This was a sustained allegation that was reduced to a written reprimand?

A.      That's my understanding, yes sir.

MR. WEBB: Jeremy, I guess I do note objection. That particular that you have attached is not signed.

MR. CARROLL: I know it's in here. We've all seen it.

MR. WEBB: I agree, but I would say that is the one that was in the Personnel file we referenced earlier. So we're talking about the racist document.

MR. CARROLL: Yes. The signed copy is in the letter dated November 27, 2017 from the U.S. Department of Justice? I think it's elsewhere in here as well.

Q.      Then let's go to the next one, Document 6. This is actually a note from Craig Frye?

A.      Yes. This is an interoffice memorandum dated January 25th and this memorandum is from Officer Frye to then Master Sergeant Andrew Corbin. It states "I had started to use the computer for an IBR report when I noticed that Officer Oliver was still signed in. I then changed his internet home page to a homosexual website. I did this only as a joke and was not meaning for anyone else to see except Officer Oliver. This was a continuation of small practical jokes being played by Officer Oliver and others. It was an impulsive action on my part and merely a response to being the butt of several practical jokes and the knowledge of the jokes being played by other officers. This was done to get a laugh. I would have thought it was funny if it had happened to me and not to offend or get anyone in trouble."

Q.      Again, I'm not trying to take up all the time.

A.      Yeah, it's a letter explaining why he did it and it was a practical joke.

Q.      Again, there's no issue about whether it was done or not? It happened because Mr. Frye has written this letter?

A.      Yes.

Q.      Document 7 is the planting of the drugs that states it was deemed to be not credible?

A.      That's correct. Like I said, I do not know who did this investigation, but I assume that it was done by the Bureau of Alcohol, Tobacco, and Firearms and it concluded that the allegation was unfounded, but it was an allegation.

Q.      When you spoke with Ms. Munro and met with Ms. Rottenborn, they believed it should be turned over?

A.      Absolutely. They stated that any allegation where there was an allegation of drugs being planted on a defendant would certainly be Giglio material.

Q.      The next memo, and I'm at 8. Again, this is another document you turned over. This was the issue of consuming alcohol while on leave and goes back to the off duty, the request for off duty information, is that correct?

A.      Yes, essentially taking sick leave when you weren't sick and he was out.  Of course it's just a memo that was in there.  They deemed it to be worthy of being submitted for Giglio.

Q.      You did not rely on the discipline at the end of the day and they didn't mention it in their communication?

A.      No, I didn't.  Like I said, this was just another one that was turned over as a group of documents.

Q.      Then 9 is the traffic stop concern?

A.      Yes.  This is dated June 10th, 2008, and it is a document that talks about where Officer Frye was pulled over in the 1100 block of Norfolk Avenue in Roanoke City on March 23rd and that he was stopped for speeding at nearly 20 miles per hour over the posted speed limit.  The officer who stopped him reported that he could smell alcohol on his breath.  It is alleged in this document that Officer Frye told him that he was only two blocks from his house when in fact he was two miles from his home, and the officer allowed him to continue on driving.  How this report came to the attention of Lieutenant Cook or Chief Cooley, I don't know.  I just know that the memo exists and there was an allegation that he provided incorrect information to the officer which subsequently resulted in Judge Conrad ruling that this was in fact Giglio material.

Q.      To be clear, to your knowledge he was not, Mr. Frye was not disciplined for this at the time?

A.      No.  I don't know if any, it says in the memo "The Department will not", well, it sounds to me like somewhat of a reprimand.  I guess I should read it into the record.  "Based on the officer decision not to proceed with further investigation, which would have included field sobriety tests and other investigative information, no disciplinary action will be taken on this particular complaint.  However, in speaking with Chief Cooley about this situation, it has been determined that you placed yourself, the Department and a Roanoke City Police Officer in an embarrassing situation.  Your actions whether on duty or off duty, reflect on you as a person and as a police officer.  The Department will not tolerate further incidents of this nature and a written reprimand is recommended in this situation.  If any

further concerns of this nature arise, consideration will be given to disciplinary action including, but limited to, removal from the ATF Task Force."

Q.      Again, you've already referenced this.  This was one of the issues underlying the Order issued in the Woods case by Judge Conrad?

A.      That's correct, where Judge Conrad issued this Order.

Q.      And the U.S. Attorney argued that it was not Giglio material?

A.      That's correct.

Q.      And they provided to Judge Conrad and it's attached in the materials and a letter from the Chief saying it was not a concern?

A.      Right.

Q.      And obviously, Judge Conrad disagreed with them and held that it was Giglio material?

A.      Correct.

Q.      Document 10 we've already talked about.  That's the document pertains to the accusations by Ms. Alterio and Detective Cummings?

A.      That's correct.

Q.      Again, you spoke with both of them in the context of this investigation?

A.      Yes.  They pertain to sexual harassment, insensitivity, and inappropriate remarks.

Q.      And the last document you turned over, and I'm trying to hurry along, I apologize, is the reference to the complaint by Attorney Holohan?

A.      Yes sir.  Like I said, these were from two situations, one where I went over the documents on the telephone and one where I met in person and turned them over at their request.  These were, however many documents that is.  It was a stack of them, and although those occurred on different dates, these to the best of my knowledge were the exact same documents that I referred to in both instances.

Q.      You have attached, and I just want to be clear about this, a Document 17.

A.      Yes.

Q.      The Corbin report?

A.      Yeah.  That's the Corbin report that –

Q.      That Mr. Webb was asking you about?

A.      Yes.

Q.      That was not turned over to the –

A.      No.  That came later when I didn't know that document existed, and quite frankly, I was kind of surprised that it existed because normally when an employee would leave, of course there's a bit of a caveat, Mr. Corbin still is a part-time employee with the Department, but he recovered that document from his personal records from when he was an IA Investigator, but that was apparently an all-inclusive summary of internal investigations involving Mr. Frye that Chief Cooley requested Corbin do.  So as Chief of Police however I did not see those documents exist outside of the agency, but he brought it to me.

Q.      Mr. Corbin did investigate at a minimum Detective Cummings' complaint?

A.      Yes.

Q.      And Mr. Webb asked you about that?

A.      Yes.

Q.      They are of the position that perhaps it was withdrawn or not?

A.      Yes.

Q.      Did Mr. Corbin indicate that it didn't happen?

A.      No.  As a matter of fact in my conversations with Ms. Alterio, she wanted it to be, I don't want to put the words in her mouth, she's here.

MR. WEBB:  I guess I would note an objection because the issue is whether it has to be disclosed and going through now and have witnesses recount the facts as to what happened are really irrelevant to the civil issues.

MR. CARROLL:  I understand.  My only point is that to the extent you're talking about willfulness, if it happened and it wasn't disclosed, then I think that goes to whether he should have known that it occurred.

MR. WEBB:  But he denies it happened.  So it goes to whether it was a sustained finding. Plus, we've already disclosed that that complaint was withdrawn and he said there was no finding on it. So I don't understand how the facts are even relevant at this point in the sexual harassment complaint.

MR. CARROLL:  Well, her statement is that it was not withdrawn.  She just asked that it be handled with the conversation with Mr. Frye.  I think that's how it was conveyed to me and it would be handled rather more informally.

MR. WEBB:  I was referencing Lieutenant Corbin's finding.

MR. CARROLL:  Okay.  I'm sorry.

Q.      You spoke with Ms. Alterio and Detective Cummings?

A.      Yes.

Q.      Did either of them refute that the incident occurred?

A.      No.  Neither of them did and both of them were very adamant that both of these situations occurred.

Q.      As you testified?

A.      Absolutely.

Q.      So those are the documents you left with Ms. Rottenborn.  You exited her office. I believe that's now the universe of the information that you provided to her?

A.      Yes, that's correct.

Q.      A few days later you heard from Ms. Rottenborn?

A.      Yes, I did.  I was asked by Ms. Rottenborn to go and check our confidential informant files to see if Detective Frye's girlfriend had ever been an informant with the Vinton Police Department.  That was the question that I was asked.  I did do that.  I told her that we had no record of that.  Then on Monday, June 19, I received a phone call from Ms. Rottenborn.  She stated that Detective

Frye's testimony would no longer be accepted in Federal Court and that I would be receiving a telephone call from Special Agent in Charge Boxler with the Bureau of Alcohol, Tobacco, and Firearms, which in fact I did receive the next day, Tuesday, June 20th. He called and advised that Frye was being removed from the ATF Task Force. He stated the matter would be investigated by the ATF Internal Affairs or the Inspector General's office or possibly not investigated at all as Frye was being removed from the Task Force. He further stated that Task Force Officer Frye was in Bristol on an operation with Mr. Billy Cunningham, or Agent Billy Cunningham, and would advise him of his removal from the Task Force and Frye would be directed to return to the Vinton Police Department. The next event occurred on Tuesday, June 20th. Law Enforcement Liaison Issac Van Patten called to advise that they were going to be taking –

Q.     It's in the record. There's no need to read that. I'm just trying to move along. At some point were you contacted? Ms. Rottenborn reported over the phone to you the outcome of their Giglio inquiry?

A.     She did.

Q.     Did you receive a communication from Mr. Mountcastle?

A.     Yes. On July 31st, I received a letter from United States Attorney Mountcastle referencing Detective Frye. That letter is of course in the record.

Q.     It is Tab 3 of the town's materials. I want to go to Page 3 of that letter. Again, Page 3 of the town's file and I am uncertain which page it is of Dale's file. On Page 3, the next to the last paragraph, they make specific reference, "they" being the U.S. Attorney's office, make specific reference to a series of questions on the Giglio Questionnaire, is that correct?

A.     Yes, they did.

Q.     Which questions were those?

A.     They referenced Question 3, Question 6, and Question 2.

Q.     And they determined that the answers given by Mr. Frye demonstrated or displayed a lack of candor?

A.     They did.

Q.      And they do in the preceding paragraph, they reference the Order from Judge Conrad in the Woods file?

A.      That's correct.  They reference the *United States v. Aaron Eugene Woods*.  Judge Conrad's decision constitutes Giglio material.

Q.      I'm going to refer back to Page 1, the very first sentence of that letter.  What was the determination of the Department of Justice based on the information?

A.      "I write to advise you that Officer Craig Frye will no longer be permitted to testify as a government witness in Federal criminal cases prosecuted by our office."

Q.      Read the next sentence.

A.      "This decision has been made because of the seriousness of potential impeachment material obtained by our office, including information provided by your office on June 16, 2017."

Q.      It doesn't say exclusively based on information you provided?

A.      No.  It says that the decision is being made in part by information that I provided.

Q.      Now back to Page 3, the questions that they were concerned because Mr. Frye's answers demonstrated to them a lack of candor.  Question Number 3.  I'm not sure why they took it in the order in which they took it.  Let's actually change the order up a little bit.  Let's go with Question 2.

A.      Question 2 is "Are you aware of any allegation or finding by a Judge, Judge Magistrate, Administrative Hearing Officer, or Prosecutor that reflect upon your truthfulness or bias, including a finding of lack of candor"?

Q.      And what was the AUSA, the U.S. Attorney's concern reflected on this?

A.      Regarding Question 2, "He failed to disclose that an Assistant Commonwealth Attorney from Roanoke County had in 2012 made a complaint against him involving his truthfulness and candor."

Q.       Now we've obviously been over this a little bit.  I'll try to be brief.  You testified, correct me if I'm wrong, that information was to be provided back to the beginning of time, not just in your update, is that correct?

A.       Yes.

Q.       That's what they told you?

A.       Yes, to perceive one's career.

Q.       And you heard Mr. Webb question you about whether this information was disclosed to AUSA Wolthius?

A.       Yes.

Q.       Is it your understanding that the disclosure to AUSA Wolthius would have mattered with regard to this specific Giglio inquiry?

A.       Based on my understanding in my conversation with the U.S. Attorney's office, it would not have mattered.  It has to be re-disclosed.

Q.       As a part of the Grievance Process, did you reach out to Mr. Mountcastle and ask him that question?

A.       Yes, I did.

Q.       Save that space.  We'll come back to it.  In my documents, it's Document Tab 11, fourth page in, Bates Number 180.  Is that Mr. Mountcastle's reponse?

A.       Yes.

Q.       Again, this is after the fact, but this is during the Grievance Process when you're going through the various steps of Mr. Frye's Grievance?

A.       That's correct.  I was directed by one of the Step Respondents of the Grievance Process, who is our Assistant Town Manager, Richard Peters, that if I would reach out and get a formal, I guess more formal written opinion regarding the scope of Giglio and whether or not each Giglio letter that is sent is simply a refresher or does it go to the beginning of time essentially.  I had this reply if you'd like me to read that into the record?

Q.      Sure.

A.      "We expect the Law Enforcement Officer to provide complete and truthful answer each time he has the candid conversation with the Assistant United States Attorney" although they abbreviated it AUSA, "Note the LEO does not complete the form. The AUSA asks questions and completes the form based on the LEO's answers. As you can see from the form, all of the initial questions call for a "No" or "Yes" answer so those should be answered truthfully no matter how many times the LEO has been asked the questions. There is nothing about any of the questions that limits the "No" or "Yes" answers based on previous answers. Moreover, with respect to the Questionnaire at issue here, Officer Frye had the conversation with Department of Justice Attorney, DOJ Attorney, and AUSA from our Harrisonburg office with whom he had not previously worked so his answers to any candid conversation he may have previously had with a Roanoke AUSA were irrelevant. Finally, according to our records, Officer Frye did not previously disclose the allegations of misconduct other than the DUI traffic stop by Roanoke City PD. I hope this helps. Best regards, Rick A. Mountcastle, Acting U.S. Attorney."

Q.      Thank you. Now back to where we were when we left off on Question 2. So we have the Giglio question which asked him about allegations and you now have the U.S. Attorney's determination that he failed to disclose, correct?

A.      Yes sir.

Q.      At some point you did receive a response from Mr. Webb and he provided information on this?

A.      Yes, he did.

Q.      We'll get to your final findings in a moment. We'll continue through 3 and 6, but I wanted to address exactly what we understood those allegations were, rather what those violations were about. So let's go to Question 6 on the Questionnaire itself.

A.      Question 6 on the Questionnaire asks, "Have you ever been arrested, charged with, or convicted of a criminal offense? If yes, what and when?"

Q.      I understand Mr. Mountcastle got it wrong slightly, but he does reference the expungement.  He speaks in terms of a prior criminal charge in his letter?

A.      That's correct.  He refers to in his letter that regarding Question 6, he failed to disclose the existence of a prior criminal charge and expunged conviction."  So there what he uses is both terminology, "And the Court, well, that goes into Question 2, which we just discussed.  So yes, it does go with the criminal arrest.

Q.      And again, you disclosed the expunged nature of the file of the record to AUSA Rottenborn?

A.      Yes, I did.

Q.      The fact that the expungement shows in the letter though again there's the mischaracterization of it as a conviction?

A.      Yes.

Q.      Then Question Number 3.

A.      Question Number 3 is, "Are you aware of (A) or any state findings in relation to past complaints, investigations, or disciplinary actions concerning the performance of your official duties and any off duty conduct or (B) anything negative in your Personnel File?"

Q.      Now a couple of questions here before we get back to the U.S. Attorney's findings.  The off duty conduct, that's what we were talking about earlier with regard to while on sick leave.  Again, not anything that factored into your investigation?  This is limited to why you disclosed that information.

A.      Uh-huh.

Q.      The reference to sustained finding is after (A), is that correct?

A.      It is after (A).

Q.      And what is (B)?

A.      (B) is anything negative in your Personnel File.

Q.      Now could something negative be in the Personnel File if it has some foundation in fact, but maybe it hasn't led to a sustained finding?

A.      That's correct.  It could because again, using a progressive disciplinary model, there may be some things where a person is you know showing up late for work or in the case where we had some things here of maybe not following through with vaccinations and things like that.  It doesn't necessarily rise to a sustained obligation or disciplinary action, but it's something that you would document in a file to show a potential pattern of behavior of failing to follow instructions or something of that nature.

Q.      Sustained finding has a degree of cache that you know, especially in the Law Enforcement community there's some seriousness to it.

A.      That's correct.

Q.      But anything negative in the Personnel File seems to be a slightly lower standard in my opinion.  Do you agree?

A.      It's a much lower standard and as I said, I've been a Supervisor since 1995 in Law Enforcement and sometimes we document things in a Personnel File, a working file that we think is a problem that may need to be addressed further in the future, and we do that because it may represent a pattern of behavior that needs to be corrected.

Q.      Now referring back to Mr. Mountcastle's letter and the sentence he refers to with regard to Question 3.  Are you able to get there?

A.      Yes.

Q.      Mr. Mountcastle's letter, Page 3.

A.      With regard to Question 3, his letter states, "In response to Question 3, he failed to disclose the existence of sustained findings and disciplinary actions against him in relation to the performance of his official duties."

Q.      Now sustained findings and disciplinary actions so at least as reflected in this letter, they're two different things?

A.      That's correct.  He uses the work "and".

Q.      Before we get into your findings, I want to jump forward to Mr. Webb's Document 16.  It is the November 27 letter to Defense Counsel.

A.      Okay.

Q.      They have made in that letter, "they" being the U.S. Attorney's office, signed by Mr. Mountcastle and Ms. Waering four decisions or four findings.

A.      Yes.

Q.      Take a look at Number 1.  I'll submit to you that that relates to Question 3.  I know she didn't include those.

A.      Yes.  It just states that Frye has been disciplined or sent for additional training or counseling for issues involving a variety of misconduct including inappropriate behavior towards women, racially insensitive remarks, and a failure to follow proper investigative protocol.

Q.      We talked about the 2004 two memos where there were some investigative procedures that were not followed?

A.      Yes.  It should be noted she refers to these as sustained findings.

MR. WEBB:  Let me just, I'm going to object so there's no occlusion.  There's no charge for failure to follow proper investigative protocol in Mr. Foster's charge so that would not be relevant.

MR. CARROLL:  Yes.  I agree with you, Mr. Webb.

Q.      The racially insensitive remarks that they reference there, that would be the memo that we discussed earlier?

A.      Yes, where there was a referral for Employee's Assistant Program Counseling.

Q.      The second finding she makes has to do with Question Number 2 and the AUSA?

A.      That's correct.  Assistant Commonwealth Attorney of Roanoke County made a finding, and she uses that term, that Frye made untruthful, had been untruthful in communications to him in a Search Warrant and that he would not present evidence from Frye in a criminal case unless it was corroborated by other evidence.

Q.     And to be clear, we've already touched on this, attached to this document, despite these findings by the U.S. Attorney's office, are the materials arguable from the former Chief saying that the charges were not substantiated?

A.     That's correct.

Q.     So again the question is not about sustained findings in that regard, it's about allegations?

A.     It's about allegations as the Giglio letter states.

Q.     And clearly the U.S. Attorney felt that the "No" answer was improper?

MR. WEBB:  Objection.  I think the U.S. Attorney can speak for himself.

MR. CARROLL:  I think you're right, Mr. Webb.  Thank you.

Q.     And the next paragraph has to do with the expunged again.  There he put conviction in quotation marks, but that's the arrest?

A.     Yeah.  "Frye reported an expunged conviction for grand larceny on his employment application."  Then like you say, they put 'conviction in quotations.

Q.     The fourth issue again doesn't relate to your discipline because you did not discipline him for the possibility of pursuing legal action?

A.     No, I did not.

Q.     The U.S. Attorney's office was concerned about it, but you were not?

A.     I was not concerned about it.  That comment, you know I don't know Officer Frye extremely well, but in the time that I have known him, I did not feel that that statement warranted any discipline, I didn't feel warranted of an allegation of any type.  I just took it as he would exercise his rights because he felt that the fact that all the records were not disposed, that the IA records were improper and he certainly has the right to take legal action, and I would never give an allegation against an employee for exercising their rights or try to intimidate them by doing so.  He has a right to take whatever legal action he wishes against me.  I fully understand that.

Q.      Once you received Mr. Mountcastle's July 31 letter, you then proceeded to, you'd already placed Mr. Frye on Administrative Leave, is that correct?

A.      That's correct.

Q.      Paid Administrative Leave?

A.      Paid Administrative Leave.

Q.      At that point, once you received Mr. Mountcastle's letter you issued the notice of the complaint or the notice of the charges on August 8?

A.      That's correct.

Q.      That's Tab 4 in my binder, if you want to refer to it to confirm your memory. I'm not going to ask you any further questions about it.

A.      Okay. Yes.

Q.      And you state that you were concerned about the lack of candor as reflected in Mr. Mountcastle's letter?

A.      Yes.

Q.      And you invited, as you had to, Mr. Frye's response, and of course he responded through Mr. Webb on August 29th?

A.      Yes.

Q.      In the interim did you speak with any of the players, Mr. Holohan, Mr. Leach? I believe you said, I'm asking you six questions at once so forgive me. You said you spoke with Ms. Alterio and Detective Cummings?

A.      Yes. I'm not sure of the exact dates on those, but they were more informal conversations, held to private, but yes. I'm sorry. I lost track of your question.

Q.      You did receive a response from Mr. Webb on Mr. Frye's behalf?

A.      Yes, I did and again, it was delivered to me at the Police Department.

Q.      You spoke with Mr. Leach and Mr. Holohan. What is your understanding of the status of Mr. Frye's ability to testify for the Roanoke County Commonwealth's Attorney?

A.     In all honesty, it was a bit mixed, and I say that, Mr. Leach who is the Commonwealth Attorney was stating that he felt that he could not testify unless his testimony was corroborated by another officer.  Mr. Holohan felt a little more strongly in stating that he would not really wish to, his own personal policy as he put it, would to be not to prosecute matters involving Detective Frye as a witness.  I came away from that really taking the opinion of the Commonwealth Attorney, which was uncorroborated.

MR. WEBB:  Jeremy, can we stipulate that Brian Holohan is no longer with the Commonwealth Attorney's office?

MR. CARROLL:  Yes, absolutely.

Q.     Did Mr. Leach mention to you any obligations he would have with respect to Mr. Mountcastle's Giglio letter?

A.     Yes.  He stated that in any future prosecutions involving Detective Frye, he would have to disclose the Mountcastle letter and findings.

Q.     And again, you testified he would require corroboration of the testimony?

A.     And he would require corroboration by another law enforcement officer or I assume, reading into that and I guess I shouldn't assume, but I would also assume that maybe a good other witness would suffice as well, but I don't know.  He stated officer, I believe.  An independent witness I guess is what I'm looking at.

Q.     In your findings, and again I believe it was Tab 4 in Mr. Webb's documents, Tab 79, your charging letter or your letter of your IA Report.

A.     Right.

Q.     We're obviously not going to go over any more than I already have, but you obviously recounted the circumstances of your investigation, who you spoke with for the most part, and what all you learned?

A.     Yes.  Like I said, it's my practice, I keep a running timeline of interviews that I do and any internal investigation and take those notes and compile them into an Investigative Report.

Q.      And one of the things you considered was Mr. Webb's response?

A.      Yes.  I read it and in my reply in the end, Mr. Webb's report was very detailed, very thorough, and very long, but I tried to the best of my ability to reference the major points in his response and take that into consideration in reaching my investigative conclusions.

Q.      Your findings start on Page 10, is that correct, in that document?

A.      Yes, they do.

Q.      I'll come back to Page 10 in a second.  I want to advance to the top of Page 11. How many policies did determine were violated in this instance?

A.      I really referred primarily to two.  I believe they are PER 3-9 and ADM 1-4.  Let me see if I can get that in front of me again.

Q.      It's the top of Page 11 of your IA Report.

A.      Yes, General Order ADM 1-4 and General Order PER 3-9.

Q.      Within General Order ADM 1-4, were there two subsections you refer to?

A.      Yes.  I referred to Subsection (E) which is "Employees shall always display absolute honesty" and in Paragraph (N) which states, "Employees shall not engage in any conduct which is in violation of the policies and procedures contained in the Town of Vinton Employee Handbook or any action or inaction which is detrimental to the Police Department, the Town of Vinton, its reputation or the town's citizens."

Q.      And then obviously, PER 3-9, that's a little bit disjointed.  You have to jump around in the document to find, but willfully giving false statements to officials or the public?

A.      That's correct, or falsifying records such as — yes.

Q.      With regard to, and Mr. Webb lettered them or numbered them A through E, so with regard to those five findings, did you find, and you're more than welcome to refer to them, did you find that all of those policies were violated or just 3-9 was violated?

A.      You say all policies meaning both?

Q.      The one for (E), the one for (N).

A.    I found that they were all violated.

Q.    So this is not just about IA 3-9?

A.    No sir.

Q.    With regard to the violations, you found after conducting your end of the investigation, I know you testified already you deferred on the Giglio issues to the U.S. Attorney's office.

A.    Correct.

Q.    You found with regard to Bullet Point (A) first, this is the arrest issue.

A.    Correct.

Q.    So you found, what did you find?

A.    That based on my investigation that there had been an arrest in Detective Frye's past that had not been reported as required by the Giglio Rule.

Q.    Did you find that that violated the policy?

A.    That did violate policy for failure to display absolute honesty as stated in General Order ADM 1-4 and potentially also PER 3-9 and willfully give false statements to officials.

Q.    And giving false statements I would assume could be detrimental to the Department or its reputation?

A.    That's correct.

Q.    What about just failing to answer accurately?

A.    Yes.

Q.    Was there anything else that went into your determination as far as Bullet Point A regarding the lack of candor or truthfulness you reference other than the failure to disclose the expunged arrest?

A.    No, that's it.  It was pretty much as simple as that, failure to disclose and being told that it was required.

MR. WEBB:  What was that last part?

A.      That it was required, that the information was not provided and it was required to be disclosed.

Q.      I'm going to drop down to Bullet Point (D) real quick.  What was your finding with regard to a violation with regard to Bullet Point (D)?

A.      That it violated PER 3-9 of the Vinton Policy and Procedures Manual which states that willingly giving false statements to an official in that there had been a finding by Judge Conrad.

Q.      I'm sorry, (D), not (E).

A.      Oh, (D)?  That there had been an allegation by Assistant Commonwealth Attorney Brian Holohan that he felt that Detective Frye had been untruthful in his statements to him regarding probable cause for an arrest and Search Warrant.

Q.      And as with Bullet Point (A), and you can read this if you want to, what you found to be the violation was the failure to disclose the incident?

A.      Failure to disclose.

Q.      And that was the same with Bullet Point (A), the failure to disclose?

A.      Failure to disclose.

MR. WEBB:  Objection.  Can we indicate failure to disclose the time he spoke to Shelvey, correct?

MR. CARROLL:  Yes.

Q.      Is that correct?

A.      That's correct.

Q.      Again, you've italicized it here "allegation" and that's because Question Number 6 specifically asked about allegations by Prosecutors?

A.      That's correct, and I italicized it to show that it was merely an allegation and that it corresponds with the Giglio letter that discusses allegations.

Q.     And you were aware from your conversations with Chief, I think it was Cook, that he was 99 percent sure that it had been determined unfounded at that time?

A.     That's correct.

Q.     But you still thought it should have been disclosed?

A.     Yes.  Well, the U.S. Attorney's office told me that it should be disclosed and I made my decision based on their ruling.

Q.     Because they were aware that it had been unfounded or may have been 99 percent unfounded?

A.     Apparently so.  Although Mr. Mountcastle told me there had been nothing disclosed apparently based on the information provided and Mr. Frye's response and Mr. Webb.  It was there and they should have been aware of it I guess.  It was in their document.

Q.     Now let's refer to your findings with respect to Question 3.  I've got those in (B) and (C) and we can talk about Judge Conrad's Order here momentarily, but let's go back to Question 3 for a moment.  Question 3 is the (A) was sustained findings and (B) was anything negative in the Personnel File?

A.     Right.  Question 3 of the Giglio letter?

Q.     Yes sir.  I'm sorry.  You've been at it a long time.  You're doing far better than I am, that's for sure.

A.     I'm starting to feel it.  Question 3, "Are you aware of (A) any sustained finding –

Q.     You don't need to read that.  It asks about sustained findings regarding performance of official duties and (B) anything negative in your Personnel File?

A.     Yes.

Q.     Your findings, when you look back at your findings, what Mr. Webb has referred to as (B) and (C), is it Question 3 that you deem to have, that he did not respond truthfully to?

A.     To (B) and (C) of the, that he labeled (B) and (C)?

Q.     Yes sir, that he labeled (B) and (C).

A.      Yes.

Q.      And what were the incomplete disclosures by Mr. Frye that led to your finding? You can refer to the attachments that you refer to in the documents as well.

A.      I'm pretty sure I'm correct in this.  (B) is the document dated December 5 attachment, "Disciplinary action from Herb Cooley for racially insensitive and inappropriate comments."

Q.      We talked about that.  He was issued a reprimand for that?

A.      Yes, and counseling.

Q.      Keep going.  What else was there?

A.      And that Detective Frye knowingly changed a co-worker's internet homepage to a homosexual website, which was done as a practical joke, further that he understood that this was inappropriate.  Although it was understood that Corporal Frye may have had no, did not intend to offend anyone, these actions may have been merely an impulsive act, an ill-advised joke.  The incident was documented and was therefore required to be disclosed under Question 3, and unfortunately on Question 8, finding of bias.

Q.      And this is the memo where we actually have Mr. Frye's letter of apology, or acknowledgement?  I can't remember if he said, "I'm sorry", but I think he did.

A.      Yeah, it's kind of that he knew that it was not a good idea, that he felt that it was, my interpretation is that it was just sort of bantering within the office and that it was sort of just officers playing jokes on one another.

Q.      And the next Bullet Point, which I've labeled (C) now, is that something that went into your belief that Question 3 should have been answered differently?

A.      Absolutely.  That was the one where an allegation had been made regarding sexually insensitive and inappropriate comments to Ms. Alterio, and then of course the simulated kiss, I guess is a better way of putting it, on Detective Valerie Cummings and hitting her on the rear end.

Q.      Again, you spoke to both parties?  Well, I don't need to ask that.  I've asked that before.

A.      Yes, I have.

Q.      Why do you think these questions should have been answered differently, based on the information you have, with regard to Question Number 3 on the Giglio Questionnaire?

A.      Because these are negative things that were in his Personnel File and were documented and written and they indicated of course bias as what we I guess would now see as sexual harassment and they would require disclosure under Subsection B in one case and Subsection A is a sustained finding.

Q.      And that's the racially insensitive comment?

A.      Correct.

Q.      Is it your understanding that the U.S. Attorney agreed or he reached a similar conclusion that the information should have been provided in response to the Giglio Question?

A.      That's correct.  That's what he indicated to me in his report.

Q.      Flip over real quick to the next page, (E).  This is the Judge Conrad Order.

A.      Right.

Q.      We've been over this a couple of times.  He issued this Order despite some of the findings and some of the arguments to the contrary, correct?

A.      That's correct.  The Assistant United States Attorneys had made an argument apparently that they did not feel that the traffic stop incident constitutes Giglio material.  However, after reviewing the matter, Judge Conrad issued an Order stating that it was in fact Giglio material so therefore it would require disclosure on the Giglio letter.

Q.      Turn back to Page 10, a few pages back, "Investigative Findings".

A.      Yes sir.

Q.      These are your findings.  That second paragraph, and I'm not saying you have to read it, but read that real quick and tell the panel what is behind that second paragraph.

A.      It states that "Regardless of the cause of Detective Frye's acts or omissions, he is no longer permitted to testify as a government witness in Federal criminal cases prosecuted by the United

States Attorney's office.  The acting United States Attorney, Mr. Rick Mountcastle, writes 'It is clear Detective Frye withheld information and displayed a lack of candor'.  Further, due to this finding and the belief by Assistant Commonwealth's Attorney Brian Holohan that Detective Frye was not truthful in his disclosures to him during a 2012 criminal investigation, Detective Frye's uncorroborated testimony cannot be accepted in our local" and I'm saying local but it's local and state "court system either.   In fact, Commonwealth's Attorney Randy Leach stated that this information will be required to be disclosed, Detective Frye's inability to testify in the Federal Court System to Defense Counsel in all cases where Detective Frye is a witness.  Thus, the Town of Vinton now has a sworn police officer whose testimony cannot be accepted by our Federal or local Court Systems."

Q.       Is it an essential job function of your detectives to be able to testify in State and Federal Court?

A.       It is a core function listed in their job description that requires all of our detectives of course to be able to testify in Court.

Q.       How many sworn law officers do you have?

A.       I currently have 24 sworn personnel and two support staff, 24 including me.

Q.       To your knowledge, they're all able to testify?  You don't have anyone who has been told they are not permitted to testify as a government witness?

A.       No, I have no knowledge whatsoever that there is anyone who has been disqualified from testifying.

Q.       But you said the job description for the position and which indeed leads into the pay for the position requires that they be able to testify?

A.       Requires them to be able to testify, yes.

Q.       Is that what you're conveying here with this paragraph?

A.       I am.

Q.       If somebody applied for a job when they were not qualified to testify or could not testify, would you consider hiring them?

A.      No, I would not.

Q.      The Vinton Police Department is obviously in the Western District of Virginia?

A.      Correct.

Q.      So Mr. Mountcastle's office is the one prosecuting Federal crimes arising out of Vinton?

A.      Yeah. Any Federal nexus or any case that would be adopted by the Federal Court System would of course be heard under the Western District.

Q.      Do you have jurisdictional arrangements with Roanoke City and Roanoke County?

A.      Yes. We have what we call an Extraterritorial Arrest Agreement where Vinton Police Officers have jurisdiction throughout the Roanoke Valley and Roanoke County, Roanoke City, the City of Salem, and of course the Town of Vinton.

Q.      Obviously, once this determination was made you proceeded to terminate Mr. Frye's employment?

A.      Yes, I did.

Q.      You met with him and Ms. Collins? Ms. Collins is the Human Resource Director?

A.      She is. She is the Human Resource Director and we met and presented the findings of the investigation to Mr. Frye and advised him that his employment with the Town of Vinton was being terminated.

MR. CARROLL: Judge, I may just have a few more questions. If we want to take a restroom break real quick while I get my notes together. Okay.

Q.      There was a reference, again back to the issue of records retention, Chief Foster. Your policy through 3-9, and for the record 3-9 is in our book is Tab 6 towards the end. I wasn't as smart as Dale to make color tabs, but towards the end of my book, 3-9 –

A.      Did you say Tab 6?

Q.      Tab 6, but it's the second Tab 6, which is why it's confusing.  Is there a provision in here with regard to the retention of reprimands?

A.      There is.

Q.      I can tell you it's towards the top of Page 3.

A.      I'm having trouble finding the second Tab 6.

Q.      I'm going to help you.

A.      I see a Tab 8 and the first Tab 6.

Q.      Mine is upside down.  It's Tab 9.

A.      Okay.  That helps me because I'm like, "Oh, my gosh, I'm looking bad here because I can't find these things."  But we do have a policy concerning verbal and written reprimands.  It states that "Verbal reprimands shall remain active for 12 months and written reprimands remain active for 24 months.  At the end of the active period, reprimands are removed from the employee's Personnel File and retained only for archival purposes."

Q.      So you wouldn't use that reprimand, the older reprimand, for progressive discipline with regard to Mr. Frye?

A.      No.  Once it expires, it's life expectancy so to speak expires, it would not be considered for promotion or used against an employee for promotion or for progressive discipline.  However, archival purposes would, it would be kept for an instance like this maybe where there was documentation needed for a Giglio response.

Q.      There was considerable discussion during your direct and I won't go over much if any of it, but about records, management, and whether you needed to have Mr. Frye's consent to turn the materials over to the Department of Justice?

A.      Correct.

Q.      Did you need to have Mr. Frye's consent to turn those materials over under your Records Management Policy?

A.      I'm not sure how to answer that.

Q.    The Records Management Policy says you can turn over documents –

A.    Oh, as required by law.

Q.    Or as allowed by law?

A.    Or as allowed by law, yes.  So using that standard and the fact that it was again the United States Attorney's office requesting it, I felt that I could turn these records over.

Q.    And that is Tab 11 in Mr. Webb's, and you don't need to flip to them because I'm almost done with it.  And before turning them over, you consulted with the Human Resources Director?

A.    I did.  I communicated with Human Resources actually, like I said, for clarity and accuracy, to my recollection that Captain Frye, excuse me, Captain Drumond actually placed that call on my behalf.

Q.    And you had before going over there, you had talked to the Town Manager about it?

A.    I had told him that, yeah, the existence of these documents and the, I kept him briefed and updated on the situation as it developed so he was aware of the meeting that I had coming up with Ms. Rottenborn.

Q.    Did you encourage the U.S. Attorney's office to make any particular outcome or reach any particular conclusion with regard to their –

A.    None whatsoever.

Q.    Does anybody at the Poff Building have anything to do with whether President Trump appoints you to be a U.S. Marshal?

A.    No sir, not that I'm aware of.  I've had no communication with them whatsoever. I've only had communications regarding my appointment to the U.S. Marshal with my members of Congress and my two United States Senators, and again, I don't know where I stand on that right now.  I just know that I've been recommended.

Q.    Did that possibility influence any of your decisions in this process?

A.      None whatsoever.  I would never engage in an administrative investigation to influence my opportunities for an appointment of this type.

Q.      Obviously, the U.S. Attorney has made one mistake in referring to it as an expunged conviction, but your report, your findings refer to an expunged arrest, is that correct?

A.      That's correct.  I referred to an arrest, and like I said, it's my absolute belief that I referred to it as an arrest in there because this is an understanding that I have.  These questions arise and come to us all the time.  People come to the Police Department wanting to know how to get something off their record.  It's a fairly common question and I have a clear understanding that only the President of the Governor can remove criminal convictions from one's record through the pardoning process.

MR. CARROLL:  That's all the questions I have.

MR. WEBB:  Judge, I just have some quick questions.

JUDGE APGAR:  Mr. Webb, let me just express on behalf of the panel, in the time that we have left, because it's the heartfelt wish of the panel that we wrap up by 7:00, it is the desire of the panel that you focus on the evidence that you may have one, that Mr. Frye had a reason to believe that it was an update as opposed to a history every time the Giglio form went through because you say you have some of that, and two, at what prior time today before the trouble arose in the middle of 2017 that the information, Bullet Points A through E, had been previously disclosed, if at all.

MR. WEBB:  Okay.  Yes sir, absolutely.

JUDGE APGAR:  Because I think, and I think the panel agrees it's the thrust of Mr. Frye's position that one, he had a reasonable belief it was an update, not a history, and two, that at a prior time this information had been disclosed to the U.S. Attorney's office as shown by some of the documents, as in the Wolthius documents.  They already had this.  So if you can kind of focus on that.

MR. WEBB:  I will.  I have about five questions and I'll wrap up quickly.

REDIRECT EXAMINATION – QUESTIONS BY MR. WEBB

Q.      This is a follow up.  The homosexual memo web thing, you're not representing that's in the Personnel File, are you?

Q.      The Records Management Policy says you can turn over documents —

A.      Oh, as required by law.

Q.      Or as allowed by law?

A.      Or as allowed by law, yes.  So using that standard and the fact that it was again the United States Attorney's office requesting it, I felt that I could turn these records over.

Q.      And that is Tab 11 in Mr. Webb's, and you don't need to flip to them because I'm almost done with it.  And before turning them over, you consulted with the Human Resources Director?

A.      I did.  I communicated with Human Resources actually, like I said, for clarity and accuracy, to my recollection that Captain Frye, excuse me, Captain Drumond actually placed that call on my behalf.

Q.      And you had before going over there, you had talked to the Town Manager about it?

A.      I had told him that, yeah, the existence of these documents and the, I kept him briefed and updated on the situation as it developed so he was aware of the meeting that I had coming up with Ms. Rottenborn.

Q.      Did you encourage the U.S. Attorney's office to make any particular outcome or reach any particular conclusion with regard to their —

A.      None whatsoever.

Q.      Does anybody at the Poff Building have anything to do with whether President Trump appoints you to be a U.S. Marshal?

A.      No sir, not that I'm aware of.  I've had no communication with them whatsoever. I've only had communications regarding my appointment to the U.S. Marshal with my members of Congress and my two United States Senators, and again, I don't know where I stand on that right now.  I just know that I've been recommended.

Q.      Did that possibility influence any of your decisions in this process?

A.      No, that was in the Scanner File Discipline.  That's where it came from, that 81-page thing.

Q.      Just answer my question.  That was not in the Personnel File?

A.      No sir.

Q.      Are you representing that the sexual harassment complaint was in his Personnel File?

A.      The document that I have came from the Scanner Files.

Q.      So neither of those, in reference to that one question being anything negative in the Personnel File, those two documents were not in the Personnel File, correct?

A.      Well, the Disciplinary File, I guess it's how you interpret what is the Personnel File.

Q.      Well, the HR person has the Personnel File.  Was it in that file?

A.      I do not believe so.

Q.      The second question, you referenced, and I'm going to just read you.  You said, "Regardless of cause, the decision is being made because of a seriousness of potential impeachment material obtained by our office including information provided by your office on June 16, 2017."

A.      Uh-huh.

Q.      When you read this document, it was the document you gave them and the U.S. Attorney had that In Camera memo.  Those were the documents that were at issue here, correct?

A.      I don't know what documents they used to make their decision other than the documents that I provided.  I didn't have access to that information.

Q.      Third question:  You had referenced that this Scanner File that Ms. Alterio had, you didn't know it existed prior to you going to search to find out, correct?

A.      No.  I knew she scanned documents into the computer into a scanner, but I didn't know that this Bolt Scanner File, as they call it, under an old software program existed until she explained it to me.

Q.      And there's no evidence that Mr. Frye knew that there was a file there that had those documents existing either, correct?

A.      I would say he probably wouldn't know. I didn't know. I would think he may not have known either.

Q.      So how would he in 2017 be able to produce the documents you found if he didn't even know about them?

A.      It would be very, very difficult. He would, I guess, have to come in and make a request of all the documents whether they be in HR or in the Department, but I see your point, sir. I don't know that I have a good answer for that.

Q.      Then on this concept of a candid conversation, you said that it goes back to the beginning of time. What did your investigation reveal, or do you know how long his candid conversation took place with Ms. Shelvey?

A.      I don't know. He explained it to me. I read in a report that the candid conversation, the last one was on I think a hurried day when he was involved in an investigation and she called him and he was pushed for time and had to answer very quickly her questions. I don't know how long that conversation took. I don't know, as I said, one of the problems here is there's a little bit of a difference in the letter that I received in whether the questions, and they're slightly different. The questions, there's like two different sets of candid questions.

Q.      My question to you was do you know how long it took him to do that timewise?

A.      No, I don't know. He indicated to me that it was very quick and I believed him.

Q.      It was over quick?

A.      Yes.

Q.      So in your investigation into this candid conversation going back to the beginning of time, do you know how long normally those conversations took place, how long it took normally to do those as a general rule with the ATF?

A.      No sir, I do not.

MR. WEBB:  Thank you, sir.  That's all the questions I have for you.

MR. CARROLL:  I just have one follow up.

RECROSS EXAMINATION – QUESTIONS BY MR. CARROLL

Q.      In 2017 was Mr. Frye asked for his documents or was he asked to answer

questions?

A.      It's my understanding, I was told that he was asked to answer questions and then

they subsequently completed the form for him.

MR. CARROLL:  Thank you.

MR. WEBB:  I did have one just one Exhibit.  I want him to authenticate so I've got to

use it.

FURTHER REDIRECT EXAMINATION – QUESTIONS BY MR. WEBB

Q.      This is Exhibit 22, letters from Vinton, you see 2012 to the Tactical Division of

the United States, 2014 and 2016.  Are those documents coming from Vinton to the Task Force and the

ATF providing the Personnel Files every two years of what you have? (Showing to witness)

A.      It looks like it, yes sir.

Q.      Have you done it yet?

A.      I have not.

MR. WEBB:  All right.

JUDGE APGAR:  Thank you, sir.  You may step down.

CHIEF FOSTER:  Thank you all, and I apologize for to take so much time fumbling

around trying to find these things.  Thank you for your patience.

JUDGE APGAR:  Who do you have next?

MR. WEBB:  Billy Cunningham.  Should I leave this Grievance Record on that table/

JUDGE APGAR:  Yes, I'd leave both of them there.  We'll take a short break while Mr.

Cunningham is coming.

(RECESS)

(WITNESS SWORN)

The next witness, WILLIAM CUNNINGHAM, having first been duly sworn, testified and stated as follows:

DIRECT EXAMINATION – QUESTIONS BY MR. WEBB

Q.     Introduce yourself to the panel, please.

A.     Yes sir.  My name is Special Agent William Cunningham with the Bureau of Alcohol, Tobacco, Firearms and Explosives.  For another week, I am the Resident Agent in Charge of the Roanoke, Virginia Field Office.

Q.     Can you tell them how long you've been in that position?

A.     I began with ATF in 2001 in Roanoke Field Office as a Special Agent.  I became the acting Supervisor in June of 2016 and became Resident Agent in Charge around August of 2016.

Q.     In your position as a Resident Agent in the Roanoke office, are you the supervisor over the agents as well as the Task Force officers?

A.     Yes sir, I am.

Q.     And how many people do you supervise?

A.     I currently supervise five agents, four full-time Task Force officers and a couple of part-time Task Force officers.

Q.     Was one of those Task Force officers at the time of this event Craig Frye?

A.     Yes sir, it was.

Q.     Was he one of the people that you supervised?

A.     Yes sir.

Q.     In your position as Supervisor of the Roanoke Office at the ATF, were you responsible for implementing various procedures and policies that were given down to you regarding the ATF agents and the Task Force officers?

A.     Yes sir.  I didn't set these policies, but some of these policies I was in charge of implementing.

A.      The U.S. Attorney's office under the last administration put a gentleman, John Fishwick in.  John Fishwick and I shared a pretty close relationship.  We didn't agree on a lot, but we have a very close relationship and we talked a lot and discussed a lot of things.  There was some turmoil in his office and the U.S. Attorney's office, the exact nature I don't know what it was, but they had a shuffling in that office and at the time, Rick Mountcastle, who had been down in the Civil Division for seven or eight years, all of a sudden he was transferred up to the Criminal Division to make the first Assistant U.S. Attorney under John Fishwick.  That's when things, or when I noticed things really started to change in that office.  You also have to realize the time it was.  This was a few years ago when there was a very, very, or at least in my impression, a very anit-law enforcement, anti-police attitude in the press and politically, and I started to notice a number of changes in the way the U.S. Attorney's office was handling, was dealing with law enforcement and dealing with officers.  It was becoming a, it was changing and it wasn't changing for the better, in my opinion.  I often, at least three or four occasions and met with Mr. Fishwick and Mr. Mountcastle fairly regularly and said, "This is becoming an adversarial relationship between our offices.  We can't have this."  There's a special relationship here, something I'd never experienced and something that I've described to other agents I've worked with across the country and they couldn't believe the relationship coming out of this office, but it definitely began to change, and I remember at least three occasions where I said, "This is becoming an adversarial process between your office and my office, and your office and law enforcement in general" and it just continued to deteriorate down the line.  Then about a year later, November of 2017, the election came.  President Trump won and Mr. Fishwick resigned in December, which is to my understanding, which is the normal practice for U.S. Attorney's when the (Inaudible) that he resigned.  Mr. Mountcastle is named the acting U.S. Attorney at that time and things became –

MR. CARROLL:  Can I interrupt?  I think you said November '17 and the election would have been November '16.

Q.      Yes sir.  I apologize.  The election was in '16 and Mr. Fishwick had retired or resigned his position December of '16 and that's when Mr. Mountcastle came to be the acting U.S.

Attorney. Things really started to become very adversarial between his office and my office. It had

started before then. They had hired, not hired. That's not the right word. They had in their employment

an unpaid SAUSA, Special Assistant U.S. Attorney named Corey Munro. Ms. Munro started working

with our office and initially it started working out well, but we found that we didn't trust her, that she

would not tell us the truth. She would lie to us, she would lie about us, and at first I kind of put it up

because I trained most of the Task Force officers in my office and including the Federal agents. I tried to

take her side and say, "Hey, look, you know this is how things have worked. I didn't make this up. This

is how I was taught by Assistant U.S. Attorneys beforehand. You can't just call the Police Departments

and tell them that you know there's a Trial next week and there's no Trial because you're not getting what

want," and it fell on deaf ears and it became very, very, very heated. It got to the point where, this was

even before I was a supervisor that we would not meet with her alone. There was that much distrust and

that much bad blood between us. Like I said, it was not just me, but other agents and other Task Force

officers. She was making accusations against many in my office saying that we were withholding

evidence, and we tried to explain, "We're not withholding evidence. This is our policy that your office

helped set up," but by this time Mr. Mountcastle was in and all these changes were coming and they were

being rammed down our throat, "This is the way it is" and there was very little to no discussion about it.

It was, "This is what I tell you do." We don't vote for them and I told them that, politely at first and then

rather adamantly. "We don't work for you. We're a team. It's our job to protect these informants and

some of the other issues. It's our job to do this and you have to help us do this." That was one of the

many issues, but the blood turned very, very bad. Then I became a Supervisor and it became real bad. I

thought it actually appeared to relax a little bit. We had some meetings with different Assistant U.S.

Attorneys with Ms. Munro, with her Supervisors and things seemed to settle down.

        In March of last year, March of '17, I was the acting, not acting, I was the Supervisor of

the office. I got a call from my boss in Washington, D.C. and he said, "Hey, why is Rick Mountcastle

coming to see you?" I'm like, "I don't know." He said, "How are things down there?" I said, "Honestly,

I think they're improving quite a bit. Things seem to be moving along. We're getting some cases

prosecuted. The arguments aren't, but they don't seem to be taking it personal." I guess that's the difference. That's one of the things I need to point out to you is that when we, agents, Task Force officers would argue with them, it was in a professional sense and it was not taken personally, but that changed when Mr. Mountcastle and Ms. Rottenborn got into power because it was almost like "Do what I say because I'm the Assistant U.S. Attorney. You either do what I say now," or one of the phrases we heard, "It's my law degree. It's my law degree" and they threw that at us all the time. I was just like, "I guarantee you you don't care much more about your law degree than we care about our reputation down here. It's all the same so we need to work together," but it became very hostile and turned very personal, which is the big difference where it hasn't happened before. There's always been arguments. There's always been disagreements, but at the end of the day we were able to get together, work something out and move towards the goal, and our goal was to put bad guys in jail, and it became very obvious that they thought, Mr. Mountcastle and Ms. Rottenborn especially thought that they were better than us and they let us know that, that we were just supposed to do everything they say when they say. That's not my personality. It really is not so March of 2017 they came into, asked for a meeting with my boss. I was down in Florida with my family for a week. My boss says, "Hey, write something up" so I wrote something up, just kind of giving the background of the U.S. Attorney's office. They had the meeting and I got a phone call. I think I was back. I got a phone call and my boss told me that Mr. Mountcastle walked in his office with another Assistant U.S. Attorney and he said the first words out of his mouth is, "Billy is gender biased and we're going to Giglio him." I asked him, "What the heck am I supposed to do with that?" I said, "Gender biased, are you kidding me? They accused me of being gender biased?" He said, "They also said you use unprofessional language." I was like, "Okay, I'm guilty on that. I use off color language. I do." I said, "If that's what they said, I did it. I use off color language."

They asked me about a couple of different things I supposedly said, and I said, "Absolutely not." I said, "Those aren't words I would use. Those are absolute lies, and that became the error of what I phrased as the "gotcha era" where the U.S. Attorney's office was constantly making accusations against us, constantly, constantly. So what it first turned out is the first set of accusations

were they made the accusations against me that I was gender biased and that I used unprofessional language, which I said, "Okay, I do at times use unprofessional language. I'll work on that." Then they also accused another agent in my office of making, and we never really got what the statement was, but making some type of inappropriate statement four or five years prior. So I said, "BS on that" to my boss. I said, "Look, if he made some statement four or five years ago and it's so egregious, why wasn't it dealt with then instead of bringing it up four or five years later?" That just seemed to be the beginning of the era of accusations that were leveled against us by Mr. Mountcastle and Ms. Rottenborn and the other members of the Management Staff. Also you have to realize that inside that office, I don't know how else to say it, it's a mess inside the U.S. Attorney's office, and it is a very well-known fact within the Federal Law Enforcement community and the Federal Judicial community that there are a lot of problems in this office. They go after each other. There are demotions. There are you know people are getting security clearances stripped. There are a lot of unhappy people up there the way things are being run. Defense lawyers, we have a close relationship with a lot of Defense lawyers and we have to through our work. They said, "What the heck is going on?" The U.S. Attorney's office right, it's just, not my words, but a Defense lawyer's words, "It's in a shambles," and the hope is that Mr. (Inaudible) comes in here and straightens things out, but it is really bad.  So it is not just my office. They were targeting themselves. They were targeting other law enforcement, and it became a very, very adversarial relationship with law enforcement, but also with themselves as well.

Q.     In your case, Mr. Cunningham, and the agency worked for you when those complaints were made, you had the documents and information, you had your Internal Affairs people to review that, correct?  To respond to those allegations?

A.     Not exactly.  Not exactly.  We became much, much, much better in documenting our interactions with this U.S. Attorney's office.  We started saving e-mails.  We started making Management Log Entries on our case system, when the meetings, what was said because we were being told so many different things on different days by different, and it was just there was no set policies. They said they had policies, but they would change.  They would tell you one thing one day and then a

week later they would say "We didn't say that." It just became, it's hard to believe it got to that level, but it really, really did. You know I've had a lot of time to think about this and I wondered why my office, myself and my office were chosen and the only thing I could figure out is that I stood up to them. Actually I've been told this. There's quite a few people in the U.S. Attorney's office that still talk to us. They'll sneak down to the office or they'll meet me offsite so they're not seen and they'll tell me things in confidence. This includes a lot of the attorneys that I've worked with over the years, and I said, "What is it?" and he goes, "You guys stood up to them. You guys stood up to them and didn't back down from what you thought was right and they took it personal" and that's why they started attacking us.

Q.      Are you of the opinion that the letter Rick Mountcastle wrote July 20, 2017 claimed that Craig Frye was untruthful is a response to this toxic environment you're telling us about?

MR. CARROLL:  I'm going to object. I think that's speculative.

A.      There was -- I'm sorry.

Q.      No, go ahead.

A.      There was a continuing pattern of constant inconsistent complaints against me, against the people that work for me under my supervision. There was a constant, and I spent pretty much of the last year, all I've been doing is responding to various complaints by the U.S. Attorney's office. About the end of March I was talking to my Supervisor, I said, "Look, let's just do an Internal Affairs. Let's get Internal Affairs in here. If they want to say I used inappropriate language, I'll take my licks for that, but being gender biased and those statements they attributed to me," I was like, "Absolutely not. I'll take a polygraph on those right there." They said stuff about Agent Davidson about statements he made four or five years ago. I said, "That's just bunk." I mean you can't, if he said something that he shouldn't, it should have been dealt with then. So Internal Affairs came in. They never talked to me. ATF Internal Affairs, they never talked to me, never to anybody in my office, never talked to my former female partner who I worked with for seven years, seven or eight years, never talked to the former female Federal Prosecutor I worked pretty much exclusively with for four years, never talked to any of the clerks. They talked all the hand-picked witnesses in the U.S. Attorney's office that Mr. Mountcastle and Ms.

Rottenborn gave to them and they hand-fed them the witnesses. At the end of the day, they came back that "their allegations against me were without substance". That's what it came back as, that the allegations against me were without substance. I heard through the grapevine, through various things, through the people that still talk to me in the U.S. Attorney's office that the Management Staff of the U.S. Attorney's office was livid. They were livid that I wasn't dealt with properly as they felt, that it was cleared. What I did get was a non-disciplinary letter of caution, which doesn't even go in my file. It basically was a letter from my SAC, my Special Agent in Charge, saying "Be mindful of unprofessional language." Everything else, the gender bias allegations went away. It was then that we started feeling the defiance against the different agents and officers, different agents and Task Force office in my office. I've been in the Roanoke Field Office since 2001. Giglio was never threatened against everybody. In the past year, Giglio has been threatened multiple times against three of my agents and two of my Task Force officers, over half the people that I supervise. This U.S. Attorney's office has taken this Giglio thing and they've used it as a bludgeon to try to beat us down or beat us into submission. I've discussed this with my own counsel, if there is a Giglio finding by the U.S. Attorney, there's very little recourse with this. So that was their threat and they've threatened to Giglio one of my brand new agents multiple times. It got to the point where we had to transfer him out into a different office and judicial district because we were afraid that they were going to ruin his career. They threatened Giglio on another one of my agents. They've threatened Giglio on another Task Force officer and obviously, they Giglioed Craig Frye. So that became their weapon of choice in the U.S. Attorney's office. All I've done is respond to allegations by the U.S. Attorney's office. I've got a three-page allegation right before Christmas. I spent two weeks marking it up, and I just sat down with my boss for a couple of hours and say, "This is my right. This is the end of the year."

The good part of that is that our documentation has gotten a lot better, but there is such an air of distrust. I won't meet with, I will not meet with the Management Staff of the U.S. Attorney's office alone and I highly recommend, I can't order my guys not to, but I recommend they don't either, and that seems to be holding true because we never know what's going to be said or how things are going to be

characterized. I mean they have told outright lies about us. They've told outright lies about me. They've told outright lies about different agents and Task Force officers in my office. If you would have told me two years ago that this would have happened, I wouldn't have believed it. Again, it's not just towards my office. I mean they're doing it in their own office and there are problems with people in the Federal Law Enforcement community that are all very well-known. These accusations, and that's all I've done for the past year is respond to accusation after accusation, and then they would have to withdraw the accusation. The e-mails would be there or the documentation would be there. Like I said, there are a number of Assistant U.S. Attorneys that still talk to me. I said, "I've done everything they've asked" and I was told this is the punishment. This is the punishment for not doing what they said, punishment for the Internal Affairs investigation not going the way they want it to is that my punishment would be to have to keep responding to all the allegations by the U.S. Attorney's office management and that my guys were going to be constantly attacked. I was told this on a number of occasions by a couple of different Assistant U.S. Attorneys and people in that office. I guess I'm used to it by now, but it was very shocking when I first heard that, that it became that petty, that vindictive, that personal. I mean these were professional disagreements. These were something new. I've been arguing with the U.S. Attorney's office for 18 years. People in my office have been arguing with the U.S. Attorney's office. It became personal and not at our level.

     Q.    Mr. Cunningham, with that explanation and this background, are you of the opinion that the letter that Rick Mountcastle ultimately filed against Craig Frye is a continuation of that toxic environment you just told this panel about?

     MR. CARROLL: I would restate my objection. He's just speculating.

     JUDGE APGAR: I'll let him state his opinion.

     A.    In my opinion, absolutely. This is a continuation. They have gone after me, they have gone after my agents, they have gone after my Task Force officers, and they got him.

     Q.    You talked earlier about this game of "gotcha", the timeline here is that they asked the Giglio questions of Officer Frye on April 27th, 2017 and then on May 3rd, 2017, right after that,

they go to get the documents to compare that with his answers. Is that the type of "gotcha", the game of "gotcha" you're talking about?

      A.     Yes. I mean I think, it is my opinion that what they did to Craig Frye is well choreographed, well thought out. One of the Assistant U.S. Attorneys told me that the investigation they did on Craig Frye had a predetermined outcome even before it was started, and this person was in the know in the U.S. Attorney's office. That's why it's so, you know, it's not easy for me to sit here and tell you these things, and I fully expect to have some type of retribution leveled against me, but I'm telling the truth. I'm sitting here looking you gentlemen in the eye and telling you the truth, that this U.S. Attorney's office under this Management has so far skewed off the path and for whatever reason, the reason I think was because we stood up to them and challenged their authority that they went after us and they went after us personally, and I think that's what they did to Craig Frye. It was a symptom or a continuation of these attacks no my office. These attacks haven't stopped. I mean as recently as December, I've been having to do this. As soon as they found out, they seem to have subsided now, but they found out that I was granted a transfer. So I'm truly hoping that for the people that I have left in my office that they will be left alone, but that doesn't help Mr. Frye right now.

      Q.     You had indicated before that in the past before the Mountcastle era that you would work with the U.S. Attorney's office and their attorneys and looking at the material and together you all would try to decide what's Giglio and what's responsive. Is that how it was done in the past?

      A.     Yeah, but you know, it came up. Nobody in my office has testified more in Federal Court or sworn Affidavits than I have. I'm not bragging, but it's just a fact. I have testified in more judicial processes, sworn to more, I've been an affiant or co-affiant on I can't tell you how many Federal Affidavits, and I can't recall that I was ever once given a Giglio Questionnaire. I can't recall. I cannot look you gentlemen in the eye and say I was absolutely never given one. I just don't remember ever being given it. Normally what it is is anything, I mean, and we've talked about this on almost a daily basis since I had to remove Craig from my Task Force. This is how it was generally given, "Has anything changed since last time? No." Okay. It's that quick. That's what it is. Giglio was brought up. We had

some training in my office through my Division Counsel on the Giglio training. Quite frankly, I couldn't

begin to recite anything that was said. Giglio came up in the U.S. Attorney's office for a while and then it

just kind of went away. I mean I was the lead case agent on a pretty significant case out of Lynchburg

and I was never, and I testified in Grand Jury and Court, and I was never Giglioed. It's much different.

You can't weaponize under the administration of the U.S. Attorney's office.

> Q.      So do I understand your testimony, you said that from the common practice of

how all the officers there were dealing with this, was the Giglio response that you all would be given an

update or would you have to go back and recreate from the beginning of time your answers to a Giglio

question?

> A.      Like I said, I couldn't tell you the last time that I was asked a question on Giglio.

I could not tell you the last time. It's been years, but since Craig Frye, I had to remove Craig Frye from

my Task Force and it has been almost a daily conversation, not every day, but we talk about weekly, and

we talk about the arbitrary disjointed way that even to this day that is administered by this U.S.

Attorney's office. I became the acting RAC in June of '16 and then got promoted later that summer and

these problems were starting that I described earlier, were starting to kick off. I was like, "Look, you

guys are changing a lot of policies. You are creating an adversarial relationship. If these policies are

going to change, then you need to provide us some type of training."

> Q.      Did you ask for training of Giglio, the procedures?

> A.      I asked for training quite a bit from the U.S., not just on Giglio, but all the things

they were changing.

> Q.      Did they ever give you that training prior to this event involving Craig Frye?

> A.      No, they didn't, and I asked them for it. I've asked them on at least three or four

occasions I asked them for training. I said, "Come down to my office. I'll have my guys. It doesn't

have to be anything formal. We'll sit down and go over your policies because you tell us this policy is

this, but then in practice, depending on which attorney we use, depending on which day, the policy

changes" and it changed all the time. You know it became a comfort level with how we worked or who

we worked with in the U.S. Attorney's. We all had our favorites and we all got used to the way, you know, my favorite was Morgan Scott, and Morgan Scott and I worked very well together. I knew what he expected from me and I knew what I expected from him. Craig Frye worked with an ASUSA named Andrew Bassford and they worked very well together. So things were done differently. So I asked for training. I said, "If you're going to change these policies, then you need to give us some sort of training with that."

Q.     Was it denied the training?

A.     They said it was coming. So the training was coming.

Q.     With your understanding of the common practice within your office, talking to the other agents, dealing with Giglio, and the simple question this panel wants to hear about today when you gave a Giglio response, you gave a prior disclosure, when you were Giglioed again or asked those questions, was that just an update or did you have to go back to the beginning of time and go through it all again?

MR. CARROLL:  I'm going to object. I think he testified he didn't recall answering any Giglio questions.

MR. WEBB:  He talked to his other officers regarding common practice.

JUDGE APGAR:  Go ahead.

A.     Yes sir. Like I said, we talk about this daily, you know multiple times during the week this comes up. What happened to Craig sent a shock wave through my office and because it's so permanent because there seems to be very little, once that decision is made there's no appeal process as far as appealing Giglio. So we do talk about it. So no, I have not been Giglioed in years. I have not been asked a Giglio question myself in years, but talking with the people I supervise, most of the time it's "Has anything changed? Has anything changed since the last time?" You know Ms. Rottenborn, who sets this policy, implements this policy, you know she doesn't apply it the same way. She asked one of my agents a couple of months ago during his Giglio, "Has anything changed since the last time?" She never asked him all the questions. She never did it. She worked with another agent, another ATF agent getting a

warrant in the Western District of Virginia which she's never worked with before that I'm aware and did not administer Giglio at all to him, and that's what we were told, that prior to going to a Judge and swearing out any Affidavits, the Giglio test would be applied. This is the managing AUSA and the officer who sets this policy never even gave him that Giglio. I have another ATF in my office who has been here probably going on four years now. The first time he got his Giglio examination was just a couple of weeks ago at the end of January, the beginning of February. So there's a very arbitrary way that this U.S. Attorney's office administers this Giglio policy and they seem to administer it based on how it suits their needs. We're told the policy is one thing, but the way they administer it is totally different. It depends on the day, it depends on the person, it depends on, like I said, even the Management Staff who sets this policy doesn't follow their own policy. So yes, most of the, talking with my people that work for me, most of the time the Giglio policy, or the Giglio Administration, it's given as "Has there been any changes since last time?"

> Q.      So it's an update?

> A.      Yes.

> Q.      It's not a disclosure?

> A.      Right. Now what their official policy is and how they implement it is two

different things. After Craig was removed and I believe at that point he was on suspension from the Vinton PD, they finally set up a training. They finally set up a training for us. Our office was the first office and my Division Counsel came down to me, my ASAC, my Acting Supervisor came over and they gave use five or six hours of training with a lot of emphasis on Giglio and they said, "You will be given Giglio prior to testifying in the Grand Jury, prior to testifying in Court, prior to swearing out an Affidavit every time, and that policy to this day is not followed even by the Management Staff. We've had follow-up training from my Division Counsel because it is a huge, huge, huge issue in my office and my Division. Our Division Counsel came down and gave a supplemental Giglio training after all of this, after Craig Frye was suspended.

> Q.      Did you all change your policy based on what's happened to Craig Frye?

A.      Absolutely.

Q.      Yeah, I bet you did.  Tell them about that.

A.      I want to make sure I get this right.  Our Division Counsel, our Division lawyer, said that we have, first of all we don't see it.  The Assistant U.S. Attorney sits there and reads it to us.  We're not shown the paper.  I don't know that it's being hidden from us, but it's not something that's right in front of our face.  At least not in the discussions I've had with Mike Ives.  The questions are read.  We need to insist that the entire form is read to us, that "Has anything changed since last time?" is no longer working.  We need to insist that they change, that they read the entire form to us.  So they're supposed to read the entire form to us.  We're supposed to answer each question individually.  We're supposed to, you know, if we got caught shoplifting in high school, we're supposed to divulge that, but we just don't know what's Giglio and what's not.  If I had to answer Giglio again, there would be a lot of things I would have to review back when I was a kid that they may consider Giglio.  I don't know.  That's the thing.  We don't know what they consider Giglio these days.  That's the arbitrary process that they do.  So we're told to ask for every question to be read.  There is a question, if this is still their form, and I'll talk about this form here in a second.  Question Number 10 on the version of the form I have says, "Do you now or did you during any time in the involvement with the case take any medication or other substance which impairs your ability to perceive or recall?  If "yes", what medication, what dosage, and how often?"  We are instructed we are not to answer that.  We are supposed to respectfully decline to answer that question.

Q.      Is your office now having someone internally produce documents now of the U.S. Attorney to respond to that Giglio?

A.      That's the last part.  The last part is where we're supposed to tell them, "In case I missed anything, please check with my Internal Affairs Division to make sure that there's nothing in there that I don't know about or that I neglected to tell you."  So it's a catch-all.  You know, in case I didn't tell you something, please check with my Internal Affairs.  Now I think the panel may know and you may not know, this is a version of their Giglio form.  I don't know what version it is.  There's no standardized

forms for the Department of Justice. I work for the Department of Justice. There's a standardized form for everything, but my understanding, what I've been told is there is no standardized form, that each judicial division comes up with their own set of questions. I assume they're similar. I don't know the answer to that question, but that's another thing that strikes me very strange is that you know if this Giglio issue is such an important issue, why isn't there a set of standardized questions. We can't interview somebody, do a hiring interview unless we have standard questions. We can't just ask them questions.

Q.      Let me show you, I'm going to show you Exhibit 8. This is on the issue. This is the panel has expressed to me that they want to have information regarding this update policy and how it works. So I want to show you Exhibit 8. Can you identify to the panel what Exhibit 8 is? (Showing to witness)

A.      Yes. Myself and another agent had a meeting with the U.S. Attorney's office in reference to another agent. There were more accusations against this agent than he would tell them so they were threatening Giglio. We met with AUSA Laura Rottenborn, Ashely Niece, and Jennie Waering. During that meeting we, I think if I remember correctly, we got most of it worked out, the issue that I was dealing with at that time. Then at the very end as we were leaving, I asked Jennie Waering, whom I've known for probably about 18 years, I asked her, I said, because we had been told that they were doing an investigation on Frye and that office was, like I said, was a very small community. We knew there was something going on and we were told there was something going on with Frye. So I asked Jennie, I said, "What's going on with Frye? What is your office doing with Frye?" and she said, "It's a routine Giglio investigation." Well, looking back on it now, I think the investigation, at least from my perspective, was anything but routine. I asked her some questions. I said, "How does it work? Is it an update, and this is well before the training that they provided us last year, "Is it an update or are we supposed to do it every time, talk about everything we ever did or ever been accused of?" and this is the e-mail I got back from her that we were supposed to do it from top to bottom every time, which doesn't make a whole lot of sense because they keep files on us anyway. They keep a Giglio file on everybody anyway.

Q.      She answered "Once a 'yes' answer is in our Giglio file, it remains there. It does not go away. Old 'yes' answers can lead to letters requesting updated information", correct?

A.      Yes sir, I see that.

Q.      So from your understanding of what she's telling you, you knew they had a Giglio officer there maintaining a Giglio file, correct?

A.      Yes. My understanding is each one of the U.S. Attorney's offices, Charlottesville, Harrisonburg, Roanoke, and Bristol maintain Giglio files on agents, officers, detectives, and investigators.

Q.      And you know that Mr. Frye, in his response to Shelvey, you've reviewed some documents here, you know that he told Ms. Shelvey, "Go see my Giglio file. Beyond that, between the last time I gave it and now, my answer is 'no'." Is he proper in giving that type of response saying "Go see my Giglio files. It's got the information I've sent. Beyond that, there's no update." Is that the way you knew it was done in your office and is that proper for Mr. Frye to do?

MR. CARROLL: Objection to the characterization that it's proper. I don't know that, you can certainly ask him if that's the way he's done it himself.

Q.      Was that the common practice in, well, I think it is proper. From your understanding of the Giglio policy, you think that was, as you all understood at the time, was that proper for Mr. Frye to do that?

MR. CARROLL: Objection to the question. He's not with the U.S. Attorney's office so I don't know that he can deem what's proper, though I think he can testify as I just stated.

JUDGE APGAR: Go ahead.

Q.      That was the standard procedure. I mean that was the standard procedure. Again, as I said, in the many, many, many conversations, most of the time "Has anything changed from last time?" and I've actually witnessed because I sent one of my agents upstairs to go, I think to go swear out a Search Warrant and I didn't want him to go up there alone so I went up there with him, and that's how the Giglio test was administered. "Has anything changed from last time? No" and that was it. In

talking with my guys, that's how it was administered the majority of the time, that's how it's still administered at times, if it's administered. Again, what their policy is, I think I told you what the policy, how it was explained to us is that prior to us testifying, swearing to an Affidavit, that we would be given this Giglio.

Q.     This is the training you had after the Frye event that you're talking about?

A.     Yes sir. How it is actually enacted to us, at least in my office, is still very haphazard, very, you know, it depends on the day. Like I say, my guy, one of my agents has been here almost four years. The first time he got the Giglio exam was a few weeks ago. So there are problems there. There are problems, there are issues there, and in my mind -- well, I'll let you ask the next question.

Q.     I want to move on. In addition to your testimony regarding the update policy, I want to ask the type of information that's supposed to be responsive to Giglio. I want to ask you some questions about that. Are all complaints of the bias or truthfulness that exists in officers' files, regardless of whether they're founded or unfounded, are they required to be turned over or is a finding important, from your understanding, for the ATF's office and what's supposed to be produced prior to the Craig Frye event?

MR. CARROLL: I'm going to restate my objection, Your Honor. He's not with the U.S. Attorney's so I don't know that this is within his bailiwick.

JUDGE APGAR: Well, his office is in his bailiwick.

A.     Prior to we didn't know what to put down. We have been told since then by the training from our Division Counsel that if we even think it's near to it, we're to tell them about it.

Q.     That's now after Frye?

A.     That's now after Frye.

Q.     I'm talking about before. Was the common practice there, were you responsible for turning over every complaint or was it findings that were irrelevant?

A.     My understanding it was if we were currently under investigation at the time, we had to divulge that, but if it was, if a complaint or something or an allegation was unfounded, that it didn't

rise to Giglio, but there's a lot, you keep saying "policy" and common practice. The common practice is the policy, we didn't really have an idea of what the policy was.

Q.      Because you never got training from Rick Mountcastle's office, what he wanted, correct?

A.      Correct.

Q.      I'm going to move to the charges real quick and I'm going to apply to –

JUDGE APGAR: Mr. Webb, when you say "the charges", are you talking A through E?

MR. WEBB: Yes, and his application of those.

JUDGE APGAR: I think that's up to the panel. Who has the guidelines that were in operation at the time –

MR. WEBB: I can tell you he is the Supervisor, just like Mr. Foster has, he as his Supervisor has reviewed those charges and has an opinion that he would provide to each of you whether he thinks that's misconduct because he is the Supervisor too.

A.      I want to just clarify something you said, sir. Chief Foster was his Supervisor, like if Craig Frye worked for me, he worked under me, but his ultimate Supervisor was Chief Foster.

Q.      At the time?

A.      Yes, or whoever was the Chief of Police at the time.

JUDGE APGAR: But I think if he's testified to what he believed the guidelines were, that if it was unfounded, unsubstantiated or otherwise not found to be a viable complaint, that they didn't report it and they thought that was fine. I mean we can do the math too.

MR. WEBB: I agree. Thank you, Judge. Let me see if there's anything else?

A: If I may, sir, I think it's also important to point out that as kind of a catch-all and based on my reading of Chief Foster's is that Craig Frye told them, "and check with Bassford because there's something in my file" and at the time Andrew Bassford was the Giglio Officer for the Relevant Field Office, and that's what we were instructed to do with now, but we were instructed to go to IA. So it's kind of a catch-a, "Hey, in case I missed something, check with Bassford or check with the Giglio

Officer" because they maintain files on us, and this all came to light, just so the panel knows, Craig and I have known each other for a very long time.  We worked together when he began working down in Radford and then up here, and he and I worked a number of cases together.  So I do have personal feelings for him.  I want everybody to know that and I've been very clear with that.

Q.      Would that in any way prevent you from testifying truthfully today?

A.      Absolutely not.  I wouldn't lie for him or anybody else.  I'd take a bullet for him, but I wouldn't lie for him.  When he said, "Check with Bassford," that was the catch-all.  It used to be a team effort with the U.S. Attorney's office.  There's no doubt in my mind or anybody else's in my office that he was set up by the U.S. Attorney's office.  If he wasn't, then they would have asked for some clarification.  They was no – they got the answers they wanted from him the first time and they did it over the phone, which I don't want to say that's improper, but they got the answers and there was no follow up, nothing to ask him.  When this reared its head back in 2009, it was an arson case he and I were working, he was asked for clarification.  He worked with Jennie Waering.  He provided Jennie Waering his full file.  She was given the file and my understanding is that she went to Judge Conrad.  I don't know if she showed him the file, but she represented the file to him, and this is when this whole thing started, and there was, in my mind, a very serious breach by a Defense lawyer, Terry Grimes, who Craig Frye talked to about some personnel issues he was having here.  Terry Grimes, he did not, I do not know all of the details of how he was hired, Craig Frye relayed to him some of the details of the personnel issues he was having with his supervisors at the time.  He was not hired and all of a sudden Terry Grimes started representing one of our suspects in the arson case and started bringing up stuff Craig told him in private as lawyer/client.  To me, I'm not a lawyer, but that was a clear breach right there.  At the time that was a very big deal to the U.S. Attorney's office because they were supposed to pursue it and they barred complaints against Mr. Grimes.  That never happened, but this, when this all came up, I think it was 2009, 2010 --

Q.      If I show you Exhibit 18.  Is that what you're referencing?  Is that this In-Camera Review by Jennie Waering that's our Exhibit 18? (Showing to witness)

A.      Yes. There's something about this that the panel needs to know too. I can't speak for everybody in my office, but I know Craig and I know I never knew this Motion, this piece of paper existed until the date of that e-mail that you showed me when she gave me that. We had no idea. I said, "What?" because she talked about a ruling from Judge Conrad on the Aaron Woods case. I'm like, "What are you talking about?" and that's when she gave me a copy. I brought it down to Craig. I said, "Have you ever seen this?" because I'd never seen this. I mean we weren't even aware. I wasn't aware. I took him at his word that he wasn't aware because he looked shocked at it too that this document actually existed. We had no idea. We were never shown it. I don't know if it was on purpose or if it was unintentional, but it's something we weren't shown until last spring.

Q.      Is this Cooley letter which you referenced, the October 22nd —

A.      I've seen this before, yes sir.

Q.      And you knew that Chief Cooley at the time had reviewed his entire file for Brady/Giglio stuff to reveal that, correct?

A.      Yes sir. I saw this at the time. I mean this was, it was an arson case not too far from here that Craig and I were working together, and that's when all of this came up and there was a traffic stop when Craig was off duty and it was an investigation. It was unfounded, but that's when all of this came up. You know up until then we never, I mean I heard the word "Giglio". I really had no idea what it was. I had heard it, but I remember seeing this letter at the time. I think Craig showed it to me that Chief Cooley said he reviewed his whole file, and Craig told me his whole file was given or a copy of the file was given to Jennie Waering.

Q.      His Personnel records?  ...

A.      His Personnel records, yes sir.

Q.      And Craig Frye then got his Personnel record to take it and give it to them?

A.      That's my understanding, yes sir.

MR. WEBB:  And I'll tell you, Exhibit 19 is the Personnel record, for the panel, that we're talking about. I think that's all the questions given the panel's statement about —

A.      I had a lot of time on my hands before I came in here so I jotted down some notes.

JUDGE APGAR:  You really have to do it in response to a question.

MR. WEBB:  And he was going to go through the charges.  I understand the panel's statement, you can do the math.  I can hear what you're saying on that so he won't do that, but I'll stipulate for the record.  Well, let me just ask you this question.

Q.      After reviewing all the charges of which you've seen here, and we won't go into each one of them because we want to make this efficient, but after you reviewed all the charges, do you believe Mr. Frye committed misconduct based on the common practice you had there, of understanding what needs to be disclosed, and the update policy, do you think Mr. Frye committed misconduct in intentionally lying and preventing, not revealing information under Giglio?

MR. CARROLL:  I have to object.  I think that's requesting an opinion from him.  It's not asking him about his experience as based on being with the ATF.  It's just asking for his opinion.

JUDGE APGAR:  That may be a little too far.

MR. WEBB:  Well, let me say, Judge.  He is, I think Mr. Foster has made his finding.  Billy here basically was his Supervisor at ATF.  He's the person who knows Giglio and he's now reviewed the charges –

JUDGE APGAR:  He can go ahead and answer.

A.      I will say that I –

MR. CARROLL:  I would object.  There's been no showing that he knows anything about the town's policy.  I mean you're asking him to speculate about things –

JUDGE APGAR:  He doesn't know anything about the town's policy.

MR. WEBB:  I'm not asking him about the town's policy.  I'll change the question.

Q.      Based on –

MR. CARROLL:  This is why we don't ask this type of witness these kinds of opinions.

MR. WEBB:  Well, you asked your witness about it.

MR. CARROLL: He's the one that made the decision.

MR. WEBB: This witness is his Supervisor too and knows about Giglio.

JUDGE APGAR: Revise your question.

Q.       I'm revising my question.  Based on your review of this entire record, Mr.
Cunningham, including your understanding of the update policy and your understanding of what type of
information should be disclosed in the Giglio, do you have an opinion of whether Mr. Frye committed
misconduct to the charges you reviewed?

MR. CARROLL: I'm stating my objection for the record.

JUDGE APGAR: Yeah, I'll go ahead.  I don't think he can answer that.

MR. WEBB: Okay.  Can I stipulate his answer for the record?  Can I have him answer it
as a stipulation?

JUDGE APGAR: Sure.

Q.       What's your opinion?

JUDGE APGAR: He's just stating it for the record.

MR. CARROLL: Am I going to cross exam him the stipulation?  What are you
stipulating?

MR. WEBB: He's going to provide his answer and then there'll be a stipulation.  I
understand.

JUDGE APGAR: It's a proffer really.

MR. WEBB: A proffer, yes, it is.

Q.       What's your answer to that question?

A.       What I have to say is that it is my true belief and the rest of the people in my
office that the Giglio Questionnaire given to Craig Frye was not given in good faith.  They had the
answer.  They already knew what they were looking for and what doesn't make sense and why they
should have asked for clarification is why would he try to hide something that he'd already given to the
U.S. Attorney's office and then lie about it?  It just doesn't make sense.  The full file was given back in

2010. Chief Cooley did it. There was an allegation by an Assistant Commonwealth Attorney. That was unfounded. He told them. He notified the U.S. Attorney's office. It was unfounded. In my mind, that's a nonissue. Why would he turn everything over and then lie about it later? I just think that this whole process by the U.S. Attorney's office lack in ethics and was given in bad faith. They knew what they were trying to do and they got the answers they wanted.

      MR. WEBB:  Thank you. You can answer any questions Mr. Carroll may have.

      CROSS EXAMINATION – QUESTIONS BY MR. CARROLL

Q.     For the past couple of years the U.S. Attorney's office has had a few occasions where they've been called on the carpet I guess by the Federal Judiciary on some Giglio and Brady issues, is that right?

A.     Yes sir, and your law firm participated.

Q.     And that may be what explains the increase potential to Giglio and Brady issues?

A.     Yes sir.

Q.     So it may not just be the arrival of Mr. Mountcastle, there are external factors that could be in play here?

A.     I cannot speak for Mr. Mountcastle or anybody else in the U.S. Attorney's office. What I can speak to is what I observed, what the people in my office that I supervise observed and experienced, but as far as their intentions, I wouldn't even begin to go down that road, sir.

Q.     Have you filed any bar complaints? Some of these accusations you've made, have you filed any bar complaints against members of the U.S. Attorney's office?

A.     With the bar?

Q.     With the state bar?

A.     Not as of yet, no. I have filed complaints with IPLG and the Department of Justice.

Q.      Are there any pending U.S. Attorney claims or accusations against you now?  I think you mentioned some had been dealt with already and found to be unsubstantiated.  Are there any pending presently?

A.      Not that I'm aware.  Well, we'll see what happens after today.

Q.      Have you ever been arrested?

A.      Yes sir.

Q.      Have you been asked that question in Giglio?

A.      No sir.  Like I said, I don't remember asking.

Q.      You don't remember being asked?

A.      I actually have been arrested twice.

Q.      If you had been asked the question, would you have answered "Yes"?

A.      Yes.  It's on every one of my background investigations I've ever provided.

Q.      Do you know when Laura Rottenborn came to the U.S. Attorney's office?

A.      Four or five years.

Q.      Was it before Mr. Mountcastle?

A.      Oh, yes.  Yes.  She was a line AUSA.  She was promoted to a supervisory position by Mr. Mountcastle after he demoted a number of very experienced attorneys.

Q.      She was there under Heaphy and then she was there under Fishwick, you believe?

A.      I know she was there under Fishwick and I won't swear she wasn't under Mr. Heaphy, but I know for sure she was under Mr. Fishwick.

Q.      You said you removed Mr. Frye from the Task Force?

A.      Yes sir.

Q.      Was that your responsibility as, I know you said you weren't the supervisor, but as the Resident Agent in Charge?

A.    How it all went down, sir, is that we were on an operation down in Bristol, Virginia, working with our Bristol office in Grayson County where we did a mass arrest roundup.

Q.    I want to advance things. I'm not trying to cut you off. You can say that if you want to, but were you the one who did remove him?

A.    Yes. I received a call from my SAC and my ASAC telling me that Mr. Frye had been Giglioed by the U.S. Attorney's office and he could no longer testify and that I had to remove him from the Task Force office. I believe I talked to Chief Foster later that same day.

Q.    So his inability to testify going forward was the reason he was removed?

A.    Yes sir. He's not an ATF employee and he was, I don't know how to say it, he was no good to ATF anymore.

Q.    If he had been an ATF employee, would he have been terminated, reassigned?

A.    My understanding is that he would have been, that our agency would have provided at least a defense to that or some type of investigation into it. If it held, then if he had more than three years passing a probationary period and would have to be transferred to a non-investigatory position.

Q.    A position where he wouldn't testify?

A.    Correct, and if in the case of one of my agents who did have three years on and we transferred out, he would have been fired because he didn't have his full three years on. The ATF wouldn't have held onto him for his career.

Q.    As you said, you don't remember the last time you were asked Giglio questions by a member of the U.S. Attorney's office?

A.    No sir.

Q.    Do you testify frequently?

A.    Not anymore. I used to testify a lot.

Q.    When did you stop testifying?

A.    When I became a Supervisor which was 2016, almost two years ago.

Q.      So that would have been during the administration when Mr. Fishwick would have been in charge?

A.      Yes sir.

Q.      But when you testified in 2016, you don't remember being asked Giglio questions?

A.      I'm adamant I didn't get asked in the last set of jury trials I had up in Lynchburg with Judge Mintor.  I never got, and like I say, I want to make sure I'm clear about this.  I'm not telling you I've never been –

Q.      Okay, but you don't remember?

A.      I don't remember it.  I may have been asked over the years, "Has anything changed since last time."  Again, that whole process takes 10 seconds.

MR. CARROLL:  I don't have any further questions.

JUDGE APGAR:  May he be excused?

MR. WEBB:  Just two questions.

REDIRECT EXAMINATION – QUESTIONS BY MR. WEBB

Q.      What is the effect, can you tell the panel what the effect is if they uphold misconduct from the issue of Giglio for Mr. Frye?  In your opinion, can he work as a policeman anywhere else?

A.      No.  He can never testify in Federal Court.  I did review Chief Foster's report and based on my reading of Chief Foster's interview of Mr. Leach, that they would have to divulge that and he's tainted.

Q.      In essence, if it's upheld he had misconduct from Giglio, he's done as a police officer, correct?

A.      I can't say.  In my opinion, federally, nobody would touch him unless he never testified in Federal Court.

Q.      The issue Mr. Carroll asked you about arrests, were you guys ever given any training or information on whether you have to reveal expunged arrests?

A.      Expunged arrests never, not until this.  We never even talked about expunged arrests.  It was never even brought up.  It wasn't brought up during the training.  Let me rephrase that.  I don't recall during the U.S. Attorney's office the issue of expunged arrests.

Q.      You're talking about after Mr. Frye got fired.

A.      After.

Q.      How about before, did you receive any training about whether expunged arrests have to be revealed under Giglio?

A.      No sir, not that I recall.

Q.      Lastly, do you have an opinion regarding the character and integrity of Mr. Frye?

A.      I've worked with Craig Frye a lot of years and I think I was honest with the panel that I think very highly of him.  He is one of, as far as detective, and I could go into story after story about how his investigative instinct has solved cases, has brought things around.  I know you're going on time. I trust Craig Frye with my life, and if he told me something, that I wouldn't question it.  As a matter of fact, the times that I have questioned his, not his integrity, but his investigative sense, he's made me look like a fool, and he was right and I was wrong.  You know I have no issues with his integrity.  I trust Craig with my life.  I trust Craig with my family's life, and quite honestly, that group of people I trust like that is very small on one hand with a few fingers left over.  I'm not placing any blame on Chief Foster or the Vinton PD, but this Giglio Questionnaire was given to him in bad faith with an intended outcome by this U.S. Attorney's office, and I cannot testify to their motives or their intentions, but it appeared to be continuing acts against my office to keep us in line and it did, and I'm here to tell you that when he was Giglioed and I had to remove him from the Task Force, it sent shockwaves and these shockwaves are felt today in my office that this rule could be used like this.  They should have asked him for clarification. They stress team, team, team, teamwork.  That's what they stressed during this training and the U.S.

Attorney said it's a team effort. There's nothing "team" about what they did to him. They got the answers they wanted and they didn't ask for any clarification and they moved forward.

      MR. WEBB:  Thank you, Mr. Cunningham.

      JUDGE APGAR:  May he be excused?

      MR. WEBB:  Yes.  Craig Frye is my next witness.

      The next witness, CRAIG FRYE, having first been duly sworn, testified and stated as follows:

DIRECT EXAMINATION – QUESTIONS BY MR. WEBB

Q.      Will you introduce yourself to the panel?

A.      My name is Craig Frye.  I've been a police officer since February of 2002.  I started in Radford, Virginia, came to Vinton the end of August, first of September 2004, and I got assigned to the ATF Task Force in March of 2008.

Q.      You heard the panel's interest in this case as far as the avenue they want us to explore and discuss, and I'm going to do that so they get the information they have to look at this case. So I'm going to go right to it and cut to the background.  I want you to tell the panel your understanding of the practice there with the ATF, when you responded to a Giglio request, is it an update if you've given a prior disclosure or do you have to go back to the beginning of time?

A.      It was always my understanding after this 2009 debacle that happened, that it was just an update.  I had to provide an update.  Sometimes it was "Has anything changed?"  One time they e-mailed me the Questionnaire and I responded "Nothing new".  It was always an update.  I've never had to start over from start to finish, and I've answered the questions the exact same way every time since the 2009 incident.

Q.      Meaning you've said "No" because there's been no change in the update?

A.      Correct.  Now since 2009 two things have happened to me, two accusations have came out.  One of them is this sexual harassment thing and the other was the Holohan complaint.  In both instances, although I can't remember which one I was talking to, but in the Holohan incidents I can

remember clearly. We were working a case, myself and Don Wolthius, that complaint came in. I came down here and met Ben Cook. It was my impression that Holohan didn't really make the complaint. Ben Cook had actually spoke with him and then Cook did the complaint and all that. I left that meeting with my complaint letter and went and met with Wolthius because I was like, "Oh crap, this is big." I tell Wolthius we have a meeting. He said, "This is very important. Keep me updated. Let me know." I basically was benched for this short period of time. I think it was almost a month. When I say "benched", I didn't do anything new on the case. I didn't want to taint any more stuff just in case the ruling came back and it was not in my favor. I got called maybe a month later by Ben Cook and he had to exonerate the complaint he wrote because it was unfounded. I immediately left here, went straight back to Wolthius and sat down and said, "It's unfounded. The complaint is over with. It's unfounded." I don't remember giving him a copy of the document, but I obviously had it. We got it back from the U.S. Attorney's office so I'm assuming I did. But at that time, Wolthius said, "Great. It's unfounded. We don't have to deal with it." So in my mind, "I don't have to tell you about that anymore. It's unfounded. I'm over and done with that."

The sexual harassment complaint, that happened after 2009. That was something, I had many meetings with Chief Cooley over this sexual harassment stuff. I was told in part, April more specific, withdrew her complaint. Both complaints were on one document, but for her part, April Alterio withdrew her complaint because we're friends and had been friends and she withdrew her part. The other part, the third meeting I left Chief Cooley's office, I was told it was dropped. I was told that I didn't get along with Valerie and then I was told to go back there and swallow my pride, be contrite, and apologize and try to move forward, and that's what I did. So in my mind it was dropped.

Q.   So that complaint, there was never a finding or anything on that complaint?

A.   At the third meeting with Chief Cooley, I had my response to that complaint ready. I actually contacted the PDA. I was going forward with this because this is, you have to understand, I guess I need to give you a little bit of history about me. I started in 2004. Craig Harris and Ben Cook were the detectives. Ben Cook was the Narcotics Detective. The day I walked in the door,

Craig Harris was telling all the other employees that he vowed to have me fired two weeks of being hired. If I had known that mess had started, I'd have stayed in Radford where I was happy. I just got tired of driving to Radford. I lived in Roanoke and I got tired of driving back and forth. So I didn't know that at the time. This is stuff I've learned after years of being here, but every time I turned around I was getting some complaint. You mentioned being late for work. There's some silly rule you've got to be there 15 minutes before your shift starts and you had to stay, you know, it's a 7:00 to 7:00 shift and it's 6:45 and you stay till 7:00. Anyway, I walked in at 6:50. I was talking to an officer in the parking lot, Jack Custer to be exact. I walked into the officer's room. Andrew Corbin looks at me and says, "Write a memo of why you're late." Ten minutes after that another officer walks in behind me and nothing is said to him. This place has been a nightmare for me. Every step I took I kept getting complaints and complaints and complaints. I heard crap like, I'm very good at getting dope on traffic stops. I don't know. If I pull over a car, the driver hands me a bag of dope. It was my luck and how I worked. I'm good at that. Valerie made the statement that there's no way that he can get that much drugs unless he's into drugs himself. This is stuff that my co-workers are telling me. So this ATF position comes along and the Chief says, "I'm going to give it to you. Get out of here. So over there, stay over there. You don't need to come to town anymore. That's your new gig." Every once in a while, an update and then even in between that, my first case I did at the ATF office, this is all leading up to the 2009 event. This is how big of an event 2009 was for the U.S. Attorney's office and me. My first case was a guy named Brandon Rolen. I didn't know what I was doing. I was under the direction of Mike Soleno, Special Agent with the ATF. Every move I made, Mike Soleno told me to do it. Valerie heard reports, read a report about a stolen firearm and begins a parallel investigation. I'm not credited with that term, but that wasn't my term. That was what was told to me justifying why it happened. So Valerie begins investigating me on my first case working for the ATF, but what she didn't realize is she was actually investigating the ATF because I was doing what Mike Soleno told me to do. He's the agent, and that led to Mark McIntire calling me at 11:00 one night. Mark is the previous resident agent in charge, who I first went there and started working for. It was a very heated conversation, not towards me, but towards this agency. Mark basically says that he's

thinking about getting Valerie charged with obstruction based on all the crap that she had done on my first case. All this happens. They submit a memo to the Commonwealth Attorney that basically says I'm stealing firearms. I learned about this, not from my Department, not from the Commonwealth Attorney, but from the defendant sitting on the stand yells, "Talk to me about this." That's how I learned. So I asked Mary Kelly. She showed me some memos. So I'm over at the ATF, but I'm still trying to testify in the county court and all of this is coming out in the midst of this arson case. Then we have this arson case and prior to that I get pulled over in 2009. I was speeding. I left Corned Beef in downtown Roanoke and one of the girls that just graduated the Academy couldn't graduate with firearms. She had to go back through firearms training in the midst of trying to graduate, the Glock locked, cut her face. They had to get another weapon for her. She goes back and still qualifies at the same time. We were rather excited so we go celebrate her stuff. I'm not a big drinker. I never have been, but I had a couple of beers. I leave there and I'm going 45 in a 25 and I get pulled over for speeding. I'm in my car, my personal car. I get pulled over. The officer comes up, asked me for my stuff. I hand him my license. Probably four or five months prior to that we had been in a pursuit together so he recognizes me. He says, "Oh man, where you going?" I said, "I'm just going", before that he asked me if I had had anything to drink. I said, "Yeah, I just left Corned Beef." He recognizes me and said, "Where are you going?" I said, "I just leave a couple of blocks away." That gets turned into a couple blocks to a couple of miles. I was the road that I lived on right here at the Transfer Station. I don't know if you all know, it's where you take all the trash. There's two houses there. You go across 460. That led to Mason's Mill. There's I think six or eight roads before you got to my house. So when I said a couple of blocks, that's what I meant. I was in my car. He had my tag. He knew where I lived. It's not like I was, but Ben Cook decides to investigate this. Somehow he finds out.

I get a call from a high ranking officer at Roanoke City who says, "You've got a guy over here trying to do you." I sent an e-mail to the Chief, "What's going on?" The Chief said, "I heard about it, but there's no IA going on anyway at least to this memo, the traffic stop memo." I don't agree with this memo because it says at the bottom it's a written reprimand and the Chief says it's not a written

reprimand. I'm in the HR Department meeting officers up there. I said, "It says it's a written reprimand at the bottom of it. I'm just confused because I'm not standing for this." The Chief calls me out of HR, calls me down there and says, "I didn't know this was going on. This went way too far. This is not a written reprimand. It's not in your file. Don't worry about it. Get out of here." Okay. I go hire Terry Grimes because I am done of being accused of being a drug user. So I hired Terry Grimes. When I say "I hired him", I went and had a meeting with him. He told me what to bring back. I had another meeting with him. I brought back documents to include my personnel file stuff, all this stuff that's in my file from the past to include the traffic stop letter and we agreed that he was going to write a Cease and Desist letter to Vinton telling them to knock it off and then we were going to pursue a civil action against the town for allowing all this crap to go on, and to certain employees. In the meantime, he gets appointed to represent, not hired, he gets appointed by the Federal Public Defender with a list in the Court to represent Aaron Woods at the first Hearing. I guess it was a Probable Cause Hearing or it could have been a Bond Hearing. I'm not sure. At first I'm testifying, Mr. Grimes starts going after me based off the stuff I gave him. I answered the questions because it is what it is. I answered. We lost. We went on. I went away for a weekend. I came back and I talked with Billy Cunningham first, told him what happened. He says, "Man, that is completely improper." We went straight upstairs to Jennie Waering and we had a meeting over this. Jennie Waering says, "I'm just going to send Terry Grimes and e-mail and tell him to get off the case and it will be no harm, no foul." So she does that. Terry Grimes says he didn't represent me, "I never represented him. He never hired me" and he takes all my information that I gave him and files it in Federal Court as inevitable discovery. So Jennie Waering says, "Oh crap. Go get me a copy of your Personnel File" and listed all the things to do so she can prepare for whatever Terry Grimes is going to do, and then she started fighting to get Terry Grimes removed.

Q.      The panel knows that's Exhibit 19 when you got the Personnel File?

A.      I came down here and met. I called her first and then I came and picked it up. Beth Austin is her name. When I walked into Beth Austin's office, she has a manila envelope sealed and a binder of loose paper together and she handed me the file. I looked at that and I looked through the file

and I said, "Great! Hey, some of these things are old. Shouldn't they be removed?" and she said, "Oh

yeah. It's my policy after 24 months some of this stuff is removed," but regardless, I took what she

handed to me and I went straight to Jennie Waering's office and I gave it to her. I don't know what she

did with it, but I handed her every bit of it. Then Terry Grimes ultimately gets removed from the case,

but he didn't concede. He got removed by Judge Conrad. Then all my file went for review. I don't know

what all she took out of that file to Judge Conrad. I wasn't a part of this. This was In Camera –

        Q.      Is that Exhibit 18, the Motion in Camera Review?

        A.      I saw that. She sent me that showing me what she was doing, but I wasn't a part

of the In-Camera. I don't know what was reviewed. I don't know what was taken over there. I only

know what I provided her which is my entire Personnel File as I know it here. Then she, on her own,

without my knowledge, contacted Chief Cooley, I guess asked him the questions and he supplied the

other attachment to that.

        Q.      The October 2009 letter?

        A.      Right, where he basically says, "I've looked at everything and there's nothing

here" and that is how I took that. So in my mind, from 2009 back, there's nothing there. There's nothing

there I've got to discuss. Jennie Waering agreed with it, Chief Cooley agreed with it, and I have no

reason to question any of that decision. It was never brought up again. When I was asked Giglio again, I

knew they had a Giglio file on me because –

        Q.      You're talking about the Federal Government maintained one?

        A.      The U.S. Attorney's office had a Giglio file on me, and the reason I knew that is

every U.S. Attorney that I dealt with had to talk about this traffic stop. I didn't produce this, they did

every time I went to Court, if I was going to testify. So this was common knowledge. Like when a new

U.S. Attorney came in there and they were covering, especially the new older ones like Dan Newbar, I

had to have a special meeting with the Judge and say "They've got this memo and I just want you to

know." So that was no secret. Every U.S. Attorney's office knew that I had this "Giglio problem".

Towards the end I started working with Andrew Bassford because he's just easy to deal with, no drama.

When I started working with Andrew Bassford, we began talking about this Giglio issue and I've been given the ruling, but I was told the ruling out of that was that Judge Conrad ruled that I could be asked if I had I ever been accused of lying and if I said "No", they could bring out this memo and just tear me up because somebody from this Department had accused me of lying. My response to that was, "Well, if you take out the memo, I still have to answer 'Yes, I've been accused of lying'" I mean if you want to go back, I've been accused of lying a lot in my lifetime. It was never substantiated, never sustained, but I've been accused by, I've just been accused a lot in my life especially at this Department. So Andrew Bassford starts telling me that he thinks Jennie Waering threw me under the bus. What he means by that is he thinks she did a poor job of defending this letter because nothing else fit under it so why would this letter fit under it. I even asked that question. Out of all the crap in my Personnel File, why this? This wasn't in my file and the Chief says, "No, no, this was done outside my office." I didn't get an answer to that. So we began working with Bassford and I said, "Why don't you challenge this for me?" I don't remember if it was me that brought it or him or both of us talking, but it was my and Bassford's plan under the right circumstances to not look like we were judge shopping, to get it back in front of Conrad during a, where a Defense Attorney, we were actually hoping for Paul (Inaudible) because he would be the one to do it, where a Defense Attorney would challenge you on this to turn over the letter, and then he could take it back in front of Conrad and have another In-Camera Review and see if he could get Conrad to change his decision because Bassford said, "This falls under the same regulations, this unfounded stuff. We don't have to turn over unfounded stuff. This goes to unfounded. This does not apply. I think I can win this, if I can get Conrad to change his mind," and everybody knows Conrad is not going to do so. So that was the plan. From there on out, I dealt with him and we did Giglio. He never did Giglio with me, but I did Giglio with other people that I had to deal with and it was always, "Nothing has changed since 2009." The last time when Ms. Shelvey called, you don't know how proud I was to say "I've got nothing." I mean there's nothing from five years, 2012 to now. There's nothing new. I'm proud to say that I've kept out of trouble, kept my nose clean, and there's nothing there, and at the end of that conversation, because I didn't know, Giglio, the ruling of Conrad doesn't kind of fit any of those

questions. It doesn't kind of fit any of the molds and I don't know who Ms. Shelvey is. If she walked in

behind me today, I couldn't point her out, but I know she worked for the Western District of Virginia. I

know, now even though it was the Harrisonburg office that I was dealing with, it was from a case I did

here in Roanoke. So they're working with U.S. Attorneys down her as well, not to mention they work

under Rick Mountcastle. So at the end of my conversation, I did tell her about the traffic stop, that was

the ruling as I knew it. I threw everything out there that I knew about this traffic stop, and at the end I

said, "Go get with Andrew Bassford. He has my file and he'll explain the rest." Then I hung up

immediately with her and then I called Andrew Bassford and I said, "I just spoke to Ms. Shelvey." He

said, "Yeah, I know who she is." I said, "I told her to get with you on my Giglio stuff, you have my file."

He said, "I do. I have your entire file here." I said, "Okay, I just wanted to give you a heads up. She's

going to be calling you."

        Q.      So the core principles of your filing the Giglio is that once you make a prior

disclosure, you're only updating. Is that correct?

        A.      That is how I understood it. As Billy said, he said "To accuse me of hiding

something that I'd given to the U.S. Attorney's office before makes absolutely no sense." I don't know

why I would be accused of that. It just doesn't make sense to me that that would be the accusation.

        Q.      Then on the types of information you're supposed to disclose, you heard the town

say, "Oh, it's any allegation even unfounded." Is that what you understand and is that how you applied

the policy the entire time you've been there?

        A.      No. It was unfounded stuff did not meet, and the stuff that the town turned over,

and we can go through it one on one, some of this stuff I've never seen before, he turned it over. I've

never seen it. The e-mails from 2004, nobody has ever shown me that. The 2004 and 2005 stuff, I've

never seen that. There's, I don't know, five or six things in the stuff that he turned over that I've never

laid eyes on before he turned it over.

        Q.      So with those two core principles that you only turn over founded sustained

complaints and it's an update, I want to look at the charges and go through them with the panel so they

know what you did.  Let's start with Exhibit 4-E.  Let's just go through that rather quickly.  That charge is what you're talking about, the charge that they're saying that you didn't turn over this Gilio Order which is Exhibit 18 and you didn't reveal the traffic stop memo that was in Exhibit 18.  As I understand your testimony, have you found that?

> A.      No.  The Exhibit Number, the white ones.  Okay.

> Q.      That's after the Motion In-Camera.  You're aware of the Charge E that we've said about the charge that you didn't reveal this information, correct?

> A.      Yes, but I want you to know that Government Exhibit 1is from the U.S. Attorney's office.  That's from the court case.  This is their document that was supplied back to me.  So to say I didn't turn it over, but yet I get it back from them doesn't make any sense.

> Q.      And you're saying that you had been testifying where they would take their Giglio file and they'd turn over the traffic stop memo lots of times before?

> A.      Every time I had to get in front of the Judge when there was a different attorney that I was dealing with, like with Bassford, he did it once.  I don't know what he would do.  I don't know if he called the attorneys themselves.  I don't know his process for that.

> Q.      So the town's problem with what you answered that day is that in reference to some sustained finding or allegation from a judge you said "No", but then you went ahead and say, "Hey, go see my Giglio file.  There's a Court Order.  There's a traffic stop document in there," and you told Ms. Shelvey that?

> A.      The Court Order is not.  I said that there was a ruling from Conrad.  I don't really know about the Order.  The first time I seen the Order is when Billy came down from the U.S. Attorney's office and handed it to me, and I even wrote the date on the top of that Court Order.  I don't know if it's on there or not.

> Q.      I think it is.  It says May –

> A.      May 31st, "Given from Billy Cunningham by Jennie Waering and Laura Rottenborn."  That's the first time I've ever seen that document.

Q.      So the accusation here of misconduct, Mr. Frye, is that basically they're saying you said "No", but you did tell them, "Go see the Giglio file.  There's this memo in here and there's a traffic stop document in there"?

A.      Correct.

Q.      So why did you say, I mean it's almost inconsistent.  Why are you answering "No" to that, but then telling them about the exact document they're saying you failed to disclose?

A.      Because I go back to the 2009 event and from there on there's nothing new to disclose.  I don't know where this document right here, this document and the ruling that I understood fits into any of those questions that were asked of me.  I listened over the phone.  Please keep in mind that I was on the phone and I shouldn't have been, but I'm still doing my work.  I'm not even in my cube.  I'm in somebody else's cube.  So I'm listening to these questions, and I don't know where that document, any of that fits, any of that crap.  So instead of saying I don't have anything at all, "Just go check with Bassford.  He'll give it to you.  He'll explain it all.  He has my file," because I'm working with him.  He's going to give it to them to get rid of that Giglio issue I have.

Q.      Tell the panel a little about you heard the town's position that you've got to go back from the beginning of time and have a candid conversation of all your stuff, and as we've seen here today, it takes hours to take through all of this stuff.  How long was your normal candid conversation when somebody called you up?

A.      Like I said, one time it was an e-mail.  The second time was, I mean you're talking mere minutes.  This conversation with Ms. Shelvey lasted maybe five minutes or less on the phone.

Q.      Is there any way possible in five minutes you could review all the stuff from beginning of time to now?

A.      If I knew that I had to review start to finish with me, I would never have spoke to her.  I would not, because there's no way in the world that I could ever make any sense out of any of this crap.

Q.      And you know that there's a Giglio Officer who has your Giglio file, who has the material that you're updating as things happen?

A.      Correct.

Q.      So would you have had access to documents and stuff that you could have said, "Okay, now I'm going to give you from the beginning of time to now"?  Would you have even had that to produce?

A.      Well, actually my file, when Jennie Waering was done with my Personnel File, she gave it back to me and I kept all of that information in my cube at the ATF office.  So knowing that I would have to give it all over again, I did have access to give it all over again.  It was kept and there.

Q.      But when you answered the question, when you answered that question to Ms. Shelvey, you're answering it as an update?

A.      Correct.

Q.      And that's based on how you've done it over how many years?

A.      From 2009 till this incident, I've answered the questions exactly the same, which is "No" to every one unless they were asking for an update and then I just say, "There's nothing new."

Q.      Let's go to Page 11, Charge A, and this is the assertion that you did not turn over an arrest, and that's dealing with the expungement issue.  I want you to tell the panel why you didn't tell Ms. Shelvey that you had been arrested?

A.      Well, when I came to Vinton and got hired, I had not had that record expunged.  I got hired with that still on my record.  It was about a year later, give or take, that I actually went forward and got it expunged, and it's always been my understanding that, and I've even seen it on police applications because I've applied to other Police Departments to leave here, that when they ask for stuff like that, it's very specific, especially on police applications.  "Have you ever been arrested, including expungements for any crime" and it goes on.  It always includes that little caveat when it's asking for it, and if it doesn't include that, then in my mind and how I always noted it and how I learned from the expungement laws and all this stuff I went through to get that done, I don't have to disclose that.  As a

matter of fact, I think I've subsequently learned that if I did disclose it and then you tell somebody about it, you're kind of violating the law in that aspect because you now learned about it in your (Inaudible). So that doesn't make sense to me why I would have to tell you about it if you can't even tell people about it.

Q.     Did you ever receive any training from the ATF or from Rick Mountcastle telling you that expunged arrests must be disclosed in this response?

A.     No, never.

Q.     Did you in good faith give your answer that day that you had no arrests based on what you knew?

A.     Yes.  If it had not have been expunged, I would have told everybody about it.

Q.     I want to talk next on Page 12 about the (B).  This is Attachment 5 and Attachment 6.  Attachment 5 is the racial insensitive remarks.  Attachment 6 is the joke where you changed some internet site to a homosexual website.  In reference to the first one, the racially insensitive remarks, did you in fact disclose that, and if so, when?

A.     That's in my Personnel File that I gave to Jennie Waering.  That is there.  That's out there.  It was a sustained finding.  I couldn't grieve it because I was on probation at the time, but it's out there.

Q.     So you disclosed it?

A.     That was in my file that I gave Jennie Waering.  That's the file that's in here now.

Q.     That's under Exhibit 19, the Personnel File, and that document is actually contained in that file when you disclosed it, correct?

A.     Correct.

Q.     Why wouldn't you disclose that and 12 years later when Ms. Shelvey is asking you this question?

A.     Because I had previously disclosed that.  That is in my Giglio file, as I understand it.  It was in my Giglio file.  I've already, if I had to redo that, I had to redo everything else

that I've already done, and it was my opinion that these questions are merely an update, especially this debacle that I had in 2009.

Q.     Let's talk about the homosexual website there. Was there ever any sustained finding? Was there ever any complaint? Was there ever any investigation of that?

A.     No. What I was told about it is that the gentleman that opened his website did so with Lieutenant Corbin over his shoulder. He saw that, and my back luck. He saw it. He was going to do an investigation to see who did it. Now I learned of that. I told somebody, "Don't do an investigation. I did that," and they said, "Okay, just write a memo and don't do it again." That was the response to that memo.

Q.     And you're aware that Chief Cooley, and that's in Exhibit 18 and the Government's Number 2, you're aware that Chief Cooley reviewed all of your documents prior to 2009?

A.     Correct.

Q.     What was your understanding based on Chief Cooley's review and Jennie Waering's review about what you had in your file as to what you had to disclose to Giglio at that time?

A.     It wasn't disclosed by Chief Cooley and to me, I don't see, we can debate this if you want, but I don't see where that answers any of the questions that were asked. I don't see where that's an answer to any of those that were asked, not how they were asking me and not how I understood them. If Chief Cooley hadn't answered in 2009, I wouldn't do it in 2017.

Q.     And to your knowledge, that wasn't in your Personnel File?

A.     No.

Q.     And it wasn't a sustained finding?

A.     No.

Q.     So you would have even had access to that document? Did you even know where that document was?

A.     No, I didn't know it existed when I did the memo to, I guess it was Corbin.

Q.    You heard Chief Foster say that when he started searching around, he wasn't aware of this Disciplinary Scanner File.  Did you know there was such a file?

A.    I learned that from Chief Foster, and to be quite honest, our miscommunication I think in his office where he thinks I asked him to shred his files, I was angry when I found out there was what I refer to as a secret file on April's computer.  I've had to learn the policy working for the Town of Vinton pretty well and there's nowhere in the policy that says April Alterio can keep any kind of disciplinary action, any kind of file like that on her computer.  Our policy is very clear.  It stays in his office, locked up.

Q.    Or if it's sustained, it's in your Personnel File?

A.    It goes in my Personnel File.  The only official Personnel File that's here, the only official one is the one in the HR Department.  That is by our policy.

Q.    So when you spoke to Ms. Shelvey in 2017, given Chief Cooley's letter, you have the Motion In-Camera letter, that all dealt with stuff before 2009, did you in good faith answer that question "No"?

A.    Yes.

Q.    Let's look at –

JUDGE APGAR:  Mr. Webb, I don't mean to presume too much, but Mr. Frye's already testified at length as to why he thought that the sexual harassment charge was not founded.

MR. WEBB:  That's the next one.  Okay.  We'll skip that.

JUDGE APGAR:  He's already testified at length that as soon as he got what he thought was an "all clear" on the Holohan problem, he hand-carried that to Don Wolthius who turned that over.  So he's testified to that.

MR. WEBB:  Yes, that's (D).  Okay.  Then that's all the questions I have for you.

JUDGE APGAR:  Any cross?

MR. CARROLL:  Yes, a little bit.

CROSS EXAMINATION – QUESTIONS BY MR. CARROLL

Q.      Mr. Frye, I'm going to bounce around.  I apologize.  Your request for relief in this Grievance is fully reinstatement, is that correct?

A.      That's correct.

Q.      You were a detective with the Police Department?

A.      That's correct.

Q.      It is correct, is it not that the job description for a detective in the Town of Vinton Police Department requires you to testify in Court?

A.      That's correct.

Q.      That could be State Court, that could be Federal Court?

A.      That's correct.

Q.      If you were granted your relief that you've requested, you would not be able to perform your job duties?

A.      I think it would be incumbent upon the town to correct the misinformation that they have, which would then hopefully solve those issues.

Q.      Do you understand though that the panel doesn't have any impact directly over the U.S. Attorney's office?

A.      Oh, yes.

Q.      And it doesn't have any impact over the Commonwealth's Attorney's office?

A.      Yes.

Q.      And you've not been subpoenaed to testify in Federal Court since this determination was made?

A.      No.

Q.      And the subpoena with regard to which was introduced previously with regard to Randy Leach, that subpoena --

A.      The one in 2017.

Q.      Yes, you are correct.  There was one in December of 2017.  You were not actually called to testify that day.   The witnesses were released, isn't that correct?

A.      That's correct.

Q.      And that is a stamped subpoena so you don't know if that was actually ever reviewed by Mr. Leach?

A.      It was sent from his office.

Q.      And there were at least three Vinton Police Officers who were subpoenaed for that case?

A.      I don't know who else was subpoenaed.

Q.      You agree that if there were three officers subpoenaed, then that would provide corroborating testimony which would conform to —

A.      It depends on what part they were going to ask of my role.

Q.      Fair enough, and you don't take issue with Mr. Leach's position that he would have to disclose the Giglio letter to Defense Counsel?

A.      I think Mr. Leach, if he knew one, that I wasn't a convicted felon and things on that, but he would be very hesitant of what he would release.

Q.      You were here when Chief Foster said he told Mr. Leach that you were not a convicted felon.  That it was an expunged arrest.

A.      Yes, but I'm also aware that the November letter, two months after I was fired still says —

Q.      I understand that, but it's the U.S. Attorney's letter, correct?

A.      But does Randy Leach not have that letter?

Q.      I don't know the answer to that.  You were removed from the Department of Justice Task Force?

A.      Correct.

Q.      You heard Mr. Cunningham indicate that it was because you could not testify in Federal Court?

A.      Correct.

Q.      And that indeed, depending on how many years' experience you had, you would lose your job with the ATF if you had been an employee or be reassigned to a non-testifying position?

A.      Correct.

Q.      Did Ms. Shelvey ask you each of the questions?

A.      I'm fairly certain she read most of the questions to me.

Q.      So she did not just say, "Is there an update?"  She did go through the questions?

A.      She did go through the questions.

Q.      And one of the questions she asked you was "Have you ever had a past criminal charge?"

A.      Yes.

Q.      And you answered "No"?

A.      Correct.

Q.      I understand the whole expunged issue, but you did answer "No"?

A.      Yes, that's correct.

Q.      You mentioned in your direct testimony that you were aware of Judge Conrad's ruling because you and Mr. Bassford wanted to get him to change his mind?

A.      Correct.

Q.      When were you dealing with Mr. Bassford on that?

A.      Up until this.

Q.      But I mean that ruling was in 2009 so when did you start working with Mr. Bassford?

A.      Oh gosh, probably three or four years ago.  When I say we were looking for the perfect scenario, as everybody knows, you don't want to upset the Judge or make it look like you are going around him.  So we had to have the perfect scenario.

Q.      I completely understand that.  I'm sure Judge Apgar understands that as well, but you were aware of the Judge's ruling a few years ago when you started working with Bassford?  You had not seen it, as you testified, but you were aware of the ruling?

A.      Yes.  What I was told of that ruling was that they could ask me that question and if I answered that question incorrectly then they could use that letter to try to impeach me.

Q.      The ruling is your word, that you were aware of Judge Conrad's ruling?

A.      Yes.

Q.      And you did not mention that to Ms. Shelvey?

A.      I did mention it to Shelvey.

Q.      You mentioned the traffic stop.

A.      Which is his ruling.

Q.      I agree with that.

A.      That is exactly what I mentioned to Ms. Shelvey.

Q.      You did mention the ruling?

A.      Yes.

Q.      And you don't know Ms. Shelvey, right?  I think you testified to that.

A.      I don't know if I would know her if she walked in her.

Q.      So you mentioned the ruling, but did you mention the traffic stop?

A.      Yes.

Q.      That underlined the ruling?

A.      Yes, because that is a prevailing Giglio issue that everybody has to deal with.

Q.      I understand.  But you had not worked with this U.S. Attorney before, Ms.

Shelvey?

A.       I don't know.  I am unfortunately terrible with names and I worked in the Harrisonburg office before.  I've worked with the U.S. Attorney that was handling the case before.  Like Grayson Hoffman is his name.  I've worked with him several times before, but I need to put eyes on Ms. Shelvey to tell you whether I know her.

Q.       Have you ever been asked Giglio questions by anybody in that office before?

A.       I don't know.

Q.       So it's possible this was your first interaction with this office?

A.       It's probable that it is, yes.  Like I say, I've worked with Grayson Hoffman, who is, it's the satellite office up in Harrisonburg.  I've worked with him several times.

Q.       So they didn't have a history with you to know some of these things.  I understand that they may have reached to Mr. Bassford or had that opportunity to?

A.       You know, when all this happened, I called Mr. Hoffman, Grayson Hoffman, and I asked "Why did you contact Vinton?" because to me the timing was terrible.  All of this was going on with Billy.  He explained all this animosity in the U.S. Attorney's office.  Well, I've learned my lessons and I wasn't part of that.  I didn't get, I thought I had good relationship with just about everybody.  I wasn't part of all this stuff.  I'd get involved sometimes when they would want to release who my informant was prior to the guy coming clean.  So I wasn't involved –

Q.       Did you ask Ms. Shelvey, go back to the arrest question for example, did you ever think to ask her, "Well, let me ask for clarification, Ms.Shelvey.  Would an expunged arrest count?"  Did you ever ask her for that kind of clarification?

A.       No.

Q.       Did you ever ask her or any other Giglio questioning AUSA about Mr. Holohan's concerns and whether the fact that there was a memo in the file that said it was unfounded and that you no longer had to disclose it?

A.       When I spoke to Wolthius about that, that is the impression I left out of his office.  It's unfounded.  He read, obviously, he has the complaint in a letter, and that I was done with that.

Q.      So you never brought it up again when asked Giglio questions to even ask –

A.      It was unfounded and it was unfounded material that did not have to be turned over.

Q.      You relied exclusively on Mr. Wolthius' statement in that regard?

A.      Yes.

Q.      And you agree that relying on the comments and the opinion of the U.S. Attorney's office is what you would do in that situation?

A.      That's what I did, yes.

Q.      I know that Judge Apgar said that you did testify at length about this already so I'm going to wade hopefully quickly into this. You were under the impression that the comments by Ms. Alterio or the concerns by Ms. Alterio about the comments had been dropped?

A.      I was under the impression that Ms. Alterio withdrew her part of the complaint and that the other part of it was dropped.

Q.      You don't disagree with the underlying, you heard what was characterized, "Take off your clothes", joking, horseplay, whatever it may have been, that comment was made?

A.      On the April Alterio part?

Q.      Yes.

A.      Absolutely. On the other part, emphatically "no".

Q.      You did not put tape over her mouth and pretend to kiss her?

A.      No.

MR. WEBB: I think the allegation was put tape over his mouth, wasn't it?

MR. CARROLL: I will stipulate to that.

A.      It has changed several times throughout the writing of what it was. It doesn't make sense in any way that you say that. Let me add something to that right there, if you don't mind. It's really important. I've gotten too many complaints over the past year. I was kind of the joke at the Awards Ceremony that I'll never get a Good Conduct Award because I always got in trouble when all this

dumb crap had come up. In 2014 I got a Good Conduct Award from Vinton. That means I got a 10-year Good Conduct, but the definition of good conduct means within the last five years you've had nothing over a, I think it's an oral reprimand or oral counseling, and I got that award. So I was really proud that I got that award. This complaint, this sexual harassment complaint falls dead in the middle of that. So I promise you, I would have never got that award if that was anything other than the complaint being gone, and that is one of the Exhibits I turned in here to show you all.

MR. CARROLL: I have no further questions.

REDIRECT EXAMINATION – QUESTIONS BY MR. WEBB

Q.      Can you look at the Exhibit Book at Number 30, the Honors and Awards that you received, Mr. Frye?

A.      Yes.

Q.      Can you authenticate that those are the awards that you got?

A.      That is the ones that I can remember at the time of doing this, yes. That's the ones that I actually have a pen or a plague that goes along with it.

Q.      Okay, and you got the Good Conduct Award, which was a five-year award?

A.      Yes. Well, it said –

MR. CARROLL: Your Honor, we've not taken issue with these awards. They're in the record. It's beyond the scope of cross examination.

MR. WEBB: I'm just seeing if he can authenticate that these are what he's talked about. I just want to make sure the Exhibits are correct.

JUDGE APGAR: He's not objecting to the inclusion of everything under Tab 30.

MR. WEBB: Correct. No questions, Judge. I'm done.

JUDGE APGAR: Thank you. You may step down. Any other evidence?

MR. WEBB: No, Your Honor.

JUDGE APGAR: Anything, Mr. Carroll?

MR. CARROLL:  I do have a couple of witnesses that I have outside.  May I speak with the Chief and make a decision whether we want to bring any of those in?

JUDGE APGAR:  Sure.

MR. CARROLL:  Can we step in the hall?

JUDGE APGAR:  Sure.

(MR. CARROLL CONFERS WITH CHIEF FOSTER)

MR. CARROLL:  I think we're going to have one witness, Your Honor.  It will be very, very short.

JUDGE APGAR:  Okay.  Who do we have?

MR. CARROLL:  This is Detective Cummings.

MR. WEBB:  Judge, I do have I guess a Motion on this.  When we talked about what the testimony is, if she's going to talk about the testimony of the sexual harassment complaint and there's been testimony that complaint was dropped.  So I don't see getting into the facts of what happened is relevant at all to this inquiry.

MR. CARROLL:  Mr. Frye has testified the incident didn't happen.  I believe Detective Cummings will say it did happen.  I think it goes to credibility and then obviously, Dale can ask her about whether it was dropped or not.

JUDGE APGAR:  I think at a minimum, Mr. Carroll could do it as a proffer.

MR. WEBB:  That's what I think.  Just proffer it.

MR. CARROLL:  I don't want to concede that it's not admissible, but I don't have any problem with, like I'm going to ask her two questions.

JUDGE APGAR:  Okay.

(WITNESS SWORN)

The next witness, VALERIE CUMMINGS, having first been duly sworn, testified and stated as follows:

DIRECT EXAMINATION – QUESTIONS BY MR. CARROLL

Q.      Detective Cummings, you're a detective with the Town of Vinton Police Department?

A.      Detective Sergeant.

Q.      Detective Sergeant Cummings, you're with the Town of Vinton Police Department.  Several years ago did you have an incident with Mr. Frye?

A.      Yes.

Q.      I apologize.  I'm assuming you know some of the things we've been talking about, an incident which involved putting tape on the mouth and trying to kiss you?

A.      Yes.

Q.      Can you detail quickly what transpired for the panel?

A.      Yes.  It occurred in the Squad Room in the Police Department.  We were in there talking.  It was probably four of us in the Squad Room and he put some tape on his lips and grabbed me by my shoulders and put his lips on my lips and that was it.

Q.      Did you report that to your Supervisor?

A.      I told my Supervisor what happened.  I didn't make a formal complaint.  I just verbally said that this happened.

Q.      What happened with that verbal complaint after you did that?

A.      Nothing.

Q.      Did you affirmatively withdraw it or drop it at any point?

A.      No.  I guess because I didn't make a formal complaint, I didn't expect any follow through.  It wasn't mentioned.  It wasn't dealt with.  It didn't come back up until probably a year later.

MR. CARROLL:  I have nothing further.

CROSS EXAMINATION – QUESTIONS BY MR. WEBB

Q.      That, just kind of looking at the allegation, it says that at the time you were alleging something that had taken place two years before, right?

A.      It had been quite a while, and it only came up because something else had come up.

MR. WEBB:  Okay.  No further questions.

JUDGE APGAR:  May she be excused?

MR. CARROLL:  Yes sir.

JUDGE APGAR:  All right.  Thank you.  Any further evidence?

MR. CARROLL:  No, the town has no further evidence.

JUDGE APGAR:  So all the evidence is in?

MR. WEBB:  Yes, Judge.

JUDGE APGAR:  I have a couple of questions of the attorneys if I could.  It's sort of by way of asking for a brief summation.  What relief are you seeking?

MR. WEBB:  Well, Judge, this is a case where a misconduct –

JUDGE APGAR:  Let me back up a second.  If the evidence is sufficient to show that the actions of Mr. Frye were not willful and intentional withholding of required information, if that's what the panel concludes and that therefore the termination should not be upheld, what relief are you seeking?

MR. WEBB:  We're seeking that he be reinstated with the instruction that I think that Mr. Foster has agreed, if they find there's no misconduct, he'll make every effort with Randy Leach to see if he'll reverse his ability to testify there because I think Randy Leach has only heard one side of this and I think with this transcript and your finding, I think it will go a huge way with him in being able to testify and that's what we want.

JUDGE APGAR:  Okay, but the panel doesn't really have the authority to direct, I believe you're saying "Yes" or "No" on whether or not the determination is upheld.

MR. WEBB:  Right.  I guess if you say it isn't withheld, I understand from the testimony of Mr. Foster, Chief Foster is going to use the same vigor to try to fix that.  I understand that will be a separate thing, but it's kind of one step at a time.  That's the only result that we can get at this point is reinstatement to where we look at it.  I suppose if it gets to where he can't testify, maybe that's another

reason they have to let him go based on that, but to me if he gets reinstated, that's the first step, and if there's finding of no misconduct, we can then use that to fix all of this other stuff that's going on. That's our goal. I know your ability is limited as a "Yes" or "No", but if we do get a favorable result from that, it gives us options to take that and try to fix what's happened to this guy.

JUDGE APGAR: All right. Let me ask Mr. Carroll some questions. Is it the town's position that the only way to reasonably construe the Giglio requirements is by the direction given by the U.S. Attorney's office?

MR. CARROLL: The only way? If there were published guidance out there, I suppose that would be the other way.

JUDGE APGAR: Well, it's just that it would appear from the Chief's testimony that he utilized what the U.S. Attorney's office said, "This is what has to be done."

MR. CARROLL: Yes sir, I agree with that quote.

JUDGE APGAR: From time zero to the present and that's mandatory. There's no other interpretation of that. So is the town then having to rely solely on what the U.S. Attorney told them?

MR. CARROLL: As to whether or not there was a failure to show candor and answer the questions –

JUDGE APGAR: An intentional failure.

MR. CARROLL: Yes, and you know one of those, ADM 1-4, Your Honor, spoke in terms of impairing the reputation of the Police Department. I suppose you could have negligence which rises to the level of that if you were so sloppy in answering the questions. Three-nine does certainly refer to willfulness. That was in my opening. I pushed back on that a little bit because I don't think both conduct require willfulness. I mean the U.S. Attorney is the one who asked him the questions. He is going to testify with the U.S. Attorney so yes, they would be the driving force of what is an appropriate response and what is not an appropriate response, at least from the town's perspective. That's all we have to rely on in that regard because ultimately, at the end of the day, to your question to Mr. Webb, the U.S. Attorney's office has determined that they won't use him as a government witness, and you see that in

Chief Foster's findings on Page 10. I went back and made specific reference to that. The inability to testify is probably, if you look at the Termination letter which is in the Grievance File, it also refers to the inability to testify and performs the functions of a police officer.

JUDGE APGAR:  What do you say the panel should do with Agent Cunningham's testimony?

MR. CARROLL:  The way other people did it in the past?

JUDGE APGAR:  Well, I guess there's really two aspects of it. One, because there was no specific direction, they usually approached this as just updating, no changes, and two, that this was a purposeful means by which to get Officer Frye out of the picture.

MR. CARROLL:  It is quite clear that there is some high level of tension between the U.S. Attorney's office and the ATF.

JUDGE APGAR:  I blame Paul Beers.

MR. CARROLL:  It might be his fault, and I don't deny that.

JUDGE APGAR:  Just kidding, Paul

MR. CARROLL:  But there's a lot of blaming going on. That was a lot of speculation. I made a bunch of objections and we both did a good job of not objecting during this. There was so much speculation going there. Yeah, I think he can testify rightfully about past practices in the ATF and their interactions, but as far as casting dispersions on what the motivation of Mr. Mountcastle is, I objected to that. I don't think you can really glean much from that. I think respectfully we'd look at, again I have to defer to what the Chief asked the U.S. Attorney's office and what he learned from them and then to the questions that were asked and how they were responded to. But to your other question, Your Honor, I'm not sure, if you look at the Grievance Policy, at the end of that, and I'm not saying the panel has certain authority and doesn't have certain authority, but I don't know how you can restore him to a detective position that requires as an element of the job to be able to testify.

JUDGE APGAR:  It's sort of a Catch-22 conundrum.  Let's say just for the purposes of argument that he was in good faith innocently doing what he thought he was supposed to do and that the U.S. Attorney's office, for whatever reason, you know kind of dropped the hammer on him.

MR. CARROLL:  If like you're saying, Mr. Cunningham's testimony was accurate and it was a Catch-22.  I recognize that conundrum so therefore, I suggested a recourse is through the U.S. Attorney's office.

JUDGE APGAR:  Therefore, he might be entitled, and I think the Chief testified at least twice, that if it turned out that it was in good faith, and then he said that if it was a violation of Town Policy.

MR. CARROLL:  But then we have an officer who is –

JUDGE APGAR:  Who is being punished for something he didn't do wrong.

MR. CARROLL:  Well, that is on, particularly if you're hypothetical, that's with regard to Town Policy.  We don't have any impact on what the U.S. Attorney –

JUDGE APGAR:  Well, he may be restored, but he'll never be able to testify in Court again without running into you know all kinds of problems that the Commonwealth would have to deal with so therefore, he shouldn't be restored.

MR. CARROLL:  And that's why I would suggest that the recourse is with the U.S. Attorney's office.  Again, the town, 24 officers and they're all required to testify.

JUDGE APGAR:  Are there any questions anybody else wants to ask?  Fire away, either side?

MR. WEBB:  I understand the dilemma with the finding from the U.S. Attorney's office and what may or may not be a continuing finding the Commonwealth Attorney's office.  If the consensus is that if this wasn't willful and he should get his job restored, if those, at least the Commonwealth Attorney and possibly the U.S. Attorney, if that's not resolved in his favor, then he has a serious problem in discharging his duties as a police officer.  In the file on December 5, 2005, a written reprimand.  It's a last chance letter.  I don't know if anybody caught that or not.  It says, "You should understand this is a

229

last-chance opportunity.  Any further misconduct on your part may be result in your immediate dismissal

from the Vinton Police Department." My question is, is it proper, is it authorized if the panel decides that

this is not a willful and deliberate action on the part of Mr. Frye that he could be restored on probationary

status to see if he can be rehabilitated as far as his credibility to be able to testify, and if he can't, at the

end of the probationary status, if he can't overcome that, then that's the end of his problem.

      MR. CARROLL:  Well, I guess the answer to that is two-fold.  One, you have the

authority to (Inaudible).  So you could try to work something out like that certainly, if you reach that

conclusion.  The practicalities of the matter, I don't know if they've reached out, and I guess we should

have asked Mr. Frye that.  I don't know if they've reached out and tried that process or not, Dale.  Have

you to the Commonwealth's Attorney or to the U.S. Attorney's office?

      MR. WEBB:  Well, really it's kind of a several step process.  This is the first step.  If we

don't get past this, then we're done.  Then as far as this issue of misconduct, so once we get that resolved,

I mean it's a baby step.  This is the first thing and that's what we needed to try to get the result for him

that I feel like he deserves.

      MR. CARROLL:  Maybe this is not a conversation that we need to have now, but why

would you not use two tracks or why would you not start with them?  I mean this may have some

timeframes which would require you to start this process, but they wouldn't have forbidden it?

      MR. WEBB:  You're talking about?

      MR. CARROLL:  With the U.S. Attorney and the Commonwealth's Attorney.

      MR. WEBB:  Because it's too much water has went out past the stream here meaning

that they've got one side and there's not been a Hearing.  This Hearing, the transcript and findings are

going to be able to be used to start moving I hope some mountains, and we've got some mountains, but

without that, we have no choice.  So that's my goal.  If we get him reinstated and then we can use this

finding, this panel has had a Hearing, looked at this evidence, then we can start getting other people,

Leach, the U.S. Attorney.  There's avenues there, but we have to have that to get it.  So that's our goal.

MR. CARROLL:  I'm going to digress for a moment.  We did close the Hearing so I don't think you can use the transcript for anything, but we can talk about that at a later time.

MR. WEBB:  Okay.  So if you're willing to lie about it?

MR. CARROLL:  Yeah, we can debate that.  Talk with me about it.

JUDGE APGAR:  Well, I know the Grievance Procedure requires a responsive writing and they don't give us much time to write it.

MR. CARROLL:  We can extend that.  Dale and I have worked well on this.  If you gentlemen, and Dale and I have even talked about do we need to get you some very, very short supplemental briefing on the –

JUDGE APGAR:  Only if you want to.

MR. CARROLL:  Not on the facts, only on the burden of proof question we had.

JUDGE APGAR:  I think ultimately, and I'll hear from Mr. Webb, I think ultimately Mr. Webb and Mr. Frye have the burden of proof, we'll call it, by a preponderance of the evidence that the conclusion of the Chief and the steps up till now are incorrect, and I guess that can be based either or a fact.  So I think the burden is on you to say that what's happened before now has been incorrect.

PANEL MEMBER:  May I ask just one question?

JUDGE APGAR:  Sure.

PANEL MEMBER:  To you, sir, the only reason that their team would need to use the transcripts is to take forward the argument the Commonwealth Attorney should let him testify.

MR. CARROLL:  Again, I don't think Dale has any concerns about working with me on that.

PANEL MEMBER:  I got the impression that that was something that you might want to block even though the Chief said that it would be direction –

MR. CARROLL:  No, I just wanted to make sure that we were all on the same page.

JUDGE APGAR:  Let me ask one other question about the Town's Grievance Procedure.  Is there a step you take before the Circuit Court from this level?

MR. CARROLL:  I believe the Appellate options are simply to enforce the decision.

JUDGE APGAR:  Okay.  So we're it.

MR. CARROLL:  Yes sir.  There's no de novo review.  All the pressure is on you, Judge.  I mean collectively.  I didn't mean individually.

JUDGE APGAR:  Well, stealing a line from the "Wizard of Oz", I need to hob nob with my fellow wizards.  So we're going to excuse ourselves.  If you want to turn the record off, you guys can leave and we'll stay right here.

MR. WEBB:  We're happy to do that.  Do you want to deliberate tonight?

MR. CARROLL:  Well, I think we're going to have a Preliminary discussion.

JUDGE APGAR:  Let's turn the recorder off.